Justin Marceau (California Bar No. 243479)
2255 E. Evans Ave., Denver, CO 80208, jmarceau@law.du.edu

Matthew Liebman (California Bar No. 248861)
170 E. Cotati Ave., Cotati, CA 94931, mliebman@aldf.org

Matthew Strugar (California Bar No. 232951)
2154 W. Sunset Blvd., Los Angeles, CA 90026, matthew-s@petaf.org

Paige M. Tomaselli (California Bar No. 237737)
303 Sacramento St., 2nd Floor, San Francisco, CA 94111, ptomaselli@centerforfoodsafety.org

(*Pro Hac Vice* applications pending)

Richard Alan Eppink (Idaho Bar No. 7503)
ACLU of Idaho Foundation, P.O. Box 1897, Boise, ID 83701, reppink@acluidaho.org

Maria E. Andrade, (Idaho Bar No. 6445)
P.O. Box 2109, Boise, ID 83701, mandrade@andradelegal.com

Attorneys for Plaintiffs

_____

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

**ANIMAL LEGAL DEFENSE FUND,**                )
**PEOPLE FOR THE ETHICAL**                    )
**TREATMENT OF ANIMALS, INC.,**               )
**AMERICAN CIVIL LIBERTIES**                  )
**UNION OF IDAHO,**                           )
**THE CENTER FOR FOOD SAFETY,**               )
**FARM SANCTUARY,**                           )
**RIVER'S WISH ANIMAL**                       )
**SANCTUARY,**                                )
**WESTERN WATERSHEDS PROJECT,**               )
**SANDPOINT VEGETARIANS,**                    )
**IDAHO CONCERNED AREA**                      )
**RESIDENTS FOR THE**                         )
**ENVIRONMENT,**                              )
**IDAHO HISPANIC  CAUCUS**                    )
**INSTITUTE FOR RESEARCH**                    )
**& EDUCATION,**                              )

| | | |
|---|---|---|
| **COUNTERPUNCH,** | ) | |
| **FARM FORWARD,** | ) | |
| **WILL POTTER,** | ) | |
| **JAMES McWILLIAMS,** | ) | |
| **MONTE HICKMAN,** | ) | |
| **BLAIR KOCH,** | ) | |
| **and DANIEL HAUFF** | ) | |
| | ) | |
| | ) | **CASE NO. 1:14-cv-104** |
| | ) | |
| Plaintiffs, | ) | **CIVIL RIGHTS COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| **C. L. "BUTCH" OTTER**, in his official | ) | |
| capacity as Governor of Idaho; | ) | |
| **LAWRENCE WASDEN**, in his official | ) | |
| capacity as Attorney General of Idaho, | ) | |
| | ) | |
| Defendants. | ) | |

_____

The non-profit organizations Animal Legal Defense Fund, People for the Ethical Treatment of Animals, American Civil Liberties Union of Idaho, Center for Food Safety, Farm Sanctuary, River's Wish Animal Sanctuary, Western Watersheds Project, Sandpoint Vegetarians, Idaho Concerned Area Residents for the Environment, Idaho Hispanic Caucus Institute for Research & Education, and Farm Forward; the news journal CounterPunch; award-winning author and journalist Will Potter; animal agriculture scholar and historian James McWilliams; would-be-investigator Monte Hickman; freelance journalist Blair Koch; and agricultural investigations expert Daniel Hauff (hereinafter Plaintiffs), bring this Complaint and allege as follows:

## **INTRODUCTION**

1.     This lawsuit challenges Idaho's "ag gag" law, I.C. § 18–7042 (2014), as

1

unconstitutional.  The law creates the crime of "interference with agricultural production," which has both the purpose and effect of impairing the public debate about animal welfare, food safety, environmental, and labor issues that arise on public and private land.  In essence, the law criminalizes undercover investigations and videography documenting the "production of agricultural products for food, fiber, fuel, and other lawful uses."  The law makes it criminal to document animal welfare, worker safety, and food safety violations at an "agricultural production facility," thus "gagging" speech that is critical of industrial agriculture, including speech that advances significant public interests in protecting Idahoans' safety.  The statute defines "agricultural production facility" so broadly that it applies not only to factory farms and slaughterhouses, but also to public parks, restaurants, nursing homes, grocery stores, pet stores, and virtually every public accommodation and private residence in the state.  In doing so, the statute violates the First Amendment, the Supremacy Clause, and the Fourteenth Amendment of the U.S. Constitution.

2.     Since the early twentieth century, some of America's most storied journalistic endeavors have exposed inhumane and unsafe agricultural production facilities.  Upton Sinclair became a household name for exposing the unfair labor practices, cruelty to animals, and unsanitary conditions of meat processing plants in the early 1900s, and his exposé led to the enactment of the Federal Meat Inspection Act and the Pure Food and Drug Act.

3.     There is a long and celebrated history of journalists and activists reporting on industrial agriculture conditions, spurring enforcement, legislative reform, and public debate. The modern day accounts of the meat, dairy, and egg industries are no less compelling than those of a century ago when Sinclair wrote *The Jungle*.  *See, e.g.*, Timothy Pachirat, EVERY TWELVE

SECONDS (2011).

4.      In the last decade, animal protection advocates have conducted more than eighty undercover investigations at factory farms in the United States, virtually all of which would be criminalized by the Idaho statute. Without exception, each investigation has exposed horrific animal suffering.  These investigations, as well as the subsequent media coverage, have led to food safety recalls, citations for environmental and labor violations, evidence of health code violations, plant closures, criminal convictions, and civil litigation.   Such investigations have resulted in thousands of news stories in the past year alone.

5.      Recent undercover investigations at factory farms have found workers kicking pigs in the head, spray painting them in the eyes, stomping and throwing chickens and turkeys like footballs, smashing piglets' heads against concrete floors, and beating and sexually assaulting pigs with steel gate rods and hard plastic herding canes.[1]

6.      In order to silence the undercover investigations and corresponding media coverage that contribute to public debate about animal treatment and food safety, industry

---

[1] One investigation by Plaintiff PETA that was widely covered in the media revealed workers slamming chickens against the wall, ripping their beaks off, twisting their heads off, spitting tobacco in their eyes and mouths, spray-painting their faces, and squeezing their bodies so hard that the birds expelled feces, all while the animals were still alive. People for the Ethical Treatment of Animals, *Thousands of Chickens Tortured by KFC Supplier*, Kentucky Fried Cruelty, http://www.kentuckyfriedcruelty.com/u-pilgrimspride.asp (last visited March 6, 2014). Another investigation by PETA revealed multiple beatings of pigs with metal rods and workers sticking clothespins into pigs' eyes and faces.  A supervisor was filmed kicking a young pig in the face, abdomen, and genitals to make her move and told the investigator, "You gotta beat on the bitch.  Make her cry."  People for the Ethical Treatment Animals, *Mother Pigs and Piglets Abused by Hormel Supplier*, https://secure.peta.org/site/Advocacy?cmd=display&page=UserAction&id=1131 (last visited March 12, 2014).  Other investigations have led to concerns about meat contamination and food safety issues more generally.

executives have made the enactment of factory farm-secrecy statutes, commonly known as "ag gag" laws because they gag speech that is critical of industrial agriculture, a top legislative priority.  In fact, Idaho's ag gag statute was drafted by a lawyer for the Idaho Dairymen's Association.

7.      Plaintiffs bring this action to prevent the enforcement of Idaho's ag gag law, I.C. § 18–7042,[2] which constitutes a sweeping prohibition on important protected speech.  Idaho's

_____

[2] The full text of the statute reads:   18–7042. INTERFERENCE WITH AGRICULTURAL PRODUCTION.

(1) A person commits the crime of interference with agricultural production if the person knowingly:

(a) Is not employed by an agricultural production facility and enters an agricultural production facility by force, threat, misrepresentation or trespass;

(b) Obtains records of an agricultural production facility by force, threat, misrepresentation or trespass;

(c) Obtains employment with an agricultural production facility by force, threat, or misrepresentation with the intent to cause economic or other injury to the facility's operations, livestock, crops, owners, personnel, equipment, buildings, premises, business interests or customers;

(d) Enters an agricultural production facility that is not open to the public and, without the facility owner's express consent or pursuant to judicial process or statutory authorization, makes audio or video recordings of the conduct of an agricultural production facility's operations; or

(e) Intentionally causes physical damage or injury to the agricultural production facility's operations, livestock, crops, personnel, equipment, buildings or premises.

(2) For purposes of this section:

(a) "Agricultural production" means activities associated with the production of agricultural products for food, fiber, fuel and other lawful uses and includes without limitation:

(i) Construction, expansion, use, maintenance and repair of an agricultural production facility;

(ii) Preparing land for agricultural production;

(iii) Handling or applying pesticides, herbicides or other chemicals, compounds or substances labeled for insects, pests, crops, weeds, water or soil;

(iv) Planting, irrigating, growing, fertilizing, harvesting or producing agricultural, horticultural, floricultural and viti-cultural crops, fruits and vegetable products, field grains, seeds, hay, sod and nursery stock, and other plants, plant products, plant byproducts, plant waste and plant compost;

law criminalizes an entire class of historically celebrated and important speech.  Anyone who captures images or sounds of an agricultural activity in a facility not open to the public without "express consent or pursuant to judicial process or statutory authorization" is guilty of "interference with agricultural production."

8.     The law criminalizes acts of capturing image or audio even when the person is otherwise lawfully permitted to be at the location in question, and the law criminalizes gaining employment for the purposes of whistle-blowing.

9.     Notably, this law criminalizes efforts to document criminal behavior in a workplace.  The Idaho statute unconstitutionally and unwisely prohibits efforts to bring violations of state and federal laws relating to food safety, environmental protection, and animal handling to the attention of the public and law enforcement.

10.     I.C. § 18–7042 limits speech in the form of sound and image production, and it

---

(v) Breeding, hatching, raising, producing, feeding and keeping livestock, dairy animals, swine, furbearing animals, poultry, eggs, fish and other aquatic species, and other animals, animal products and animal byproducts, animal waste, animal compost, and bees, bee products and bee byproducts;

(vi) Processing and packaging agricultural products, including the processing and packaging of agricultural products into food and other agricultural commodities;

(vii) Manufacturing animal feed.

(b) "Agricultural production facility" means any structure or land, whether privately or publicly owned, leased or operated, that is being used for agricultural production.

(3) A person found guilty of committing the crime of interference with agricultural production shall be guilty of a misdemeanor and shall be punished by a term of imprisonment of not more than one (1) year or by a fine not in excess of five thousand dollars ($5,000), or by both such fine and imprisonment.

(4) In addition to any other penalty imposed for a violation of this section, the court shall require any person convicted, found guilty or who pleads guilty to a violation of this section to make restitution to the victim of the offense in accordance with the terms of section 19-5304, Idaho Code. Provided however, that such award shall be in an amount equal to twice the value of the damage resulting from the violation of this section.

does so in a content-based manner.  The law almost entirely limits the production and distribution of politically salient speech regarding industrial agriculture.  The practical effect of the law is to provide preferential treatment to industries at the expense of political speech.  Only one side of the debate regarding food safety, animal welfare, environmental degradation, and labor practices is available for public scrutiny after the enactment of the ag gag law, thus skewing the body of information that can contribute to free public discourse in the marketplace of ideas.

11.    Employment-based or other undercover investigations of facilities that process or produce food, fiber, or fuel are not uncommon in Idaho.

12.    I.C. § 18–7042 is both facially content-based and predicated on a viewpoint-based legislative purpose.  Undercover employment investigations in *any* industry that processes food, fiber, or fuel are outlawed, as are most undercover video or audio investigations.

13.    A law that prohibits the recording of audio or video during certain activities—be it a political rally or an unsafe or inhumane workplace—is content discriminatory.  Moreover, the legislative history, detailed below, leaves little doubt that the legislative purpose was to punish animal rights groups and curtail a form of political speech of great public interest.

14.    The purpose and effect of the law, as set forth in detail below, are to stifle political debate about modern agriculture by (1) criminalizing all employment-based undercover investigations; and (2) criminalizing investigative journalism, whistleblowing by employees, or other expository efforts that entail images or sounds.

15.    Accordingly, the law renders impossible the creation of non-industry-approved speech about matters of great public concern.  The law prevents the public and the government

from learning about violations of laws and regulations designed to protect workers, prevent environmental degradation, ensure a safe food supply, and minimize animal cruelty.  There is no substitute for investigative journalism or exposés in documenting such issues in the agricultural industry.

16.     Plaintiffs, as parties that conduct these investigations, have a concrete desire to engage in speech and expressive conduct that violate the ag gag statute.  Equally, Plaintiffs rely on the investigations for their reporting, research, and educational outreach to contribute to an important public debate about mass-produced agricultural products.  The rise of the internet and the increased public interest in safe and ethically produced food have fostered greater awareness of and concern with ongoing abuses by large agricultural enterprises.  The ag gag law has the effect of shielding these industries from scrutiny regarding food safety, animal welfare, environmental quality, workers' rights, and other related concerns.

17.     Moreover, the criminalization of this speech also creates significant obstacles to the enforcement and efficacy of federal laws and is therefore preempted under the Supremacy Clause.  I.C. § 18–7042 criminalizes whistle-blowing speech that is incentivized by the False Claims Act and other statutory provisions protecting whistle-blowers and regulating the food industry.

18.     In addition, because the law is motivated by animus towards a politically unpopular group—animal protection advocates—it also violates the Fourteenth Amendment.

19.     In short, the Idaho law infringes the rights of Plaintiffs and gives the agriculture industry a virtual monopoly on the most relevant and probative speech on a topic that is of vital importance to the public, thereby allowing the industry to provide a misleading account of its

7

activities and hide violations of animal cruelty, labor, environmental, and food safety laws.  Such a sweeping prohibition on speech directly harms the Plaintiffs, both as investigators and conveyors of this information, and effectively removes an entire category of speech from the marketplace of ideas.

20.     Accordingly, Plaintiffs ask this Court for injunctive relief to preserve their right and the right of others to engage in expressive and communicative activity that is of the utmost public concern.  Unless this Court enjoins enforcement of the ag gag law, Plaintiffs will be compelled to divert resources from their core missions in order to engage in outreach and education about the ag gag law.  Several Plaintiffs suffer a direct injury because their missions relating to educating the public about the reality of factory farming in Idaho are made more difficult.

21.     Plaintiffs bring this action seeking declaratory and injunctive relief to lift a chill that leads some Plaintiffs to refrain from engaging in protected speech, that prevents other Plaintiffs from reporting on these events, and that causes other Plaintiffs to suffer direct economic and organizational injuries.  There is an imminent and credible threat of prosecution under statutory provisions that undermine Plaintiffs' rights under the U.S. Constitution.  I.C. § 18–7042 is facially, and as applied to Plaintiffs, unconstitutional for several independent reasons: (1) it is overbroad because it sweeps within its ambit a substantial amount of core First Amendment protected speech; (2) it discriminates on the basis of the content and viewpoint of particular speech and expressive conduct in violation of the First Amendment; (3) it is preempted by federal laws and thus violates the Supremacy Clause; and (4) it violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates on the basis of animus toward

unpopular political groups and lacks a rational basis.

## JURISDICTION AND VENUE

22.     This action arises under the U.S. Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1988.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

23.     This Court has authority to grant the declaratory and injunctive relief herein requested pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

24.     Venue is proper in the U.S. District Court for the District of Idaho pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

### Plaintiffs

25.     Plaintiff–ANIMAL LEGAL DEFENSE FUND (ALDF) is a national non-profit animal protection organization founded in 1979 that uses education, public outreach, investigations, legislation, and litigation to protect the lives and advance the interests of animals, including those raised for food.  ALDF's work is supported by more than 110,000 members across the country, including in Idaho.  ALDF promotes the humane treatment of farmed animals.  ALDF and its agents have conducted undercover investigations at animal facilities around the country, including facilities that would meet the definition of an "agricultural production facility" under I.C. § 18–7042(2)(b).  ALDF would like to conduct an investigation in Idaho and has an investigative team capable of doing so.  Moreover, ALDF's core mission of

improving the lives of animals is fundamentally impaired by the ag gag law.  ALDF uses investigations to support its litigation and outreach and this law directly impedes these efforts by diminishing the supply of such investigations.  ALDF also spends significant resources to prevent the spread of, and when necessary to amend and/or repeal, unconstitutional ag gag laws like and including the one enacted in Idaho.  These expenditures to counteract the unconstitutional violations of various persons' civil rights constitute a harmful diversion of ALDF's very limited resources and a loss to the organization because those resources would otherwise be better spent furthering ALDF's core mission of protecting the lives and advancing the interests of animals through the legal system. ALDF, however, is obligated to divert its resources in order to prevent the harm ag gag laws, like and including the one enacted in Idaho, pose to ALDF's core mission because such laws prevent the creation and dissemination of information that protects the lives and advances the interests of animals, and because such laws directly impede the development of animal law.

26.     Plaintiff–PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC. (PETA) is a Virginia non-stock corporation and animal protection charity exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code.  PETA is dedicated to protecting animals from abuse, neglect, and cruelty, and undertakes these efforts through public education, undercover investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals.  A central tenet of PETA's mission is to expose cruelty to farmed animals, educate the public about such cruelty, and encourage people to choose a lifestyle that does not involve or support abuse, neglect, or exploitation of animals.  PETA's first undercover investigation—the 1981

investigation of Dr. Edward Taub's monkey testing laboratory in Silver Spring, Maryland—resulted in the nation's first arrest and criminal conviction of an animal experimenter for cruelty to animals.  PETA has conducted dozens of investigations in the United States over the past three decades, exposing illegal animal abuse and turning the results of each investigation over to appropriate law enforcement and/or regulatory authorities.   It continues to conduct these investigations to expose further illegal conduct on the part of workers and management personnel.  PETA is also interested and willing to conduct an investigation in Idaho but for the threat of criminal prosecution under I.C. § 18–7042.   Moreover, PETA uses investigations to support its litigation and outreach and this law directly impedes these efforts by diminishing the supply of such investigations.  The ag gag law impairs PETA's ability to carry out its core missions and has forced PETA to divert resources on educating the public regarding and otherwise opposing ag gag laws, like that enacted in Idaho. PETA has and will continue to divert resources to engage in educational outreach about Idaho's ag gag law, and the money spent opposing and doing outreach regarding ag gag laws diminishes the money available for these more traditional, core educational goals of PETA.

27.   Plaintiff–AMERICAN CIVIL LIBERTIES UNION OF IDAHO, INC. is a statewide non-profit, non-partisan organization of more than 1,200 members whose mission is to advance civil liberties and civil rights in Idaho.  The ACLU's members live and work throughout the state of Idaho, including at, for, and near agricultural production facilities.  According to the U.S. Department of Agriculture's most recent available Census of Agriculture, there are over 22,000 farms in the vicinity of the residences of current ACLU of Idaho members in good standing.  The ACLU nationally has a long history of protecting the public's right to know,

including through undercover investigations and journalism.  The national ACLU participated before the U.S. Supreme Court as amicus curiae in *New York Times v. United States* to protect the public's right to know of surreptitiously obtained classified documents known as the "Pentagon Papers."  The ACLU's first permanent affiliate was founded by Upton Sinclair. Among the ACLU of Idaho's members today are individuals who investigate and document hazardous conditions and practices at agricultural production facilities in Idaho, including by entering those facilities to make audio and video recordings and by obtaining facility records. The ACLU itself, sometimes through its members, staff, and volunteers, also frequently attempts to obtain records using the Idaho Public Records Law.  The ACLU's members have grave concerns about the safety of agricultural operations in Idaho.  Recently, the ACLU of Idaho participated in a lawsuit challenging an Idaho statute that prevented many Idahoans from providing comment to county governments about large confined animal feeding operations (CAFOs).  In that case, *Friends of Minidoka v. Jerome County Board of Commissioners*, the Idaho Supreme Court allowed the ACLU to defend its members' freedom of speech and Fourteenth Amendment rights as a friend of the court, over the objection of an agricultural operator and intervenor, South View Dairy.  Both before and after the enactment of I.C. § 18–7042, ACLU members have made significant complaints to the ACLU about the ag gag statute, because it will violate and chill members' freedom of speech and is constitutionally defective. The ag gag statute will subject ACLU members to arrest and incarceration for their speech during their already planned investigations and documentation of Idaho agricultural facilities, which those members continue to undertake to protect their families, their children, and the public at large.

28.     Plaintiff–THE CENTER FOR FOOD SAFETY is a 501(c)(3) non-profit organization dedicated to protecting and promoting sustainable agriculture and the environment. As a membership organization, CFS has over 400,000 members nationwide, including members in Idaho. CFS was established for the purpose of protecting the public by challenging harmful food production technologies and promoting sustainable alternatives. CFS's mission is to protect the public's right to know how their food is produced. CFS utilizes regulatory actions, citizen engagement, legislation, and when necessary, litigation, to promote transparency and accountability in the factory farm and industrial agriculture industries. CFS disseminates to government agencies, members of Congress, and the general public a wide array of informational materials addressing the harmful effects of industrial agriculture. These materials include news articles, policy reports, legal briefs, press releases, action alerts, and fact sheets. CFS relies on and uses videos and recordings obtained during undercover industrial agriculture investigations for its legal, policy, advocacy, and educational and outreach work.

29.     Plaintiff–FARM SANCTUARY is a non-profit 501(c)(3) animal-advocacy organization with over 250,000 constituents nationwide. Core to its mission is protecting farm animals from cruelty and encouraging a new public awareness about farm animals through education and media outreach. Farm Sanctuary focuses its efforts exclusively on farm animals and is the largest farm animal rescue and protection organization in the United States. Farm Sanctuary has conducted farm animal investigations in the past, and it continues to rely on the information obtained by other groups' ongoing investigations for its work. Stated differently, Farm Sanctuary is a uniquely situated recipient of the undercover recordings—a listener with a concrete injury. Specifically, Farm Sanctuary uses the videos for educational purposes and for

13

in-person and online outreach.  In addition, Farm Sanctuary has concrete and imminent plans to promote and use future investigations in its video production, online, and in legislative and corporate campaigns.

30.     Plaintiff–RIVER'S WISH ANIMAL SANCTUARY is a non-profit 501(c)(3) organization located in Spokane County, Washington, not far from the Idaho border.  On its sixty-five acres, River's Wish provides a sanctuary to rabbits, dogs, cats, goats, horses, donkeys, pigs, chickens, turkeys, cows and more.  River's Wish's mission is to provide care and permanent sanctuary to neglected, abused, homeless, and older animals in need; and to promote kindness and compassionate lifestyle choices through humane education.  River's Wish offers educational programs, such as "Compassion for Animals," which allows people to meet animals first-hand and puts a story, personality, and face behind the abstract notion of their species. River's Wish is directly harmed by I.C. § 18–7042 for two independent reasons.  First, the law will impede the organization from learning of animals that are being mistreated and that are in need of rescue.  In the past, River's Wish has rescued one or more animals that were in danger in Idaho and that came to their attention because of undercover reporting.  It will be considerably more difficult to obtain information about the need for rescue when investigative efforts to uncover abuse are criminalized.  Second, River's Wish regards education and outreach as an important part of its mission and the ag gag law impairs its ability to do such outreach. Specifically, the sanctuary will have to devote resources to raising awareness about the ag gag law instead of finding animals in need of rescue.  This diversion of resources, in turn, limits the resources available for its core outreach on the topics of veganism and animal welfare, as well as the resources available for animal rescue.  Moreover, investigative videos are highly effective as

part of vegetarian outreach—a picture is worth a thousand words—and the ag gag law chokes off the supply of this footage, thereby directly harming the sanctuary's outreach efforts.

31.     Plaintiff-WESTERN  WATERSHEDS  PROJECT  (WWP)  is  a  non-profit conservation group, founded to protect and restore western watersheds and wildlife through education, public policy initiatives, and litigation.  WWP has 1,400 members, with field offices in Idaho, Montana, Utah, Wyoming, Arizona, and California.  WWP is headquartered in Hailey, Idaho, and manages the Greenfire Preserve in Clayton, Idaho.  The group works to influence and improve public lands management throughout the West with a primary focus on the negative impacts of livestock grazing on 250,000,000 acres of western public lands, including harm to ecological,  biological,  cultural,  historic,  archeological,  and  scenic  resources.    WWP  does investigative work to document the harms of livestock grazing on public lands, some of which is now illegal under I.C. § 18–7042.  Specifically, WWP takes photographic and video images of agricultural sites that are closed to the public in a manner that is criminalized by the statute.

32.     Plaintiff–SANDPOINT  VEGETARIANS  is  an  unincorporated  non-profit association of vegetarians that encourages a vegetarian lifestyle to foster compassion, improve health, and protect the planet.  Sandpoint's mission is to promote the idea that all beings have a right of existence, that people have a moral obligation to stand up for animals, and that people must minimize the suffering of animals.  Sandpoint's advocacy includes potlucks, leafleting, film screenings, outreach, library displays, guest speakers, and presentations, all aimed at educating others about animal suffering and environmental degradation in industrial agriculture.  I.C. § 18–7042 substantially undermines Sandpoint's outreach and advocacy by eliminating the possibility of obtaining videos or photographs documenting the harm to animals on factory farms in Idaho

specifically, and it forces Sandpoint to divert resources away from vegan and vegetarian advocacy to educate the public about the ag gag law and its effects.

33.     Plaintiff–IDAHO   CONCERNED   AREA   RESIDENTS   FOR   THE ENVIRONMENT (ICARE) is a grassroots organization that advocates for Idahoans affected by animal facilities.   ICARE supports sustainable family farms and promotes the development of strong local and regional foodsheds; transparency and accountability in land-use planning, regulation, and enforcement; equitable global trade; and sane domestic agricultural policy. ICARE members are also interested and willing to conduct an investigation in Idaho but for the threat of criminal prosecution under I.C. § 18–7042.    ICARE members have conducted undercover investigations at animal facilities in Idaho in the past, including facilities that would meet the definition of an "agricultural production facility" under I.C. § 18–7042(2)(b).  In 2009, an ICARE member escorted a New York Times journalist around Idaho animal facilities for a series on Clean Water Act concerns.  The group covertly filmed several animal facilities from facility-owned property without consent.  ICARE would like to conduct similar investigation and has made arrangements to do so.   Moreover, ICARE has plans to engage in now-illegal employment-based investigations and had such plans prior to the enactment of I.C. § 18–7042.

34.     Plaintiff–IDAHO HISPANIC CAUCUS INSTITUTE FOR RESEARCH & EDUCATION (IHCIRE) is a nonprofit 501(c)(3) volunteer political organization based in Nampa, recognized as a statewide leader in advocating for social justice issues affecting Latinos in Idaho. With the charge of promoting the social, economic, and political empowerment of Latinos, IHCIRE takes an active role in addressing the ramifications of government as it relates to the Hispanic population in the State. IHCIRE's mission is to promote the social welfare of the

16

Idaho Latino community through action, research, and education on those social justice issues that continue to negatively impact the social well-being of Idaho's Latinos.  It considers farmworkers one of its core constituencies, and its campaigns to mobilize voter registration and turnout and to increase the state minimum wage directly affect the lives of farmworkers.  Among IHCIRE's objectives are to increase the acquisition and dissemination of Latino-based research on immigration, human rights, health, and employment, and to organize and execute community-based educational forums.  IHCIRE, along with its community partners, intends to host a series of community meetings in 2014 throughout the state – in Wilder, Mountain Home, Twin Falls, and Pocatello – to address issues of significance to Latino communities, in particular farm-working women and their families.  Because of the threat that the ag gag law poses to these communities, IHCIRE will be forced to divert its financial and personnel resources to educating attendees about the ag gag law.  IHCIRE will be required to correspondingly reduce the amount of time and resources it can dedicate to its core mission work at these community meetings, such as promoting voter registration and other efforts to empower Latino communities.  If the ag gag law is declared invalid, ICIRE will be able to redirect its resources to activities and outreach that promote its mission.

  35. Plaintiff–COUNTERPUNCH is a print and online journal of progressive politics, news, investigative reporting, civil liberties, art, and culture.  CounterPunch's readership is global, with over 5,000 paid subscribers and a web readership of over one million unique visitors per month.  CounterPunch and its writers have received numerous awards.  CounterPunch regularly reports on undercover investigations at factory farms; the following articles illustrate the extensive coverage CounterPunch gives to these investigations:  "Undercover at a Turkey

Slaughtering Plant," "Hatchery Horrors," "The Price of Cheap Easter Eggs," "Life on HBO's Factory Hog Farm," "Is Your Child Eating Downer Cows?," "American Beef Supply at Risk," and "Pig Hell at Wal-Mart Supplier." The ag gag law stifles undercover investigations in Idaho and thus suppresses CounterPunch's free press rights and undermines its ability to report thoroughly and accurately on a matter of significant public concern: the ethical and public health implications of modern industrial agriculture.

36.     Plaintiff–FARM FORWARD is a 501(c)(3) non-profit organization seeking to implement innovative strategies to promote conscientious food choices, reduce farm animal suffering, and advance sustainable agriculture. More specifically, Farm Forward works to eliminate the worst practices in factory farming; advocates an acute reduction in the consumption of factory-farmed meat, fish, eggs, and dairy by encouraging conscientious consumer decision-making; supports interdisciplinary research and undergraduate teaching about the cultural significance of animals and animal agriculture; and stimulates the production of essays, books, films, and religious activities that raise awareness about the problems in animal agriculture and the deeper cultural issues behind them. One of the most effective ways that Farm Forward informs consumers about the cruelty of factory farming is by discussion of investigations into these farms. I.C. § 18–7042 substantially impairs Farm Forward's ability to inform consumers about the worst practices in factory farming because Farm Forward will have to devote additional resources to explaining why abuses in the factory farm system are being hidden from public view. In addition, Farm Forward is developing a tool (BuyingPoultry.com) for consumers to learn about the practices of the specific farms from which they buy poultry products. The Idaho ag gag law will make it impossible to provide transparent, robust information on poultry

farming practices in Idaho to users of BuyingPoultry.com.  As part of its efforts to stimulate the conversation around factory farming in the arts, Farm Forward is helping producers of a documentary film (*Eating Animals*); its work to coordinate the film's content will be hindered by the Idaho ag gag law because it will prevent Farm Forward from overseeing an undercover farm investigation in Idaho, and because it will limit the ability of other groups to conduct investigations that might otherwise be discussed in the film.

37.     Plaintiff–WILL POTTER is an award-winning journalist, author, and public speaker based in Washington, D.C., who is a leading authority on the animal rights and environmental movements.  Potter's reporting and commentary have appeared in media outlets including *Rolling Stone*, *Mother Jones*, *The Los Angeles Times, Vermont Law Review,* and *The Washington Post*.  Potter has lectured at more than 100 universities and public forums internationally about his work, including Georgetown University, the New York City Bar Association, and the House of Democracy and Human Rights in Berlin, and he has testified before the U.S. Congress about his reporting.  Potter is a TED Fellow, which is a global network of innovators and trailblazers from a spectrum of disciplines.  Potter is the author of *Green is the New Red: An Insider's Account of a Social Movement Under Siege*, which Kirkus Reviews named as one of the best books of 2011 and described as a "shocking exposé" of "remarkable merit."  The book is regularly used in college and graduate school courses on political science, civil rights, and sociology.  Potter also runs the popular website www.greenisthenewred.com, where he reports on issues concerning animals and the environment.  Potter regularly reports on the results of undercover investigations, and he profits from visits to his website based on such reporting.  However, the ag gag law limits his access to undercover investigations and hinders

his coverage of industrial animal agriculture, and therefore, causes economic as well as speech related injuries.  Potter would report the findings of other investigations at animal agricultural operations in Idaho, but for the ag gag statute.

38.     Plaintiff–JAMES MCWILLIAMS is an award-winning professor in the Department of History at Texas State University at San Marcos.  McWilliams writes and publishes and lectures nationally at food and vegetarian conferences on the intersection of American history and diet, including the book *A Revolution in Eating: How the Quest for Food Shaped America*, published by Columbia University Press.  McWilliams' writing on food, agriculture, and animals has appeared in the *New York Times, Harper's, The Washington Post, The Atlantic, Slate, Forbes, Travel and Leisure, The Los Angeles Times, The International Herald Tribune, The Christian Science Monitor,* and *The Texas Observer.*  McWilliams also runs the popular blog *The Pitchfork,* where he writes about factory farming, relying in part on undercover investigations.  His current projects include two books.  One, tentatively titled *A Glorious Distance: The Origins of Factory Farming in the United States*, is being published by the Cornell University Press.  The second, tentatively titled *The Modern Savage: Our Unthinking Decision to Eat Animals* (St. Martin's Press), investigates the hidden ethical, environmental, and economic problems with small-scale animal agriculture today.  As a scholar and historian, McWilliams places great importance on access to reliable, accurate, first-hand source materials.  The ag gag law inhibits this access, screening out important and relevant materials that are essential to McWilliams' scholarship, teaching, and national lectures, thus interfering with and undermining his profession.  McWilliams is directly harmed by I.C. § 18–7042 because it impedes his access to information, which is critical to his speeches to lay audiences as well as his

academic research.

39.     Plaintiff–MONTE HICKMAN is a lifelong Idaho resident who is interested in post-retirement work as an agricultural operations investigator.   Hickman was formerly employed as a dairy worker, a lumber yard worker, and most recently as a deputy sheriff. Hickman recently retired from his position as an Idaho law enforcement officer and has been interested in doing investigative work in support of labor and animal rights in Idaho.   His law enforcement and agricultural background make him well-suited for the work.   Moreover, Hickman has been guaranteed employment as an undercover investigator in the animal agricultural industries.   However, I.C. § 18–7042 makes it impossible for Hickman to engage in this work without risking criminal prosecution, thereby depriving him of a concrete opportunity to engage in political speech, pursue a new profession, and obtain financial benefit.

40.     Plaintiff–BLAIR KOCH is a fourth generation Idahoan and independent, freelance journalist that covers sensitive environmental, agriculture, and animal welfare issues in Idaho.   Koch has engaged in numerous investigations relating to large-scale agriculture operations and intends to continue that work.   Koch's investigative work requires her to enter agriculture facilities without permission to obtain recordings or photos.   Because of Idaho's ag gag law, Koch's investigations are now illegal.   The ag gag law denies Koch the ability to continue to investigate and report on important agriculture matters that otherwise would go unreported.   Specifically, I.C. § 18–7042 suppresses Koch's political speech and criminalizes her intention to continue investigating environmental, agriculture, and animal welfare issues at Idaho agriculture facilities.

41.     Plaintiff–DANIEL HAUFF is an animal and human rights activist, consultant, and

21

expert on employment-based undercover investigations at animal agricultural operations.  He is the former Director of Investigations for a major national animal protection organization.  In that capacity, he spent four years working with investigators, facilitating their employment, and overseeing more than a dozen high security undercover investigations across the country at a variety of animal agricultural operations—from pig breeding facilities to high-density egg farms to dairies to slaughterhouses to veal farms.  Each investigation that Hauff oversaw revealed severe animal suffering, either through the gratuitous infliction of animal cruelty or through legal and routine industrial farming practices such as intensive confinement and unanaesthetized mutilations (e.g., beak-searing, horn removal, and castration).  Hauff has facilitated every stage of undercover investigations, including identifying and scouting locations, hiring investigators, advising investigators in-field on everything from the effective use of surveillance equipment to emergency decision-making, reviewing investigative footage, presenting findings to law enforcement, and serving as a media spokesperson to convey investigative findings to the public. Investigations overseen by Hauff gained national recognition and exposed institutionalized mistreatment of farmed animals, leading to raids on factory farms, rescue of abused and neglected animals, passage of landmark legislation, and major corporate policy changes affecting countless animals.  Because of Hauff's extensive expertise in the field, Plaintiff ALDF would engage him to coordinate an undercover, employment-based investigation in Idaho.  ALDF would pay Hauff to oversee such an investigation.  The existence of Idaho's ag gag law, however, prevents Hauff from pursuing this consulting opportunity, for fear of being prosecuted as an accomplice or co-conspirator to "Agricultural Production Interference."  The ag gag statute has thus injured Hauff financially by depriving him of a consulting opportunity, and

constitutionally by depriving him of the opportunity to serve as a media spokesperson about a Idaho investigation at an agricultural operation.  If the ag gag law is declared unconstitutional, Hauff will oversee an employment-based investigation of an agricultural operation in Idaho on behalf of ALDF.

### Defendants

42.     Defendant C. L. "BUTCH" OTTER is the Governor of Idaho and as such, is the Chief Executive for the state, responsible for ensuring the enforcement of the State's criminal statutes.  The Governor is sued in his official capacity.

43.     Defendant LAWRENCE WASDEN is the Attorney General of Idaho and as such, oversees the enforcement of the State's criminal statutes.  The Attorney General is sued in his official capacity.

### FACTUAL BACKGROUND

### Statutory Overview

44.     On February 28, 2014, Governor Otter signed into law Senate Bill 1337, codified at I.C. § 18–7042 (2014).

45.     I.C. § 18–7042 was enacted as an emergency provision, which went into effect immediately upon the Governor's signature.

46.     I.C. § 18–7042 criminalizes "interference with agricultural production."

47.     The statute defines "agricultural production" as "activities associated with the production of agricultural products for food, fiber, fuel and other lawful uses."  The statute lists examples of "agricultural production" that illustrate the breadth of the term, such that it includes virtually every conceivable human interaction with food, plants, or animals, including even just

the "processing and packaging of agricultural products into food," such as at a restaurant or in a home kitchen.[3]

48.    An "agricultural production facility" is any "structure or land, privately or publicly owned, leased or operated, that is being used for agricultural production."

49.    The statute creates five agricultural production interferences that will be deemed criminal:

a.    "[E]nter[ing] an agricultural production facility by force, threat, misrepresentation or trespass" while not employed by the facility, I.C. § 18–7042(1)(a);

b.    "Obtain[ing] records of an agricultural production facility by force, threat, misrepresentation or trespass," I.C. § 18–7042(1)(b);

c.    "Obtain[ing] employment with an agricultural production facility by force,

_____

[3] Idaho Stat. Ann. § 18–7042(2) defines "agriculture production" as:

(a)  "Agricultural production" means activities associated with the production of agricultural products for food, fiber, fuel and other lawful uses and includes without limitation:

(i) Construction, expansion, use, maintenance and repair of an agricultural production facility;

(ii) Preparing land for agricultural production;

(iii) Handling or applying pesticides, herbicides or other chemicals, compounds or substances labeled for insects, pests, crops, weeds, water or soil;

(iv) Planting, irrigating, growing, fertilizing, harvesting or producing agricultural, horticultural, floricultural and viti-cultural crops, fruits and vegetable products, field grains, seeds, hay, sod and nursery stock, and other plants, plant products, plant byproducts, plant waste and plant compost;

(v) Breeding, hatching, raising, producing, feeding and keeping livestock, dairy animals, swine, furbearing animals, poultry, eggs, fish and other aquatic species, and other animals, animal products and animal byproducts, animal waste, animal compost, and bees, bee products and bee byproducts;

(vi) Processing and packaging agricultural products, including the processing and packaging of agricultural products into food and other agricultural commodities;

(vii) Manufacturing animal feed.

24

threat, misrepresentation or trespass with the intent to cause economic or other injury to the facility's operations" or "business interests," I.C. § 18–7042(1)(c); or

    d.      "Enter[ing] an agricultural production facility that is not open to the public and, without the facility owner's express consent . . . , mak[ing] audio or video recordings of the conduct of an agricultural production facility's operations," I.C. § 18–7042(1)(d).

    e.      "Intentionally causing physical damage or injury to the agricultural production facility's operations," I.C. § 18–7042(1)(e).

50.    Persons violating I.C. § 18–7042(1) face up to a year in jail and up to $5,000 in fines.  By comparison, the maximum jail time for a first-offense conviction of animal cruelty is six months.  I.C. § 25–3520A.  In other words, the statute punishes those who expose animal cruelty more severely than those who commit it.

51.    Under the plain terms of I.C. § 18–7042, no new investigations of the type contemplated by some of the Plaintiffs and relied on by other Plaintiffs may be conducted in Idaho.  Farmworkers and other current employees working at agricultural production facilities cannot even credibly document unsafe conditions in their workplace without risking arrest and prosecution.

52.    Although investigations and their corresponding media coverage are the primary source of whistleblowing activity in the agricultural industry, the Idaho law makes all such speech effectively impossible.

53.    The threat of criminal liability extends beyond the individual who conducts the investigation and includes non-profit organizations such as PETA and ALDF. These Plaintiffs support and encourage whistleblowers and investigators who are shining a spotlight on practices,

in the belief that the public has a right to know what goes on in facilities that produce products for public consumption.  Indeed, even a journalist who worked with an investigator to obtain undercover video or photographic images would be a criminal.  I.C. § 18–304 (aiding in misdemeanors); I.C. § 18–1701 (conspiracy).

54.     I.C. § 18–7042 criminalizes investigative efforts—employment-based or otherwise—in an unconscionably broad range of facilities.  An "agricultural production facility" is defined so as to include land "whether privately *or publicly owned*."  I.C. § 18–7042 (2)(a).  Moreover, the law defines the range of conduct that may not be subject to investigative image or audio capture in even more sweeping terms:  any facility involved in the production of "food, fiber, fuel, and other lawful uses [of agricultural products]" that is not open to the public.  Any facility that raises animals, or grows plants, or processes the animals or plants for food is suddenly exempt from most forms of whistle-blowing.   I.C. § 18–7042 criminalizes investigations at any stage of the food production or animal handling cycle of production.  It makes an entire range of politically salient speech criminal.

55.     These statutes have the effect of criminalizing undercover investigative activities of agricultural operations, as well as the planning and assistance of such activity, thereby making the investigations and the journalism surrounding such events virtually impossible.  Actions in furtherance of a plan to investigate would give rise to attempt liability under the Idaho criminal code.

### Statutory Purpose

56.     I.C. § 18–7042 criminalizes image capture from agricultural operations not open to the public where the owner of the facility does not expressly approve of the recording in

advance of its production.

57.     I.C. § 18–7042 criminalizes both employment-based investigations where employment is obtained through misrepresentation or omission and other forms of investigation that involve documentation (including traditional whistle-blowing by employees).

58.     The statute does not prohibit or single-out images and recordings produced by the owners or others who will portray the agricultural industry in a favorable light.  The purpose and effect of the statute is to prioritize and privilege speech that is favorable to the agricultural industry.

59.     The statute criminalizes the production of only speech that is inconsistent with the goals and interests of the agricultural industry.

60.     The statute criminalizes the production of speech that is a matter of considerable public concern.

61.     The statute's legislative history demonstrates that it was introduced with the explicit intent of silencing or impeding speech by animal protection organizations.

62.     Senator Jim Patrick, sponsor of the Senate bill, justified the legislation by claiming that extremist animal activists were comparable to marauding invaders centuries ago who swarmed into foreign territory and destroyed crops to starve foes into submission.

63.     Sen. Patrick, speaking of animal activists in a committee hearing, stated: "[T]errorism has been used by enemies for centuries to destroy the ability to produce food and the confidence in the food's safety. This is clear back in the 6th century B.C."  Defending the legislation, Sen. Patrick said, "This is how you combat your enemies."

64.     Senator Linden Bateman called animal protection organizations that encourage

undercover whistleblowing "extreme activists who want to contrive issues simply to bring in the donations."

65.     Representative Steven Miller, the bill's co-sponsor, stated the motivation behind the bill was to protect the economic interests of factory farms from investigations by animal-rights groups.

66.     Representative Donna Pence also indicated that the bill was directed at protecting factory farms from investigations by animal-rights groups, disparaging core political advocacy efforts related to a prior investigation at an Idaho dairy:  "By releasing the footage to the Internet, with petitions calling for a boycott of products of any company that bought meat or milk from Bettencourt Dairy, the organizations involved then crossed the ethical line for me."

67.     One of the primary public voices in support for the Idaho statute was the Idaho Dairymen's Association.  Tony VanderHulst, chairman of the Idaho Dairymen's Association, stated, "This is about exposing the real agenda of these radical groups that are engaged in terrorism."

68.     Representative Gayle Batt, speaking of the Idaho Dairymen's Association involvement in the legislation noted: "The dairy industry decided they could no longer be held hostage by such threats. They could not allow fellow members of the industry to be persecuted in the court of public opinion. It was then that th[e]y were convinced that *they* had to go forward with this legislation." (Emphasis added.)

69.     Dan Steenson, attorney for the Idaho Dairymen's Association, proudly proclaimed that he drafted the legislation because "extremist groups implement vigilante tactics."

70.     Mr. Steenson also acknowledged the broad nature of the bill: "Subsection 1(d)

applies where, without express consent, there's a recording even if the employee is a 'legitimate' long-term employee and documents non-animal related violations such as blocked fire exits."

71.     Speaking of the economic motivations, Mr. Steenson said: "I proudly represent the hardworking dairy farmers who comprise the Idaho Dairyman's Association. Although I prepared this legislation at their request, in writing it, I kept in mind the other agricultural associations, farmers and ranchers I represent in central and southern Idaho."

72.     Upon information and belief, certain legislators and legislative staff advocated for I.C. § 18–7042 specifically because it would silence animal protection organizations.

73.     On information and belief, Idaho's law was based in substantial part on model language drafted and lobbied by the American Legislative Exchange Council (ALEC).

74.     On information and belief, the law was drafted by the Idaho Dairymen's Association with the express purpose of disadvantaging animal rights and whistleblower speech. About one week before the ag gag bill was introduced in the Idaho legislature, the Idaho Dairymen's Association began instructing its members to coerce employees to waive their constitutional rights to speak freely by requiring workers to sign agreements that prohibit them from disclosing to the government or the public *any* information about unsafe, dangerous, or abusive conditions or conduct on Idaho dairies and other agricultural facilities.

75.     On information and belief, there are no other statutes in Idaho that target a specific category of whistle-blowing or investigative journalism.  Undercover investigations of, for example, financial institutions or medical providers are still permitted.

### Investigations and Reporting Generally

76.     Plaintiff PETA regularly conducts investigations into industrial factory farming

facilities and slaughtering operations in the United States.  These investigations are central to the organization's mission and related public interest campaigns.

77.     Plaintiffs Will Potter, CounterPunch, and James McWilliams actively report on agricultural investigations.  Each engages in reporting that relies on the investigations either explicitly, or as part of their background research.

78.     Plaintiff ALDF is engaged in, or will imminently be engaged in, undercover investigations of agricultural facilities in the United States.  ALDF conducts investigations because they are useful to the organizations' educational and outreach missions, as well as its litigation.

79.     Plaintiff Western Watersheds Project investigates the harms of domestic livestock grazing on federal land.  WWP's efforts include entering federal land that is closed to the public and documenting inappropriate grazing through videos and photos, among other things.

80.     Plaintiff Monte Hickman believes that undercover investigations are an important part of civic discourse and political participation.  He has the time, background, and desire to do an undercover investigation in Idaho.  He would be employed to do such an investigation but for the existence of I.C. § 18–7042.

81.     Plaintiff Daniel Hauff believes that undercover investigations are an important means of exposing animal cruelty at factory farms.  He has the time, background, and desire to coordinate and consult on an undercover investigation in Idaho.  He would be employed to do such coordination and consultation but for the existence of I.C. § 18–7042.

82.     Plaintiff ACLU of Idaho has current members who have conducted investigations—as recently as within the past month—that included making audio and video

recordings on site at agricultural production facilities in Idaho, and those members have specific plans to conduct similar investigations and make audio and video recordings at such facilities within the coming month.  In some cases, the ACLU of Idaho's members must enter these facilities to protect their safety, because some adjacent public roads lack shoulders and some facilities have no fences.  In other cases, ACLU of Idaho members have entered facilities by crossing the plane of property boundaries with cameras and recording equipment in order to document conditions endangering the public's safety.  In still other cases, members have had to fully enter facilities' land to adequately document conditions that endanger the public's health.

83.    Plaintiff ICARE has current members who have conducted investigations that included making audio and video recordings on site at agricultural production facilities in Idaho, and those members have specific plans to conduct similar investigations and make audio and video recordings at such facilities within the coming month.  ICARE members have plans to do more investigations at agricultural facilities, both employment-based investigations and other forms of investigation.

84.    In order to document actual conditions within agricultural operations, including egregious animal abuses and routine cruelties, PETA, ALDF, Hickman, Hauff, Koch, members of the ACLU of Idaho, and ICARE have conducted or are committed to conducting undercover investigations at agriculture facilities.

85.    Hickman would be paid to attempt to obtain employment with agricultural facilities, or to gain access through misrepresentations for a shorter period of time such as posing as a member of tour group.

86.    Some of the investigations, including those that would be conducted by Hickman

and Koch, would likely take the form of an employment-based investigation. In this context, investigators for PETA and ALDF, or Hickman and Koch, would perform all the duties of a farm laborer while observing and recording any illegal conduct occurring at the facility.

87.    Even attempting to obtain employment or gain access to an agricultural production facility in Idaho would make one guilty of criminal attempt. Thus PETA, ALDF, Hickman, and Koch are precluded from even attempting to gain access to the facilities.

88.    On information and belief, agricultural employers in Idaho will inquire about whether a potential employee has any connections to an animal protection organization.

89.    Industry documents for the agricultural field, including documents provided to farms by the Idaho Dairymen's Association, routinely instruct agricultural employers to inquire about affiliations with animal protection organizations.

90.    During their investigations, employment-based or otherwise, investigators use recording equipment to document violations of applicable laws and regulations, including unsanitary practices, cruelty to animals, pollution, sexual misconduct, labor law violations, and other matters of public importance.

91.    Plaintiffs ALDF, PETA, CFS, Farm Sanctuary, River's Wish Animal Sanctuary, WWP, Sandpoint Vegetarians, ICARE, and Farm Forward have used the videos and photos of illegal conduct to seek enforcement of civil and criminal laws and regulations, to encourage legislative and industry reform, to educate the public about factory farms, and to effectuate changes in corporate policies and supply chains.

92.    PETA's 1998 investigation of Belcross Farm, a pig-breeding factory farm in North Carolina, resulted in felony indictments of workers after PETA released hours of video

footage that revealed shocking, systematic cruelty from daily beatings of pregnant sows with a wrench and an iron pole to skinning pigs alive and sawing off a conscious animal's legs.  A 2001 PETA investigation of Seaboard Farms, an Oklahoma pig farm, resulted in the first conviction for felony animal cruelty to farmed animals after PETA's investigation showed employees routinely throwing, beating, kicking, and slamming animals against concrete floors and bludgeoning them with metal gate rods and hammers.  PETA's 2008 investigation of the factory farms of Aviagen Turkeys resulted in the first-ever felony indictments for farmed poultry, and first convictions of factory farmers for abusing turkeys.

93.     Undercover investigations have and will continue to result in positive legal outcomes, provide insights into modern factory farming, and contribute immensely to public discourse about the political and ethical dimensions of our food choices.

94.     These recordings are an important part of the marketplace of ideas because they influence public opinion and consumer demand.  A 2012 consumer survey conducted by Purdue University's Department of Agricultural Economics and Department of Animal Sciences found that the public relies on the information gathered and presented by animal protection groups or investigative journalists more than they rely on industry groups and the government combined.

95.     With the exception of material generated by or done on behalf of the animal agricultural industry, or pro-agriculture speech produced by the State, investigations by journalists or activists and their subsequent coverage in the media provide the primary lens through which the workings of agricultural operations may be gleaned.

96.     Countless reporters and authors have sought access to factory farms and slaughterhouses by asking owners for tours in order to better understand modern industrial

agriculture.  Owners and managers of these facilities never give such consent.  The acclaimed author Jonathan Safran Foer, who spent three years researching agriculture for his book *Eating Animals*, wrote, "As it turns out, locked doors are the least of it. I never heard back from . . . any of the companies I wrote to. . . . Even research organizations with paid staffs find themselves consistently thwarted by industry secrecy. . . . The power brokers of factory farming know that their business model depends on consumers not being able to see (or hear about) what they do."

**Investigative Injuries (ALDF, PETA, ACLU, ICARE, Hauff, Hickman, Koch, and WWP)**

97.    Plaintiffs ALDF and PETA have the goal and organizational purpose of producing speech that shows the hidden side of industrial agriculture.

98.    ALDF and PETA have a specific interest in agricultural investigations in Idaho.

99.    Plaintiffs ALDF and PETA's missions are best served by demonstrating that meat, dairy, eggs, and related products are produced in a similar manner industry-wide, across the United States, which requires the ability to access a diverse array of states and not just a select few.  These goals are best served by constantly seeking investigative opportunities in new states; indeed, the fact that they have not done an investigation in Idaho in the past makes Idaho's agricultural industry a uniquely important area for investigation.

100.    The inability to conduct undercover investigations in Idaho allows agricultural enterprises in Idaho to claim that they are treating their animals in a way that is different than what is shown in the videos obtained by Plaintiffs from other states.  Food safety, labor, and animal welfare issues are uniquely hidden from public scrutiny because of the Idaho ag gag law.

101.    ALDF agreed to hire Daniel Hauff, a national expert in obtaining access to agricultural operations for undercover investigations.  Hauff would coordinate ALDF's Idaho

investigation.

102.    The investigations desired by ALDF and PETA would violate the ag gag statute, I.C. § 18–7042.

103.    ALDF and PETA would instruct their investigators to take photos and videos to document inhumane conduct inside the facility, without the permission or consent of the owner, and their investigators would not disclose their affiliation with animal protection organizations. As such, ALDF and PETA and their investigators would face the threat of prosecution under I.C. § 18–7042(1).

104.    Plaintiff ACLU of Idaho's mission includes vigorously protecting the civil liberties and freedom of speech of its members and all Idahoans.  The ACLU of Idaho has an ongoing interest in robust public debate, informed by investigation, documentation, and access to and disclosure of public records.  Its members have recently conducted investigations of agricultural production facilities that would violate the ag gag statute, I.C. § 18–7042, and those members plan to continue those investigations.  The ag gag statute significantly impairs the ACLU's mission of protecting its members' freedom of speech to continue these investigations.

105.    In addition to the agricultural investigations of its members, the ACLU and its members also frequently try to obtain records from the government.  Among the records kept by the government are records of agricultural production facilities, including records of dangerous and unhealthy conditions at some of those facilities.  Under I.C. § 18–7042, anyone who makes a public records request seeking records of an agricultural production facility risks being prosecuted if any of their statements in making the request is interpreted to be a misrepresentation.  These provisions substantially chill all Idahoans' speech in requesting public

records from their government.

106.    WWP documents inappropriate cattle grazing on public land, including areas that are closed to the public for any number of reasons.  WWP documents degradation of public land, including private corrals or agricultural structures not open to the public but placed on public land.  This requires entering the area and taking photographs or videos.  These acts are specifically criminalized by I.C. § 18–7042.  But for the existence of I.C. § 18–7042, WWP would conduct investigations of agricultural lands in Idaho that are now illegal.

107.    Plaintiffs believe that prosecutors in Idaho intend to enforce I.C. § 18–7042.

108.    The more successful the undercover investigations by Plaintiffs, the more likely the animal welfare, labor, environmental, and food safety issues are to achieve substantial media attention, and the more likely it is that they will be prosecuted under I.C. § 18–7042.

109.    ALDF and PETA would like to investigate one or more facilities in Idaho, but their constitutionally-protected speech is chilled because of the reasonable fear of prosecution under I.C. § 18–7042.  They cannot engage in their investigative activities without fear of prosecution.

110.    Plaintiff Hauff suffers economic harm because he would be paid by ALDF to consult regarding investigations in Idaho.  I.C. § 18–7042 precludes him from gaining employment assisting with investigations in Idaho.

111.    Plaintiff ICARE has taken photos and videos on agricultural properties without the express consent of the owners in the past and has plans to do so again in the future.  These actions are criminalized under I.C. § 18–7042.

112.    Plaintiff ICARE is interested in conducting employment-based investigations in

Idaho.  They have taken steps to find a suitable investigative employee but cannot take further actions to obtain agricultural employment for the person because of I.C. § 18–7042.

113.    Plaintiff Monte Hickman is committed to doing an agricultural investigation.  He has the background and experience that make him well-suited for agricultural employment and would pursue this type of work for both personal and financial reasons.

114.    Plaintiff Hickman cannot accept employment as an agricultural worker for purposes of an investigation because to do so would constitute a violation of I.C. § 18–7042.

115.    Plaintiff Hickman is willing, able, and ready to engage in investigative activities. He is prevented from doing so because of I.C. § 18–7042.

116.    If I.C. § 18–7042 is invalidated, Hickman's economic and speech injuries will be redressed and he will be hired to attempt to do investigative work.

117.    Hickman will be paid an hourly rate to conduct investigations, but most of the work he would be paid to do is rendered illegal by the statute.  He cannot seek employment or otherwise investigate facilities not open to the public because doing so would constitute an attempt to commit agricultural operation interference.

118.    Hickman has been promised employment as a potential investigator.  He cannot accept this employment and pursue investigative opportunities until the law is invalidated.

119.    Plaintiff Koch intends to continue her investigative activities, but is prevented from doing so because of I.C. § 18–7042.

120.    If I.C. § 18–7042 is invalidated, Koch's economic and speech injuries will be redressed and she will continue her investigative work.

121.    Realistically, there is no investigation strategy that would meaningfully reveal the

conditions inside agricultural production facilities without violating the statute.

**Reporter and Scholarly Interests (Potter, CounterPunch, McWilliams)**

122.   Plaintiff CounterPunch, a publisher, and Will Potter, a journalist, are committed to covering the images and stories that emerge from undercover investigations of agricultural operations.

123.   Plaintiff James McWilliams is a historian and scholar who lectures across the country, blogs, writes for popular media, and teaches courses on the ethics of food.  He relies on undercover investigations for his research, teaching, and presentations.

124.   Each of the above mentioned media and scholarly plaintiffs have covered issues relating to labor, the environment, food safety, or animal welfare.

125.   Each such Plaintiff is concerned with these issues across the entire nation and will attest that they would report on any investigations done in Idaho.

126.   The harm to the media and academic plaintiffs is no less than the harm to the investigative plaintiffs.

127.   There is a right to receive speech just as much as there is a right to produce it. The media and academic plaintiffs are committed to a transparent and free-flowing exchange of ideas regarding issues of food safety and animal welfare, and the ag gag law directly impedes their ability to report on these stories by stymieing undercover investigations in the state.

128.   If the ag gag law is declared unconstitutional, CounterPunch, Potter, McWilliams, and Koch will report on the findings of undercover factory farm investigations conducted in Idaho.  They will cover any investigation completed by one of the named plaintiffs in this case or an investigation conducted in Idaho by any other group or individual.

**Organizational Injuries (ALDF, PETA, ACLU, CFS, Farm Sanctuary, River's Wish,**

**WWP, Sandpoint Vegetarians, and Farm Forward)**

129.    ALDF, PETA, CFS, Farm Sanctuary, River's Wish Animal Sanctuary, WWP, Sandpoint Vegetarians, IHCIRE, and Farm Forward are each forced to divert resources away from their core educational and outreach programs to focus on the social harms of ag gag laws. The existence of I.C. § 18–7042 forces each organization to do public outreach and education about ag gag laws generally, and in Idaho in particular, and as such they have less money and time to devote to outreach on topics that are more central to their missions, such as animal rescues, the more harms of industrial farming and grazing, and community empowerment.

130.    ALDF, PETA, CFS, Farm Sanctuary, River's Wish Animal Sanctuary, WWP, Sandpoint Vegetarians, and Farm Forward are each harmed because the law makes their outreach and educational programs more difficult.

131.    ALDF, PETA, CFS, Farm Sanctuary, River's Wish Animal Sanctuary, WWP, Sandpoint Vegetarians, and Farm Forward are spending money or organizational resources on media and education regarding the harmful impacts of ag gag laws, including I.C. § 18–7042. This is money that would have otherwise been used to support their core missions of educating the public about the harms of factory farming and other forms of abuse, neglect, and cruelty to animals.

132.    PETA and ALDF use their own investigations and those of other groups to document the problems with the legal system's treatment of animals, such as the absence of federal laws that protect animals on farms or the under-enforcement of state anti-cruelty laws. I.C. § 18–7042 makes access to investigative accounts of the agricultural industry more difficult

to obtain, and thus undermines their outreach and educational programs.

133.    Farm Forward uses the investigations of other groups to document the problems with the legal system's treatment of animals, such as the absence of federal laws that protect animals on farms or the under-enforcement of state anti-cruelty laws.  I.C. § 18–7042 makes access to investigative accounts of the agricultural industry more difficult to obtain, and thus undermines their outreach and educational programs.

134.    River's Wish Animal Sanctuary benefits from investigative work at agricultural facilities.  The work of whistle-blowers can and has resulted in their sanctuary obtaining rescue animals.  That is to say, the very animals they seek to protect will be more difficult to identify because of I.C. § 18–7042.  Likewise, the law makes their outreach and educational programs more difficult.

135.    Sandpoint Vegetarians and Farm Forward rely heavily on showing video of animal agriculture to the public.  They have found this to be one of their most effective outreach tools.

136.    Sandpoint Vegetarians must now devote a significant amount of their members' time and energy to public outreach about the ag gag law and repeal efforts. This sort of outreach directly limits the amount of time and resources they can spend on advocating a vegetarian diet and the humane treatment of animals.

137.    WWP seeks to remove domestic livestock grazing from federal public lands. Those public lands fall within the definition of "agricultural production facility's operations" provided by I.C. § 18–7042(2)(b).  Their goal is to protect public lands from the environmental degradation caused by livestock grazing.

138.    A core component of the ACLU's mission and activities is public education about laws that restrict Idahoans' civil liberties.  In response to member complaints and tremendous public and media interest in the ag gag statue, the ACLU of Idaho will be forced to deploy significant staff time to public outreach and education about the ag gag law, including developing new "Know Your Rights" trainings and materials for its members about their rights under the new criminal statute.

139.    CFS relies on and uses videos and recordings obtained during undercover industrial agriculture investigations for its legal, policy, advocacy, and educational and outreach work.  For example, CFS was involved in litigation in Texas to enforce the state's Health and Safety Code at egg production facilities with the goal of protecting the public from contracting foodborne illnesses.  The lawsuit stemmed in part from an undercover investigation that revealed unsanitary and inhumane conditions at the facility.  CFS is a uniquely-situated recipient of the undercover recordings as it is a listener; without access to undercover recordings CFS has difficulty fulfilling its mission and providing information to the public about food production at agricultural operations.

140.    CFS has imminent plans to rely on undercover investigations to pursue legal and policy work as part of its campaign against concentrated animal feeding operations.  The reasonable fear of foodborne illnesses from certain agricultural facilities, the difficulty in obtaining information, and the inability to protect the public from environmental and public health threats of certain agricultural operations are themselves actual injuries.

## CLAIMS FOR RELIEF

### Declarative Relief

141.    An actual and immediate controversy exists between Plaintiffs and Defendants. Plaintiffs contend that the challenged statute is unconstitutional.  Defendants believe the statute is constitutional.

142.    Plaintiffs are therefore entitled to a declaration of rights with respect to this controversy.   Without such a declaration, Plaintiffs will be uncertain of their rights and responsibilities under the law.

**Injunctive Relief**

143.    Plaintiffs are entitled to an injunction.  Defendants are acting and threatening to act under color of state law to deprive Plaintiffs of their constitutional rights.  Plaintiffs will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a result of the existence, operation, enforcement, and threat of enforcement of the challenged statute.  Plaintiffs have no plain, adequate, or speedy remedy at law.  Plaintiffs are refraining from constitutionally protected activities solely for fear of prosecution under the statute.

**FIRST CAUSE OF ACTION**

**(First Amendment: Overbreadth)**

144.    Plaintiffs incorporate by reference all allegations contained in the above paragraphs.

145.    The act of image capture—the recording of audio or video—is not only a necessary predicate to certain speech, it is speech itself.

146.    Both listeners and speakers can challenge a law as constitutionally overbroad. When a law impairs protected speech, both the would-be speakers and those who would benefit

42

from hearing or seeing the speech are harmed.  One need not be threatening to violate I.C. § 18–7042 (2014) in order to have a cognizable injury.

147.    Even a speaker or listener whose rights are not violated by the statute in question can raise an overbreadth challenge.  Overbreadth doctrine permits the vindication of First Amendment rights for parties not before the Court.

148.    A statute that prohibits substantially more speech than the First Amendment permits is unconstitutionally overbroad even though the State could lawfully punish some of the conduct targeted by the statute.  *See United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010).

149.    Even if the State may be able to lawfully limit the creation of certain recordings on an agricultural operation, I.C. § 18–7042 regulates substantially more speech than the First Amendment permits.

150.    Specifically, the ag gag law, although designed to target and chill animal protection activists, also criminalizes all sorts of protected speech.  Intentionally or not, the law chills and criminalizes a plethora of protected speech that is not even related to animal welfare, including worker safety, food safety, labor laws, and other types of agricultural industry misconduct.

151.    The ag gag law criminalizes not just the protected speech of Plaintiffs, but of any person or group that would seek to investigate an "agricultural production facility" in a similar manner, including employees, journalists, or any person merely concerned about the conditions under which food is processed.

152.    Because the ag gag law categorizes so much protected speech as "criminal," it is unconstitutionally overbroad.

153.    Plaintiffs are entitled to prospective relief enjoining Defendants from enforcing the ag gag law.

154.    Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the ag gag law is unconstitutionally overbroad and unenforceable in any situation.

## SECOND CAUSE OF ACTION

### (First Amendment: Content & Viewpoint Based Discrimination)

155.    Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

156.    The most important function of the First Amendment is to protect against laws that target certain messages or speech because of their "ideas, subject matter, or content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95–96 (1972).

157.    "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994).

158.    I.C. § 18–7042 limits the ability to create images relating to a particular activity: agricultural operations.   A regulation prohibiting the recording of images or sounds from a certain type of activity—working conditions, animal welfare, and food safety at agricultural facilities—is content-discriminatory.

159.    Even if the speech in question is not generally protected speech—for example, if the speech in question is merely cast as trespassing—the State still may not make a content-based distinction.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380 (1992).  That is to say, content-based distinctions are impermissible even for speech that is generally unprotected.

44

160.    By its plain text, the ag gag statute is an explicit content-based regulation.  It singles out recording the activities of agricultural operations for special, discriminatory treatment.

161.    In addition, the legislative history of the statute, including statements made by the law's sponsors and drafters, make clear that the purpose of the ag gag statute was and is to interfere with and suppress the message of national animal protection groups.  Legislators were targeting the speech and expressive activities of certain individuals for discriminatory treatment.

162.    The law singles out speech about agricultural activities and limits the ability of activists and journalists to engage in political speech that is of the utmost public concern.

163.    The State has not limited the ability to engage in whistleblowing activity in other highly regulated or important industries, including medical providers, defense contractors, banks, or childcare providers.

164.    By singling out the agricultural industry for protection against political speech that may be harmful to its profits, the ag gag law must be treated as a content- and viewpoint-based regulation.  In practice, the law ensures that only one side of the debate about industrial agricultural facilities is raised.

165.    The ag gag statute, as a content- and viewpoint-based regulation that is neither justified by a compelling interest nor narrowly tailored, violates Plaintiffs' First Amendment rights.

166.    Plaintiffs are entitled to prospective relief from the Defendants to remedy the deprivations suffered as a result of the violations of their First Amendment rights.

167.    Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the

45

ag gag law is unconstitutional and unenforceable in any situation.

## THIRD CAUSE OF ACTION

### (Article VI, § 2: Supremacy Clause: Preemption)

168.    Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

169.    Article VI, paragraph 2, of the U.S. Constitution provides, "the Laws of the United States . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

170.    State laws that conflict with or frustrate the purposes of federal laws are preempted.

171.    A state law is preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983).

172.    The operation, existence, and enforcement of the ag gag law, I.C. § 18–7042, violates the Supremacy Clause because it conflicts with federal law by undermining the objectives of two federal statutes.

### False Claims Act (FCA) Preemption

173.    Because one of the core purposes of the False Claims Act, 31 U.S.C. §§ 3729, 3730 (2006), is to provide incentives and protections for private persons to surreptitiously uncover fraud against the federal government, I.C. § 18–7042 is preempted.

174.    On information and belief, in Idaho there is at least one agricultural facility that has a contract with the federal government either to provide meat for the National School Lunch

Program or other food assistance programs, or to provide some other form of agricultural commodity to the federal government.

175.    On information and belief, some of the agricultural operations in Idaho are subject to federal inspection.

176.    I.C. § 18–7042 drastically undermines the federal goal of discovering fraud against the federal government by criminalizing the very conduct that has produced at least one False Claims Act case in the agricultural industry.[4]

### Food Safety Modernization Act (FSMA) Preemption

177.    The purpose of 21 U.S.C. § 399d is to protect whistle-blowers from retaliation.

178.    The FMSA ensures that employees of an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" are protected against retaliation for reporting violations of the act.[5]

179.    An employee documenting, for example, adulterated animal products with videos would be protected under the FMSA and simultaneously subject to criminal penalties under I.C. § 18–7042.

---

[4] For example, in 2008 an undercover investigation of a California slaughterhouse resulted in gruesome images of inhumane treatment of cows. The investigation resulted in the president of the slaughterhouse admitting that his company had produced hamburger from sick cows and sold the product to the federal government for the National School Lunch Program. The case spurred a False Claims Act prosecution resulting in a $497 million judgment. *See* Linda Chiem, *Slaughterhouse Owners Hit With $500M Judgment In FCA Case*, Law360 (Nov. 16, 2012), http://www.law360.com/articles/394827/slaughterhouse-owners-hit-with-500m-judgment-in-fca-case.

[5] 21 U.S.C. § 399d (prohibiting retaliation for reporting to government officials "any act or omission the employee reasonably believes to be a violation of any provision of this chapter or any order, rule, regulation, standard, or ban under this chapter, or any order, rule, regulation, standard, or ban under this chapter").

180.    A key purpose of this provision of the FMSA is to encourage whistle-blowing. Accordingly, a state law that imposes punishments for doing so would frustrate Congressional purpose.  *See Nash v. Florida Industrial Commission*, 389 U.S. 235 (1967) (noting a conflict between a state law and the NLRA).

### Clean Water Act (CWA) Preemption

181.    The purpose of 33 U.S.C. § 1367(a) is to protect whistle-blowers from retaliation.

182.    The CWA ensures that employees of regulated entities are protected against retaliation for reporting violations of the act.

183.    An employee documenting, for example, excessive effluent run-off or violations of federal discharge permits at a factory farm would be protected under the AWA and simultaneously subject to criminal penalties under I.C. § 18–7042.

184.    A key purpose of this provision of the AWA is to encourage whistle-blowing. Accordingly, a state law that imposes punishments for doing so would frustrate Congressional purpose.  *See Nash v. Florida Industrial Commission*, 389 U.S. 235 (1967) (noting a conflict between a state law and the NLRA).

185.    Plaintiffs are entitled to a judgment declaring that I.C. § 18–7042 is preempted. Such a declaration is appropriate and necessary in order to determine the rights and obligations of the parties.

186.    Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the ag gag law is unconstitutional.

### FOURTH CAUSE OF ACTION

**(Fourteenth Amendment:  Equal Protection & Due Process)**

187.    Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

188.    The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

189.    Equal Protection and Due Process generally prohibit laws that impinge on fundamental rights, including freedom of speech.

190.    When a statue is enacted based on improper motives, including animus towards a particular group of people, the Equal Protection and Due Process Clauses of the Fourteenth Amendment are violated.  *See, e.g.*, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

191.    The motivating purpose behind I.C. § 18–7042 was animus towards animal rights groups.

192.    There was *no other purpose* behind I.C. § 18–7042 than to harm a politically unpopular group and shelter a single industry from political discourse and criticism.

193.    I.C. § 18–7042 targets animal protection groups and serves no rational, non-animus based purpose.  The legislative history is replete with derogatory statements about Plaintiffs and their political beliefs.

194.    Plaintiffs are entitled to prospective relief from the Defendants to remedy the Equal Protection and Due Process violations.

195.    Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the ag gag law is unconstitutional.

**<u>PRAYER FOR RELIEF</u>**

49

Case 1:14-cv-00104-BLW   Document 1   Filed 03/17/14   Page 51 of 52

Plaintiffs respectfully request an order and judgment:

196.   Declaring that the challenged statute, I.C. § 18–7042 (2014),  violates the U.S. Constitution on its face and as applied to Plaintiffs;

197.   Permanently enjoining Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcing the challenged statute;

198.   Striking down the challenged statute in its entirety;

199.   To ensure that the public has accurate notice of the requirements of the law and the Idaho Code, and to prevent chilling speech, requiring the Defendants to provide public notice, including in the official and online editions of the Idaho Code, that I.C. § 18–7042 is unconstitutional.

200.   Awarding the Plaintiffs reasonable attorneys' fees and costs; and

201.   Awarding any such relief as the Court may deem just and proper.


Dated this 17th Day of March, 2014


_____

Professor Justin Marceau, (*Pro Hac Vice application pending*)
Of Counsel, Animal Legal Defense Fund
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6449
jmarceau@law.du.edu

50

Matthew Liebman, (*Pro Hac Vice application pending*)
Animal Legal Defense Fund
170 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533, ext. 1028
mliebman@aldf.org

Matthew Strugar (*Pro Hac Vice application pending*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
(323) 210-2263
matthew-s@petaf.org

Paige M. Tomaselli (*Pro Hac Vice application pending*)
Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94111
(415) 826-2770
ptomaselli@centerforfoodsafety.org

Richard Alan Eppink, ISB no. 7503
American Civil Liberties Union
of Idaho Foundation
P.O. Box 8791
Boise, ID  83701
(208) 344-9750, ext. 1202
reppink@acluidaho.org

Maria E. Andrade, ISB no. 6445
P.O. Box 2109
Boise, ID 83701
(208) 342-5100, ext. 102
mandrade@andradelegal.com

Attorneys for Plaintiffs