LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation

CLAY R. SMITH, ISB #6385
CARL J. WITHROE, ISB #7051
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, ID  83720-0010
Telephone:  (208) 334-2400
Facsimile:  (208) 854-8073
clay.smith@ag.idaho.gov
carl.withroe@ag.idaho.gov
Attorneys for Defendant Wasden

THOMAS C. PERRY, ISB #7203
CALLY A. YOUNGER, ISB #8987
Counsel to the Governor
Office of the Governor
P.O. Box 83720
Boise, ID  83720-0034
Telephone:  (208) 334-2100
Facsimile:  (208) 334-3454
tom.perry@gov.idaho.gov
cally.younger@gov.idaho.gov
Attorneys for Defendant Otter

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, *et al.* )<br><br>Plaintiffs, )<br> )<br>vs. )<br> )<br>C.L. "BUTCH" OTTER, in his official )<br>capacity as Governor of Idaho; LAWRENCE )<br>WASDEN, in his official capacity as Attorney )<br>General of Idaho, )<br> )<br>Defendants. ) | Case No. 1:14-cv-00104-BLW<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |

## INTRODUCTION

Plaintiffs Animal Legal Defense Fund *et al.* ("ALDF" collectively) challenge 2014 Idaho Session Law Chapter 30 (to be codified at Idaho Code § 18-7042) (Attach. A).   Section 18-7042 prohibits certain conduct at "agricultural production facilities" defined, in general, as "any structure or land, whether privately or publicly

owned, leased or operated, that is being used for agricultural production." Idaho Code § 18-7042(2)(b). The term "agricultural production" means "activities associated with the production of agricultural products for food, fiber, fuel and other lawful uses." *Id.* § 18-7042(2)(a). Violations of § 18-7042 are subject to a criminal sanction of not more than one-year imprisonment and/or a fine of not more than $5000 and to victim restitution under Idaho Code § 19-5304 equal to twice the damage resulting from the violation. *Id.* § 18-7042(3) and (4). The statute took effect on February 28, 2014.

The prolix complaint raises two substantive constitutional challenges against Defendants Otter and Wasden ("Governor" and "Attorney General" respectively)— violation of the Free Speech Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment (Dkt. 1 ¶¶ 144-68)—and preemption claims under the retaliation prohibition in the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), the employee protection provision of the Food Safety Modernization Act ("FSMA"), 21 U.S.C. § 399d, and the employee protection provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1367 (Dkt. 1 ¶¶ 173-86). ALDF alleges that § 18-7042 has the "purpose and effect . . . to stifle political debate about modern agriculture by (1) criminalizing all employment-based undercover investigations[] and (2) criminalizing investigative journalism, whistleblowing by employees, or other expository effects that entail images and words." Dkt. 1 ¶ 14.

ALDF attacks a statute that it *wishes* had passed. The statute *actually* passed has nothing to do with speech or employee whistleblowing. It instead proscribes quite specific forms of conduct by any person: non-employees' entering agricultural production facilities by force, threat, misrepresentation or trespass; obtaining agricultural production facility records by similar conduct; obtaining employment at such facilities by force, threat or misrepresentation "with the intent to cause economic or other injury" to, *inter alia*, their operations; entering a facility not otherwise open to the public and, "without the facility owner's express consent or pursuant to judicial process or statutory

authorization, makes audio or video recordings" of the its operations; or "intentionally causing physical damage or injury to a facility's operations, livestock, crops, personnel, equipment, buildings or premises."  Idaho Code § 18-7042(1)(a)-(e).

Given § 18-7042(1)'s actual text, the complaint must be dismissed in part under Fed. R. Civ. P. 12(b)(1) and in part under Fed. R. Civ. P. 12(b)(6).  The law may interfere with ALDF's preferred business model, but, as a statute applicable to all individuals' and organizations' conduct, it violates neither the Free Speech nor the Equal Protection Clause.  The constitutional claims therefore fail on the merits against the Attorney General as to those subsections of § 18-7042(1) that ALDF has standing to challenge. The as-applied preemption claims advanced under the federal statutes are not ripe for review.  The complaint must be dismissed in its entirety against the Governor because relief against him is unavailable under *Ex parte Young*, 209 U.S. 123 (1908).

## ALDF'S ALLEGATIONS

**A.**   **The Parties and Their Alleged Injury.**     Plaintiffs consist of 12 organizations and five individuals.  Dkt. 1 ¶¶ 25-41.  The complaint identifies four categories of plaintiff conduct allegedly affected by § 18-7042: investigations and reporting generally (Dkt. 1 ¶¶ 76-96); investigative injuries (*id.* ¶¶ 97-21); reporter and scholarly interests (*id.* ¶¶ 122-28); and organizational injuries (*id.* ¶¶ 129-40).  ALDF alleges that, under the statute, "no new investigations of the type contemplated by some of the Plaintiffs and relied upon by other Plaintiffs may be conducted in Idaho" and that "[f]armworkers and other current employees working at agricultural production facilities cannot even credibly document unsafe working conditions in their workplace without risking arrest and prosecution."  Dkt. 1 ¶ 51; *see also id.* ¶ 55 ("[t]hese statutes have the effect of criminalizing undercover investigative activities of agricultural operations, as well as the planning  and assistance of such activity, thereby making the investigations and the journalism surrounding such events virtually impossible").  Once translated, the

complaint thus alleges three types of injury: interfering with "undercover" investigations, a derivative negative impact on the ability to use the results of those investigations for reporting or other purposes, and impeding the ability of employees to "whistle blow" concerning workplace conditions or practices.

Beyond these general categories, various allegations can be tied to alleged harm from specific subsections of § 18-7402(1).  Plaintiff Koch states that her "investigative work requires her to enter agricultural facilities without permission to obtain recordings or photos" and that, "[b]ecause of Idaho's ag gag [*sic*] law, [her] investigations are now illegal." Dkt. 1 ¶ 40.  These allegations relate to enforcement of § 18-7042(1)(a) and (d). *See also*, *e.g.*, Dkt. 1 ¶ 82 (Plaintiff ACLU members "have entered facilities by crossing the plane of property boundaries with cameras and recording equipment in order to document conditions endangering the public's safety"); *id.* ¶ 111 (Plaintiff ICARE "has taken photos and videos on agricultural properties without the express consent of the owners in the past and has plans to do so again in the future").   It also may be assumed fairly from the complaint's allegations that certain Plaintiffs would attempt to secure employment through misrepresenting their connection to "animal protection organization[s]" (Dkt. 1 ¶ 88) and would use employment status to obtain agricultural production facility documents.  *See* Dkt. 1 ¶¶ 113-15 (Plaintiff Hickman).

No individual Plaintiff, however, specifically alleges that he or she intends to "[o]btain employment with an agricultural facility by force, threat, misrepresentation w*ith the intent to cause economic or other injury* to the facility's operations, livestock, crops, owners, personnel, equipment, buildings, premises, business interests or customers" (§ 18-7042(1)(c) (emphasis added)).  To illustrate, ALDF and PETA allege that they have conducted undercover investigations in Idaho or would conduct such investigations in the future, but neither alleges that, even if employment were obtained through misrepresentation, the involved investigator would seek employment with an intent to

cause economic or other injury to the employer—as opposed to conducting an objective fact-based investigation.  Dkt. 1 ¶¶ 98-103.

**B.     Alleged Animus.**  ALDF alleges that Chapter 30's "legislative history demonstrates that it was introduced with the explicit intent of silencing or impeding speech by animal protection organizations."  Dkt. 1 ¶ 61.  It predicates this allegation on quotations or characterizations of statements made during hearings before the Idaho Senate and House Agricultural Affairs Committees (Dkt. 1 ¶¶ 62-71); belief that "certain legislators and legislative staff advocated for I.C. § 18-7042 because it would silence animal protection organizations" (*id.* ¶ 72); belief that "Idaho's law was based in substantial part on model language drafted and lobbied by the American Legislative Exchange Council (ALEC)" (*id.* ¶ 73); belief that "the law was drafted by the Idaho Dairyman's Association with the express purpose of disadvantaging animal rights and whistleblower speech" (*id.* ¶ 74); and belief that "there are no other statutes in Idaho that target a specific category of whistle-blowing or investigative journalism" (*id.* ¶ 75).

## APPLICABLE FED. R. CIV. P. 12 STANDARDS

The immunity of States, their agencies and their officials are immune from unconsented suit in federal court by virtue of "the plan of the convention" confirmed in the Eleventh Amendment.  *Alden v. Maine*, 527 U.S. 706, 716-17, 728 (1999).  Although not "a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction" (*Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 267 (1997)), this immunity, when asserted in a motion to dismiss, is subject to Fed. R. Civ. P. 12(b)(1).  *Taylor v. Westly*, 402 F.3d 924, 925 (9th Cir. 2005); *Alaska Cargo Transport, Inc. v. Alaska R.R. Corp.*, 5 F.3d 378, 379 (9th Cir. 1993).  Rule 12(b)(1) also governs disposition of a claim that the controversy lacks the ripeness required for justiciability under Article III or attendant prudential standards.  *Colwell v. Dep't of Health and Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009); *see also Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121-22 (9th Cir. 2010).  In resolving a motion to dismiss under Fed. R. Civ. P. 12(b)(6),

"[a]ll factual allegations set forth in the complaint 'are taken as true and construed in the light most favorable to [p]laintiffs.'"  *Lee v. City of Los Angeles*, 250 F.3d 668, 697 (9th Cir. 2001).  "Conclusory allegations of law, however, are insufficient to defeat a [Rule 12(b)(6)] motion."  *Id.*

## ARGUMENT

I.   *EX PARTE YOUNG*-BASED RELIEF IS UNAVAILABLE AGAINST THE GOVERNOR BECAUSE HE HAS NO ENFORCEMENT AUTHORITY UNDER § 18-7042

*Ex parte Young* creates an exception to the States' immunity from non-consensual, private suit in federal court, as confirmed in the Eleventh Amendment, where prospective relief is sought against state officers in their official capacity to remedy an ongoing violation of federal law.  *Virginia Office for Protection and Advocacy v. Stewart*, 131 S. Ct. 1632, 1638-39 (2011).  The exception carries with an important qualifier:

> The individual state official sued "must have some connection with the enforcement of the act." . . . In addition, that connection "must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit."

*Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1126, 1134 (9th Cir. 2012) (citations omitted).  In *Coalition to Defend*, the governor of California was deemed an appropriate *Young* defendant because the plaintiffs challenged admission policies for the public university system controlled by the Regents of the University of California, one of whom was the governor serving *ex officio*.  *Coalition to Defend Affirmative Action v. Schwarzenegger*, No. 10-641 SC, 2010 WL 3340577, at *1 (N.D. Cal. Aug. 25, 2010), *aff'd on other grounds*, 674 F.3d 1126 (9th Cir. 2012).  It also is settled that the connection between the sued officer and enforcement of the involved law "must be fairly direct; a generalized duty to enforce state law or general supervisory power over persons responsible for enforcing the challenged provision will not subject an official to suit." *Los Angeles County Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

ALDF alleges only one connection between the Governor and enforcement of § 18-7042: his status as "Chief Executive for the state, responsible for ensuring the enforcement of the State's criminal statutes."  Dkt. 1 ¶ 42.  This allegation is legally insufficient to establish the requisite enforcement connection for *Young* purposes, based as it is simply on the Governor's general duty to "see that the laws are faithfully executed" (Idaho Const. art. IV, § 5).  *See, e.g.*, *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) ("Governor Brown is entitled to Eleventh Amendment immunity because his only connection to [the challenged statute] is his general duty to enforce California law") (citing *Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 847-48 (9th Cir. 2002), *opinion amended on denial of reh'g*, 312 F.3d 416 (9th Cir.); *Ariz. Contractors Ass'n v. Napolitano*, 526 F. Supp. 2d 968, 983 (D. Ariz. 2007) ("[t]he Act does not charge the Governor with any specific duty, and her general duty to ensure that the laws are faithfully executed is not sufficient to make her a party to this challenge"), *aff'd on other grounds*, 558 F.3d 856 (9th Cir. 2008), *aff'd*, 131 S. Ct. 1968 (2011).  The Governor has no authority to prosecute criminally or to compel such prosecutions.  *Young* does not allow relief against him.[1]

## II.   ALDF DOES NOT ALLEGE A CONCRETE PLAN TO VIOLATE § 18-7042(1)(c) OR (e) ADEQUATE TO ESTABLISH A JUSTICIABLE CONTROVERSY UNDER THE FREE SPEECH AND EQUAL PROTECTION CLAUSES

The Court of Appeals has explained "[i]n evaluating the genuineness of a claimed threat of prosecution, courts examine three factors: (1) whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and

---

[1]  The Attorney General reserves the position that, like the Governor, he possesses no enforcement authority with respect to criminal prosecutions under § 18-7042 and that *Young*-based relief may not issue against him.  He nonetheless recognizes that law-of-the-circuit principles bind this Court.  *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919-20 (9th Cir. 2004).

(3) the history of past prosecution or enforcement under the challenged statute." *McCormack v. Hiedeman*, 694 F.3d 1004, 1021 (9th Cir. 2012); *see also Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) (same). Instantly, ALDF fails to allege the necessary "concrete plan" to engage in activity that violates subsections (c) and (e) of § 18-7042(1).  A justiciable pre-enforcement challenge based upon the Free Speech or Equal Protection Clause thus does not exist as to those provisions.

Although ALDF, at least arguably, alleges that securing employment in connection with "undercover" investigations may require misrepresentations during the hiring process, it does not allege that employment was or will be with the intent to cause economic or other injury to the employer.  Indeed, such intent runs counter to conducting a credible investigation because it would indicate not only a pre-existing bias against the *particular* employer but also a positive purpose to give effect to that bias by injuring the employer financially.  The complaint, however, indicates that the investigations' purpose is to further "significant public interests in protecting Idahoans' safety" (Dkt. 1 ¶ 1) by, presumably, objective "reporting on industrial agricultural conditions" (*id.* ¶ 3).  Seeking employment, even if through misrepresentation of personal background or organizational affiliation, logically would have as its objective not injuring the employer but determining whether the agricultural facility's practices do indeed warrant "food safety recalls, citations for environmental and labor violations, . . . plant closures, criminal convictions, and civil litigation."  Dkt. 1 ¶ 4.  ALDF's failure to include any allegation concerning intent to cause injury accordingly was not oversight because such allegation would compromise reliance on the objectivity and factual accuracy of its investigations.

Nothing in the complaint, moreover, suggests that ALDF has engaged, or seeks to engage, in conduct prohibited in § 18-7042(1)(e)—*i.e.*, physically damaging or injuring "the agricultural facility's operations, livestock, crops, personnel, equipment, building or premises."  As with subsection (c), the absence of any such allegation deprives ALDF of

any claimed injury-in-fact from that subsection and, therefore, this Court of Article III jurisdiction over any challenge to that provision.

Finally, Section 2 of Chapter 30 contains a severability provision whose application is controlled by state law. *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 509-10 (1993).  The Idaho Supreme Court gives great weight to such provisions. *E.g.*, *In re SRBA No. 39576,* 128 Idaho 246, 264, 912 P.2d 614, 632 (1995) ("[w]hen determining whether the remaining provisions in a statute can be severed from the unconstitutional sections, this Court will, when possible, recognize and give effect to the intent of the Legislature as expressed through a severability clause in the statute").  Here, subsections (c) and (e) are clearly severable from the remainder of § 18-7042(1) and, as such, will remain law even were subsections (a), (b) and (d) properly invalidated.

## III.   SECTION 18-7042(1) IS A STATUTE OF GENERAL APPLICABILITY THAT REGULATES CONDUCT, NOT SPEECH, AND THUS IMPAIRS NO FIRST AMENDMENT RIGHTS

The premise of ALDF's First Amendment claims lies in the theory that § 18-7042 regulates speech and not conduct.  Its theory, in turn, rests on the proposition that undercover investigations are speech.  Controlling precedent rejects this attempt to transform conduct into speech and requires dismissal under Rule 12(b)(6).

Two Supreme Court decisions—*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), and *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991)—provide the starting point.  The *Houchins* litigation arose when a television station reporter was denied access to a county jail on terms different from those applicable to the ordinary public.  Both the district court and the Court of Appeals concluded that the station established a likelihood of success on the merits, with the latter holding "that the public and the media had a First and Fourteenth Amendment right of access to prisons and jails." 438 U.S. at 7.  Speaking for a plurality of the Court, Chief Justice Burger disagreed:

> The public importance of conditions in penal facilities and the media's role of providing information afford no basis for reading into the Constitution a

right of the public or the media to enter these institutions, with camera equipment, and take moving and still pictures of inmates for broadcast purposes. This Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control. Nor does the rationale of the decisions upon which respondents rely lead to the implication of such a right.

*Id.* at 9. The Chief Justice later added that "[t]he respondents' argument is flawed, not only because it lacks precedential support and is contrary to statements in this Court's opinions, but also because it invites the Court to involve itself in what is clearly a legislative task which the Constitution has left to the political processes." *Id.* at 12. He further emphasized that the station possessed a variety of other methods for carrying out its reportorial function, including "a First Amendment right to receive letters from inmates criticizing jail officials and reporting on conditions" and "to seek out former inmates, visitors to the prison, public officials, and institutional personnel." *Id.* at 15. Thus, "[t]he right to *receive* ideas and information is not at issue in this case." *Id.* at 12.[2]

*Cowles* involved whether state-law promissory estoppel provided a basis for a damages claim by an individual who handed over documents to two newspapers after being given assurance that his status as their source would remain confidential—a commitment that the newspapers reneged upon—and who then was discharged from his employment. 501 U.S. at 665-66. The Minnesota Supreme Court reversed a jury award

---

[2] Justice Stewart concurred in the judgment of reversal and agreed that "[t]he First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government, nor do they guarantee the press any basic right of access superior to that of the public generally" and that "[t]he Constitution does no more than assure the public and the press equal access once government has opened its doors." 438 U.S. at 16. He argued, however, that "the concept of equal access must be accorded more flexibility in order to accommodate the practical distinctions between the press and the general public." *Id.* Under this standard, Justice Stewart deemed certain aspects of the district court's preliminary injunction appropriate but found two aspects "overbroad"—including allowing reporters into a facility closed to the public. *Id.* at 18. The plurality and concurring opinions, in sum, stand shoulder-to-shoulder on the principle that the First Amendment does not provide greater access to public buildings for the press than for other citizens. No need exists here in light of the opinions' unanimity on that issue to consider whether Justice Stewart's opinion provides the narrowest grounds for the judgment. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

of $200,000 on the ground that the First Amendment barred the claim, remarking that "federal law could not be made more clear" on the issue. *Id.* at 667-68. The Supreme Court had precisely the same view as to precedent but with a critical difference:

> This case . . . is . . . controlled by . . . the equally well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news. As the cases relied on by respondents recognize, the truthful information sought to be published must have been lawfully acquired. The press may not with impunity break and enter an office or dwelling to gather news.

*Id.* at 669. The majority opinion also rejected the argument that recognizing the promissory estoppel theory "will inhibit truthful reporting because news organizations will have legal incentives not to disclose a confidential source's identity even when that person's identity is itself newsworthy" (*id.* at 671) with the observation that, even if true, "it is no more than the incidental, and constitutionally insignificant, consequence of applying to the press a generally applicable law that requires those who make certain kinds of promises to keep them" (*id.* at 672).

Lower federal court decisions before and after *Houchins* and *Cowles* reach comparable conclusions. The Court of Appeals in *Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971), held that the First Amendment did not preclude a state-law invasion-of-privacy claim predicated on Life Magazine employees taking photographs and surreptitiously recording conversations in an area of a home to which access was gained by subterfuge. It reasoned in part:

> The First Amendment has never been construed to accord newsmen immunity from torts or crimes committed during the course of newsgathering. The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office. It does not become such a license simply because the person subjected to the intrusion is reasonably suspected of committing a crime.

*Id.* at 249 (footnote omitted); *cf. Entler v. McKenna*, 487 Fed. Appx. 417, 418 (9th Cir. 2012) (unpub. mem) ("there is no constitutional right to disclosure of government

documents"); *Chavez v. City of Oakland*, 414 Fed. Appx. 939, 940 (9th Cir. 2011) (unpub. mem.) ("'[t]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally'").

Almost 30 years later, the Fourth Circuit upheld a jury verdict for damages for state law-based breach-of-loyalty and trespass claims arising from an investigation by two television network reporters who secured employment for the purpose of investigating a supermarket chain's sale of rank meat. *Food Line, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999). Citing *Cowles*, the court began its analysis by emphasizing that "the Supreme Court has said in no uncertain terms that 'generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news.'" *Id.* at 520. It deemed the state-law tort claims to "fit neatly into the *Cowles* framework" and posited as an example of the claims' general applicability "an employee of a competing grocery chain hired on with Food Lion and videotaped damaging information in Food Lion's non-public areas for later disclosure to the public." *Id.* at 521; *see id.* ("Neither tort targets or singles out the press. Each applies to the daily transactions of the citizens of North and South Carolina"). The court additionally did not believe "that applying these laws against the media will have more than an 'incidental effect' on newsgathering" and remained "convinced that the media can do its important job effectively without resort to the commission of run-of-the-mill torts." *Id.*

So, too, here § 18-7042 applies to a broad component of Idaho commerce and regulates conduct not just by individuals or organizations conducting "undercover" or other investigations but by all persons. The statute thus applies no less to an employee who records in-facility activities without consent or purloins documents to assist a competitor or for posting on a Facebook page to illustrate the type of work he or she performs as it does to ALDF or another advocacy group desiring to gather information for eventual media use or release.

No less important is the inescapable fact that nothing in § 18-7042 penalizes dissemination of purloined documents or unauthorized recordings; *i.e.*, as in *Houchins*, the right to *receive* ideas is not regulated.   Media retains its ordinary methods for acquiring information through interviews, public document requests and data-acquisition services.   *Dietemann* further makes plain that the public policy significance that ALDF attaches to its activities does not affect the First Amendment calculus.   There, as is alleged instantly, the magazine's investigation centered on allegedly unlawful conduct, with the secretly recorded conversation conveyed directly to law enforcement personnel in a parked vehicle.   449 F.2d at 246.   All in all, if "[p]eering into public records is not part of the 'freedom of speech' that the first amendment protects" (*Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998)) or if access to certain public buildings can be restricted without constitutional embarrassment, no plausible argument exists for the proposition that a State may not protect not only its own but also private property— whether real, tangible or intangible—from unauthorized acquisition, use or injury. Section 18-7042 does nothing more.   *Houchins*, *Cowle* and *Dietemann*, in sum, establish beyond peradventure that no First Amendment right to investigate exists without regard to generally applicable law and, in so holding, sound the death knell for ALDF's core constitutional claim theory.

## IV.   SECTION 18-7042 IS RATIONALLY BASED ON THE GOVERNMENTAL INTEREST IN PROTECTING PROPERTY INTERESTS AND AVOIDING COERCION OR DECEPTION IN SECURING EMPLOYMENT

### A.   Applicable Rational Basis Standards

"[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."   *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Where, as here, a classification does not impair the exercise of a fundamental right or categorize on the basis of an inherently suspect characteristic, the Fourteenth Amendment's requirement of equal protection is satisfied so long as "there is any

reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* The Supreme Court further "has made clear that a legislature need not 'strike at all evils at the same time or in the same way,' . . . and that a legislature 'may implement [its] program step by step, . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.'" *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 466 (1981) (citation omitted)); *accord Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1142 n.8 (9th Cir. 2011).

A State, moreover, "has no obligation to produce evidence to sustain the rationality of a statutory classification" because "a legislative choice is not subject to courtroom factfinding.'" *Heller v. Doe,* 509 U.S. 312, 320 (1993). It is thus "entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Commc'ns,* 508 U.S. at 315. The test is simply whether the involved distinction or classification "is at least debatable." *Clover Leaf Creamery,* 449 U.S. at 464. Once plausible grounds are asserted, the "inquiry is at an end"—*i.e.,* rebuttal is not permitted. *United States R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 179 (1980).

### B. Rational Basis for § 18-7042

**1.** Here, the substantive prohibitions in § 18-7042(1) plainly advance legitimate governmental interests:

- The Legislature indisputably can act to discourage securing employment through force, threat, misrepresentation or trespass as contrary to establishing informed, truly consensual employment relationships essential to entrepreneurial success and attendant benefit for Idaho's economy—the focus of § 18-7042(1)(a). The same is true with respect to subsection (c) had ALDF adequately pled a justiciable controversy.

- The Legislature indisputably can act to discourage unauthorized acquisition of an enterprise's records or documents and thereby protect the property interest possessed by the enterprise—the focus of § 18-7042(1)(b).

- The Legislature indisputably can act to discourage unauthorized use of an enterprise's facilities and thereby to protect the property interest possessed by the enterprise—the focus of § 18-7042(1)(d).

- The Legislature indisputably can act to discourage intentionally causing physical damage or injury to an enterprise's facilities or personnel and thereby to protect not only the enterprise's property interests but also the health and welfare of its employees—the focus of § 18-7042(1)(e).  Again, ALDF does not allege a justiciable controversy as to this provision or, so far as can be gleaned from the complaint, even challenge its validity.

Moreover, because these prohibitions apply to *all* persons or entities, the *sine qua non* of an equal protection claim—discriminatory classifications—does not exist.

2.    ALDF's equal protection challenge therefore is reduced to a contention that the Idaho Legislature lacked a rational basis to limit the statute to agricultural production facilities. Dkt. 1 ¶ 191.  However, this is an instance where the Legislature opted to "address[] itself to the phase of the problem which seems most acute to the legislative mind."  *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955).  The Legislature's choice to limit the statute to agricultural production facilities makes perfect sense for several reasons.

*First*, the statute responded directly to concerns raised by representatives of the agricultural industry—as ALDF repeatedly alleges.  It comes as no surprise that § 18-7042 focused on the industry prompting those concerns, particularly given the central role that agriculture plays in Idaho's economy and culture.  *See* Paul Levin *et al.*, *The Role of Agricultural Processing in Idaho's Economy: Status and Potential*, Univ. of Idaho Extension Bull. 886 (2013) ("[t]ogether the whole food processing industry and

agricultural industry in Idaho account directly for 6% of jobs, 15% of sales, and 7% of GSP" in 2011), *available at* http://www.cals.uidaho.edu/edcomm/pdf/BUL/BUL886.pdf (last visited Mar. 28, 2014).  *Second*, the concerns related more specifically to activities at production animal facilities.  The Legislature has long set in place responsibility for complaints over alleged maltreatment of such animals in the Idaho Department of Agriculture ("ISDA").  It could rationally conclude that limiting the new law to agricultural production facilities not only was an appropriately tailored response to the voiced concerns but also would not harm the state interest in preventing or redressing animal cruelty given ISDA's authority in this area.  *Third*, ISDA's monitoring and inspection authority as to production animal facilities is subject to constraints that balance the interests of effective law enforcement with the due process and property rights of animal production facilities.  Idaho Code §§ 25-3502(2) & (3), 25-3519.  The Legislature reasonably could conclude that, given the industry concerns which prompted the legislation, limiting the law to agricultural production facilities was an adequate method to minimize the possibility that this balancing of interests would be undermined or circumvented by private, self-help conduct of the type prohibited in § 18-7042(1).  Consequently, ALDF's equal protection challenge to the statute's limitation to agricultural production facilities fails under settled rational basis standards.

### C.    Immateriality of the Animus Allegations

ALDF's reliance on *USDA v. Moreno*, 413 U.S. 528 (1973), and its animus allegations for application of some species of heightened rational basis review are misplaced.  Dkt. 1 ¶ 190.  As the Court of Appeals has held, "[u]nder the *Moreno* analysis, a court may hold a statute not implicating a suspect class violative of equal protection if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's enactment."  *Mountain Water Co. v. Montana Dep't of Pub. Serv. Regulation*, 919 F.2d 593, 598-99 (9th Cir. 1990) (emphasis added); *see also Lyng v. Castillo*, 477 U.S. 635, 638-39 (1986) ("just as in . . .

*Moreno*—the decision which the District Court read to require 'heightened scrutiny'—the 'legislative classification must be sustained if the classification itself is rationally related to a legitimate governmental interest'"); *Wisc. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 654 (7th Cir. 2013) ("Where, as in *Moreno*, an act furthers no legitimate government interest, it fails rational basis review. *Moreno* is not a case . . . where the Court suggested a statute would have passed rational basis review but for animus towards a particular group.  As unfortunate as it may be, political favoritism is a frequent aspect of legislative action.").   Consequently, once a challenged law is found to serve a legitimate governmental interest, animus allegations become irrelevant.

Section 18-7042 easily passes muster because it prohibits by *any* person certain practices affecting agricultural production facilities and accompanied by force, threat, misrepresentation, trespass, seeking employment with intent to cause economic injury to the employer, or intentionally inflicting physical damage or injury.  ALDF, in other words, is not singled out for special regulation because of its alleged status as a politically disfavored organization; it is treated exactly the same as everyone else.  Section 18-7042 instead singles out *agricultural production facilities* for discrete treatment and, as discussed above, that "classification" is entirely rational.[3]

## V.    ALDF'S AS-APPLIED PREEMPTION CLAIMS ARE NOT RIPE

ALDF's preemption claims under the FCA, FMSA and CWA are necessarily as

---

[3] It bears noting that the Supreme Court and the Ninth Circuit have rejected use of various statements by lawmakers as evidence of improper legislative *motive*. *E.g.*, *United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("what motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork"); *Menotti v. City of Seattle*, 409 F.3d 1113, 1130 n.30 (9th Cir. 2005) ("[t]he Supreme Court has held unequivocally that it 'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive'"). Inquiries into legislative motive must be distinguished from inquiries into whether, regardless of motive, a rational basis exists for a statute.  ALDF's animus allegations conflate these inquiries to the extent that they suggest that statements by legislators or others as to reasons why the legislation should be adopted have relevance to equal protection analysis if a rational basis otherwise exists for the law—as it clearly does here.

applied—*i.e.*, those statutes preempt application of the Idaho law in certain "whistle blower" contexts—and have no effect otherwise on § 18-7042.  *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (summarizing facial challenge standards).  Whether such preemption claims will ever arise is, at best, uncertain and, more realistically, farfetched.  Under either characterization, they do not possess the necessary Article III concreteness.  *E.g.*, *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1139 (9th Cir. 1999) (en banc) (Article III requires that "the plaintiffs face a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement") (internal quotation marks omitted).

The sole allegations related to likelihood of an FCA claim appear in paragraphs 174 and 175 of the complaint.  One paragraph alleges that "there is at least one agricultural facility that has a contract with the federal government to provide meat for the National School Lunch Program or other food assistance programs" (¶ 174), and the other alleges that "some of the agricultural operations in Idaho are subject to federal inspection" (¶ 175).  Those allegations say nothing relevant about the probability of ALDF ever having an FCA claim.  The complaint also does not allege that any employee of an Idaho agricultural production facility has ever invoked the anti-retaliation provision in 31 U.S.C. § 3730(h) or why the prohibitions in § 18-7042(1) would necessarily be relevant to any retaliation that might arise in the future.  A constitutionally ripe controversy cannot rest "on 'a series of contingencies'" that may or may not occur. *Educ. Credit Mgmt. Corp. v. Coleman (In re Coleman)*, 560 F.3d 1000, 1005 (9th Cir. 2009).  It is anyone's guess that a FCA claim implicating the provisions of § 18-7042(1) may ever arise, and guesswork is not enough for Article III jurisdictional purposes.

ALDF's FSMA and CWA claims are equally, if not more, academic.  The FSMA prescribes an administrative process that must be exhausted, or attempted to be exhausted, before private suit can be initiated.  21 U.S.C. § 399d(4)) (private right of action where the Secretary of Labor has not issued a final decision within specified

period or has issued a written determination).   Otherwise, review must be had of the Secretary's final order pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 to 706.   21 U.S.C. § 399d(5).   The CWA not only prescribes an administrative process but also limits subsequent suit to review of the Secretary of Labor's decision under the APA.   As with the FCA claim, ALDF does not allege that the retaliation provisions of either statute have ever been invoked by an agricultural production facility employee, the likelihood of their being invoked in the future by such an employee, or the likelihood that the prohibitions in § 18-7042(1) would be implicated.

ALDF's invocation of these statutes, like the FCA preemption allegations, relies on "contingent future events that may not occur as anticipated, or indeed may not occur at all."   *Texas v. United States*, 523 U.S. 296, 300 (1988); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992).   Its FMSA and CWA claims thus assume, at the least, that (a) a person initiates or otherwise is part of investigatory or enforcement proceedings under those statutes; (b) the person has engaged in conduct that violated § 18-7042(1); (c) the person is an employee or, under the CWA § 1367(a), an authorized representative of employees of the entity whose practices is the subject of the proceedings; and (d) the employer must take an allegedly retaliatory action based upon the § 18-7042(1) violation.   Such a string of contingencies does not give rise to a justiciable controversy—particularly where ALDF fails to allege that any FMSA or CWA retaliatory action proceedings have ever occurred in Idaho, much less proceedings involving conduct proscribed under § 18-7042(1).   *See Portland Police Ass'n v. City of Portland*, 658 F.2d 1272, 1274 (9th Cir. 1981) ("appellants can neither offer any history of alleged deprivations [of counsel], nor assert with assurance that counsel will not be provided in the future").[4]   Any preemption claim, in short, must be measured against

---

[4] As the list of contingencies indicates, it is hardly clear how the retaliatory action provisions in the FMSA and CWA are implicated by § 18-7042.   Neither statute prohibits an employer from taking disciplinary action for reasons other than participation in an investigatory or enforcement proceeding.   *E.g.*, 21 U.S.C. § 399d(b)(2)(C)(iv) (relief unavailable "if the employer

actual facts, not in the context of a law school-quiz of the sort that ALDF would have this Court administer and grade.

## <u>CONCLUSION</u>

The Governor and Attorney General's motion to dismiss should be granted.

DATED this 3rd day of April 2014.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By____/s/ Clay R. Smith_____
    CLAY R. SMITH
    CARL J. WITHROE
    DEPUTY ATTORNEYS GENERAL

---

demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action alleged in the complaint").  Nevertheless, it is clear that those contingencies must exist before the merits of any preemption claim are ripe for judicial resolution.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of April 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Justin Marceau
jmarceau@law.du.edu

Matthew Liebman
mliebman@aldf.org

Matthew Strugar
matthew-s@petaf.org

Paige M. Tomaselli
ptomaselli@centerforfoodsafety.org

Richard Alan Eppink
reppink@acluidaho.org

Maria E. Andrade
mandrade@andradelegal.com

Thomas C. Perry
tom.perry@gov.idaho.gov

Cally A. Younger
cally.younger@gov.idaho.gov

_/s/ *Clay R. Smith*_
Clay R. Smith
Deputy Attorney General