UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, et al.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>C.L. BUTCH OTTER, in his official capacity as Governor of Idaho; and LAWRENCE WASDEN, in his official capacity as State of Idaho,<br><br>                    Defendants. | Case No. 1:14-cv-00104-BLW<br><br>MEMORANDUM DECISION AND ORDER |

**INTRODUCTION**

The Animal Legal Defense Fund, as well as various other organizations and individuals,[1] (collectively, "ALDF"), challenges section 18-7042 of the Idaho Code as

---

[1] The other plaintiffs include non-profit organizations People for the Ethical Treatment of Animals, American Civil Liberties Union of Idaho, Center for Food Safety, Farm Sanctuary, River's Wish Animal Sanctuary, Western Watersheds Project, Sandpoint Vegetarians, Idaho Concerned Area Residents for the Environment, Idaho Hispanic Caucus Institute for Research & Education, and Farm
(Continued)

ORDER - 1

unconstitutional.  The State defendants, Governor Butch Otter and Attorney General Lawrence Wasden, move to dismiss ALDF's claims. The Court heard oral argument on June 25, 2014, and took the motion under advisement. For the reasons set forth below, the Court will dismiss Governor Otter from the lawsuit, as well as ALDF's challenge to section 18-7042(1)(e). All other claims survive.

## SUMMARY

Section 18-7042 creates the new crime – "interference with agricultural production." I.C. § 18-7042(1)(d).  It, in essence, criminalizes undercover investigations and videography at "agricultural production facilities."

Section 18-7042 raises First Amendment concerns because it restricts protected speech. The State defends the provision as a restriction on conduct, designed to protect agricultural production facilities against trespass and conversion. The Court acknowledges that the State has a real and substantial interest in protecting private property. But the First Amendment requires more than the invocation of a significant government interest; it requires that the restriction's benefits be balanced against the burden on protected speech. The State therefore must justify a need to serve its interest in

_____

Forward; the news journal CounterPunch; author and journalist Will Potter; animal agriculture scholar and historian James McWilliams; investigator Monte Hickman; freelance journalist Blair Koch; and agricultural investigations expert Daniel Hauff.

protecting private property through targeting protected speech. Laws that restrict more protected speech than necessary violate the First Amendment. Because this question of whether section 18-7042 burdens more speech than necessary remains unanswered, the Court will not dismiss ALDF's First Amendment claim.

ALDF's Equal Protection claim also survives the State's motion to dismiss. Laws based on bare animus violate the Equal Protection Clause. ALDF alleges, as a factual matter, that the Idaho legislators acted with animus against animal-rights activists in passing section 18-7042. If ALDF's allegations of animus prove true, the Court must skeptically scrutinize any offered justifications for section 18-7042 to determine whether bare animus motivated the legislation or whether the law truly furthers the offered purposes.

Finally, the Court concludes that the State's passage of section 18-7042 presents ALDF with the immediate dilemma of choosing between complying with section 18-7042 and risking prosecution under the challenged provision by engaging in whistleblower conduct it says federal law explicitly encourages and protects. ALDF's preemption claims are therefore ripe for review.

For all these reasons, the Court will allow ALDF's claims to proceed with two exceptions: the claims against Governor Otter and ALDF's challenge to section 18-7042(1)(e) will be dismissed. The ultimate question of whether section 18-7042 is unconstitutional remains for another day.

ORDER - 3

# BACKGROUND[2]

Section 18-7042 was enacted last year after Mercy for Animals Dairy, a Los Angeles-based animal rights' group, released a video of workers abusing cows at the Bettencourt Dairies' Dry Creek Dairy in Hansen, Idaho. Mercy for Animals secretly captured the abuse while conducting an undercover investigation of the dairy. *Naerebout Aff.* ¶ 7, Dkt. 16-2.[3] The undercover investigator made the audiovisual recording without the dairy owner's knowledge or consent. *Id.* And, according to the law's supporters, the investigator "failed to immediately report to the dairy operator or to local or state authorities the conduct he recorded, allowing additional animal abuse to occur and depriving the animals of immediate care and treatment." *Id.* The investigator gave his recordings to Mercy for Animals, which provided it to the Idaho State Department of Agriculture. *Id.*

Mercy for Animals regularly conducts these undercover investigations. To gain access to animal facilities, such as the Dry Creek Dairy, Mercy for Animals Dairy members misrepresent their true identities, so they can secretly document animal abuse. Once they gain access to the facility, they make audio and video recordings without the

---

[2] The background is based on the allegations in the Complaint (Dkt. 1), unless otherwise noted.

[3] Bob Naerebout, the Executive Director of The Idaho Dairymen's Association, Inc. ("IDA"), submitted his affidavit in support of IDA's Motion to Intervene as Party-Defendant (Dkt. 16).

facility owner's consent. *Id*. Other similar undercover investigations at factory farms have found workers kicking pigs in the head, spray painting them in the eyes, stomping and throwing chickens and turkeys like footballs, smashing piglets' heads against concrete floors, and beating and sexually assaulting pigs with steel gate rods and hard plastic herding canes. *Compl.* ¶ 5, Dkt. 1.

In the case of the Dry Creek Dairy, the response was swift. The dairy owners expressed their surprise and sorrow at the abuse and quickly fired the five people shown abusing the animals. The owners also installed surveillance cameras throughout the facility, and promised to use the Mercy for Animals video as a training tool for their employees.[4]  The workers who abused the animals were prosecuted, and the dairy industry teamed with Idaho schools to offer training in proper care of animals.[5]

While the Dry Creek Dairy owners implemented these changes, the Idaho Dairymen's Association ("IDA") wrote and sponsored section 18-7042, which criminalizes the types of undercover investigations that exposed the abuse at the Dry Creek Dairy. *Naerebout Aff.* ¶ 10, Dkt. 16-2. The Idaho legislature passed the bill quickly, and it was signed by Governor Otter on February 28, 2014.

---

[4] Stephanie Zepelin, "Diary Owner Speaks Out After Release of Shocking Undercover Video," http://www.ktvb.com/home/Dairy-owner-speaks-out-after-release-of-shocking-undercover-video-173632071.html.4.

[5] Associated Press, "After Abuse, Idaho Schools Offer Dairy Training," http://www.ktvb.com/news/Afterabuse-Idaho-schools-offer-dairy-training-224793632.html.

ORDER - 5

The law creates the new crime – "interference with agricultural production." I.C. 18-7042.  A person commits the crime of interference with agricultural production if the person knowingly:

> (a) Is not employed by an agricultural production facility and enters an agricultural production facility by force, threat, misrepresentation or trespass;
>
> (b) Obtains records of an agricultural production facility by force, threat, misrepresentation or trespass;
>
> (c) Obtains employment with an agricultural production facility by force, threat, or misrepresentation with the intent to cause economic or other injury to the facility's operations…
>
> (d) Enters an agricultural production facility that is not open to the public and, without the facility owner's express consent or pursuant to judicial process or statutory authorization, makes audio or video  recordings of the conduct of an agricultural production facility's operations; or
>
> (e) Intentionally causes physical damage or injury to the agricultural production facility's operations, livestock, crops, personnel, equipment, buildings or premises.

I.C. § 18-7042(1) (a)-(e).  The statute defines agricultural production facility as "any structure or land, whether privately or publicly owned, leased or operated, that is being used for agricultural production." I.C. § 18-7042(2) (b).

The law's supporters argue that the law is necessary to protect dairy farmers, as well as other agricultural operations in Idaho, from media persecution and potential financial ruin. *Naerebout Aff.* ¶¶ 7, 8. Dkt. 16-2. On the other side, the law's detractors argue that the law – by silencing those who wish to publicize abusive, unsafe, and unsanitary practices at agricultural facilities – stifles public debate about modern

ORDER - 6

agricultural practices, discourages whistleblowers from coming forward out of fear of prosecution, and values profits over the public's health and safety. *Compl.* ¶¶ 1, 14, Dkt. 1.

Challenging the law as unconstitutional, ALDF filed this action, alleging violations of the Free Speech Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *Id.* ¶¶ 144-68. In addition, ALDF raises preemption claims under the retaliation prohibition in the False Claims Act, 31 U.S.C. § 3730(h), the employee protection provision of the Food Safety Modernization Act, 21 U.S.C. § 399d, and the employee protection provision of the Clean Water Act, 33 U.S.C. § 1367. *Id.* ¶¶ 173-86.

## ANALYSIS

### 1.  Governor Otter Is Not a Proper Defendant Under *Ex Parte Young*.

The Eleventh Amendment generally bars federal lawsuits against a state. *Los Angeles Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).  Yet few rules are without exceptions, and in *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court created an exception to this rule. This exception allows suits against state officials for the purpose of enjoining the enforcement of an unconstitutional state statute.  *Eu*, 979 F.2d at 704.

A plaintiff, however, is not free to randomly select a state official to sue in order to challenge an allegedly unconstitutional statute. Instead, the individual state official sued "must have some connection with the enforcement of the act." *Ex Parte Young,* 209 U.S.

at 157. "This connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Eu*, 979 F.2d at 704.  If a challenged statute is not of the type to give rise to enforcement proceedings, a state official nonetheless may be named as a defendant under *Ex Parte Young* if he has responsibility to "give effect" to the law. *See, e.g., id.* at 704.

ALDF relies on two provisions to justify applying the *Ex Parte Young* exception to Governor Otter: sections 19-4522 and 67-802 of the Idaho Code. However, ALDF fails to explain how either of these provisions provides the requisite connection between the Governor and enforcement of section 18-7024.

Section 19-4522 is part of the Uniform Criminal Extradition Act of 1936, and it requires the Governor to issue a warrant for the arrest in another jurisdiction of a person charged with a crime in Idaho if he receives a rendition application meeting the requirements specified in section 19-4523 of the Idaho Code. The Governor's duty in this regard is entirely ministerial – he *must* issue such a warrant once he receives a proper rendition application.  And the decision to prosecute and request rendition rests with the involved county's prosecuting attorney. Simply because the Governor discharges a wholly separate duty under the extradition statute does not give him enforcement authority over section 18-7042 and does not create a justiciable controversy against the Governor.

ORDER - 8

Likewise, section 67-802 does not provide the requisite enforcement connection to overcome Eleventh Amendment immunity. Section 67-802 gives the Governor the discretion to "require the attorney general to aid any prosecuting attorney in the discharge of his duties." Such general broad powers to enforce or execute the laws of a state by a state official, alone, are not sufficient to make the officer a proper party defendant. *Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir. 1991) (per curiam); *S. Pac. Transp. Co. v. Brown*, 651 F.2d 613 (9th Cir. 1980).  Accordingly, the *Ex Parte Young* exception does not apply to Governor Otter, and he must be dismissed as a defendant.

**2.  ALDF Has Standing to Challenge Subsections 18-7042(1)(c) But Not Subsection (e).**

The State contests ALDF's standing to challenge subsections (c) and (e) of section 18-7042.  It argues that ALDF fails to allege a concrete plan to violate either of these subsections, which is required to establish standing under Article III. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

First Amendment cases, however, "present unique standing considerations." *Libertarian Party of Los Angeles County v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013). The Supreme Court, to avoid the chilling effect of sweeping restrictions, "has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). Consistent with this approach, when a threatened enforcement effort implicates First

Amendment rights, "the inquiry tilts dramatically toward a finding of standing." *Id.* This means ALDF need only show they engage in a "course of conduct arguably affected with a constitutional interest and that there is a credible threat that the provision will be invoked against the plaintiff." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013).

In this case, ALDF has alleged a concrete plan to violate subsection (c) but not subsection (e).

Subsection (c) prohibits "[o]btain[ing] employment with an agricultural production facility by …misrepresentation with the intent to cause economic… injury to the facility's …business interests." The ADLF plans to obtain employment at agricultural facilities with the intent to expose illegal, inhumane, or unsafe behavior. *Compl.* ¶¶ 4, 33, 39, 41, 83, 84, 86, 90-94, 97-121. ALDF hopes that exposure of illegal or abusive behavior will result in boycotts, "food safety recalls, citations for environmental and labor violations, evidence of health code violations, plant closures, criminal convictions, and civil litigation," *id.* ¶ 4 – all of which could and likely would cause economic injury to an alleged violator's business. Because exposure of such conduct could hurt a facility's profits and reputation and economically injure its business, the Court believes that ALDF has alleged intent to violate subsection (c).

The State responds that ALDF does not allege *a specific* intent to cause economic injury to an agricultural production facility, and therefore it does not have standing. Such an argument could be used to persuade a jury to acquit ALDF of charges brought under

the statute, but it would not necessarily save it from the prosecution itself. Rarely do prosecutors have direct evidence of intent; instead, they often must ask a jury to infer intent from a defendant's actions. In this case, because a natural consequence of exposing animal abuse at an agricultural production facility is economic injury, intent could be implied by the act of exposing abuse. This could subject ALDF to prosecution under section 18-7042. Therefore, there is a credible threat that the provision will be invoked against ALDF. This is enough to establish standing to challenge subsection (c).

By contrast, ALDF has not alleged intent to violate subsection (e), which prohibits "caus[ing] physical damage or injury to [an] agricultural facility's operations." ALDF does not allege intent to cause "physical" damage or injury. And the Court finds unpersuasive its argument that "physical" only modifies "damage" and not "injury," so that a showing of physical injury is not required by the literal language of the statute.

The "most natural grammatical reading" of the statute is that the initial adjective, "physical," modifies both "damage" and "injury." *See, e.g., U.S. v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) (holding that the "most natural grammatical reading" of a statute is that an initial adverb modifies each verb in a list of elements of a crime). If the legislature intended to sever "physical" from "injury," it would have criminalized the act of causing "injury or physical damage." Why would the legislature use the redundant and awkward phrasing of "physical damage or physical injury"? The Fourth Amendment, for example, does not protect against "unreasonable searches and unreasonable seizures."

ORDER - 11

And the drafters, by putting the modifier, "unreasonable" in front of only the initial term "searches," surely did not intend to prohibit *all* seizures, unreasonable or not.

In short, the Court cannot give credence to ALDF's argument that "physical" only modifies "damage." The Court will therefore dismiss ALDF's claim with respect to this provision.

**3.  ALDF Has Stated a Claim under the First Amendment.**

The State contends that section 18-7042 does not implicate the First Amendment because it is a generally applicable law aimed solely at wrongful conduct, not speech. Therefore, the State argues, ALDF's First Amendment claim should be dismissed.

**A.  *The Rule of General Applicability Does Not Exempt Section 18-7042 from First Amendment Scrutiny.***

Relying primarily on the Supreme Court's decision in *Cohen v. Cowles Media Co.*, 501 U.S. 663, 665 (1991), the State argues that section 18-7042 escapes all First Amendment scrutiny because it "applies to a broad component of Idaho commerce and regulates conduct not just by individuals or organizations conducting 'undercover' or other investigations but by all persons." *Defs' Opening Br.* at 12, Dkt. 12-1.  In *Cohen*, the Supreme Court held that the First Amendment did not prohibit a confidential source from recovering damages from a newspaper publisher who made and broke a promise of confidentiality given in exchange for information. *Id.* at 665.  In reaching this conclusion, the Court explained, "generally applicable laws do not offend the First Amendment

simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Id.* at 669.

In other words, *Cohen* teaches that the First Amendment does not grant the press special license to break the law in gathering and reporting news. *Id.* The press, just like the general public, must obey copyright laws, *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 576–579, and labor laws*, Associated Press v. NLRB*, 301 U.S. 103 (1937), and antitrust laws, *Associated Press v. United States*, 326 U.S. 1 (1945). *Id.* Similarly, the press cannot escape liability for breaking enforceable promises, *Cohen*, 501 U.S. at 665, or for committing state common law torts, *Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971).

But this rather unremarkable proposition – that the press must follow generally applicable, content-neutral laws in gathering the news – does not mean that section 18-7042 automatically escapes First Amendment scrutiny because it is "generally applicable."  To read *Cohen* so broadly would essentially eviscerate the First Amendment. As ALDF points out, if this were the rule, a law prohibiting all demonstrations, for example, would not implicate the First Amendment because it applies to all citizens equally. This simply is not the law. Even a generally applicable law may be subject to heightened scrutiny under the First Amendment. *Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622 (1994). This is true even if the law does not directly regulate speech. *See, e.g., N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) (interference with business relations); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46

(1988) (intentional infliction of emotional distress); *Cohen v. California*, 403 U.S. 15 (1971) (breach of the peace). The fact that a law applies to all persons is the starting point for constitutionality, not the ending point.

Moreover, the Court questions whether section 18-7042 even qualifies as a "generally applicable law." *Cohen* involved a common tort claim, promissory estoppel, which was routinely applied to all citizens in similar circumstances. The Supreme Court found "little doubt that the Minnesota doctrine of promissory estoppel [was] a law of general applicability," as it did not target or single out the press but instead generally applied "to the daily transactions of all citizens of Minnesota." *Id.* at 670. The Court therefore refused to invalidate the plaintiff's promissory estoppel claim simply because the defendant was the press. *Id.*

By contrast, "laws that single out the press, or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. System*, 512 U.S. at 640 (internal quotation marks and citation omitted). ALDF alleges that section 18-7042 specifically targets undercover investigators who intend to publish videos they make through the press and seeks to suppress speech critical of animal agricultural practices. If ALDF's allegations prove true – that the law was not designed as a generally applicable prohibition on fraud or trespass or conversion, but rather as an indirect penalty for criticizing animal agriculture – the Court would have to apply at least some degree of heightened scrutiny.

ORDER - 14

To further distinguish this case from *Cohen*, it should also be noted that the plaintiff in *Cohen* sought only compensatory damages, which the majority did not view as "a form of punishment." *Cohen*, 501 U.S. a 670. The statute at issue here, however, mandates state-imposed criminal sanctions, which are undeniably a form of punishment. This distinction alone places this case in an entirely different category than *Cohen*, and brings it closer to *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979), where the Supreme Court held that the state cannot make it a crime to publish lawfully obtained, truthful information about a matter of public significance, "absent a need to further a state interest of the highest order." *Id.* at 103. By providing victim-restitution damages for violations of section 18-7042, the State here may be doing just that and would therefore need to articulate a very compelling state interest to justify application of criminal penalties.

**B.** ***Section 18-7042 Regulates Speech.***

The second part of the State's argument – that section 18-7042 regulates only conduct and not speech or other expressive activity – is likewise unpersuasive. Section 18-7042 bans certain misrepresentations, which is a ban on pure speech, as well as audiovisual recordings, which is a ban on conduct preparatory to speech. As discussed below, both types of expressive activity, in the context of this case, are protected speech.

The Court's finding that the provisions regulate speech is significant because "[r]egulations that inhibit speech must comport with the requirements of the First Amendment." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 817 (9th Cir. 2013). To make

ORDER - 15

this determination whether section 18-7042 violates the First Amendment, the Court must balance the government's interest in protecting private property against the burden section 18-7042 places on protected speech. How the Court will conduct this balancing depends on a number of factors, including whether the regulation is content-based or content-neutral. *Id.*

Below, the Court addresses whether section 18-7042 implicates protected speech and is therefore subject to First Amendment scrutiny. The Court also addresses whether section 18-7042 is content-based or content-neutral. The Court, however, does not reach, through this motion to dismiss, the ultimate question of whether Idaho's interest in protecting private property justifies its restriction on protected speech.

*(1) Misrepresentation*

Section 18-7042 makes it a crime for a person to (1) gain access, (2) obtain records from, or (3) employment with agricultural production facilities through "force, threat, misrepresentation, or trespass." I.C. § 18-7042(1)(a)-(c). ALDF challenges these provisions, which ban certain misrepresentations, as a content-based suppression of protected speech.

False statements that do not constitute defamation, fraud, or perjury are fully protected speech. *United States v. Alvarez*, 132 S. Ct. 2537, 2544-45 (2012). "Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 n.19 (1964)

ORDER - 16

(quoting John Stuart Mill, *On Liberty* 15 (Oxford: Blackwell 1947)). Regardless, however, of whether a false statement contributes to the public discourse, it may be protected speech: "The First Amendment is a value-free provision whose protection is not dependent on the truth, popularity or social utility of the ideas and beliefs which are offered." *Meyer v. Grant*, 486 U.S. 414, 419 (1988) (internal quotation marks omitted).

The State responds that the misrepresentation provisions actually prohibit "certain forms of conduct – *e.g.* trespass and conversion – that enjoy no First Amendment protection at all." *Defs' Reply* at 4, n.1, Dkt. 35. In making this argument, the State correctly notes that consent is a defense to both trespass and conversion, but consent induced by misrepresentation can vitiate the consent. *Restatement (Second) of Torts* § 173. Invoking this rule – that misrepresentation vitiates consent – the State reasons that section 18-7042, by prohibiting certain misrepresentations, actually prohibits trespass and conversion, not speech.

There are several problems with this argument. First, it is a fallacy to suggest, as the State does, that the misrepresentation provisions prohibit only conduct and not speech. Under no reading of the statute does a prohibition against telling lies become a prohibition of conduct. False speech is still speech – period.  And, as previously noted, even false speech may deserve some First Amendment protection. In fact, in some circumstances, a law criminalizing misrepresentation may be facially content-based and must satisfy the "most exacting scrutiny." *Alvarez*, 2548. The State cannot deflect this

exacting scrutiny by trying to re-characterize what is unequivocally speech – telling lies (or omitting truths) – as conduct.

Second, the State's interpretation of section 18-7042 as prohibiting only trespass and conversion does not withstand the application of basic canons of statutory construction. Section 18-7042 explicitly prohibits trespass on agricultural production facilities. Yet, the State contends that the clause criminalizing certain misrepresentations really criminalizes trespass on agricultural facilities. Taking the State at its word, the statute would make it a crime for a person to (1) gain access to (2), obtain records from, or (3) employment with agricultural production facilities through "force, threat, [trespass], or trespass." I.C. § 18-7042(1)(a)-(c).  As this exercise illustrates, the State's proposed interpretation would make the statutory language prohibiting misrepresentation superfluous, which violates the basic principle that courts give effect, if possible, to every word of a statute. *See, e.g., Bowsher v. Merck & Co*., 460 U.S. 824, 833 (1983).

The Court must therefore conclude that section 18-7042's ban on certain misrepresentations prohibits more than just trespass or conversion. Indeed, a misrepresentation does not always vitiate consent. *See, e.g., Desnick v. Am. Broad. Cos.,* 44 F.3d 1345, 1351 (7th Cir. 1995). And not all lies to gain access to property or documents or to secure employment are actionable. *See, e.g., Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 820 (9th Cir. 2002); *Food Lion, Inc. v. Capital Cities/ABC, Inc*., 194 F.3d 505, 518 (4th Cir. 1999) ("The jury's finding of trespass therefore cannot be sustained on the grounds of resume misrepresentation.").

ORDER - 18

A protected union activity known as "salting" is a prime example of the legal use of misrepresentation to gain access to a worksite. *Trades Council Amicus Curiae Br.* at 3, Dkt. 30-1. Because union organizers are often denied access to worksites, unions have turned to salting, "which is to send paid union representatives to apply for positions which, if secured, would enable them as employees to solicit support among coworkers for union representation." *Id.* A salter frequently lies about or omits his or her union affiliation on an employment application because identifying oneself as a union organizer may preclude an offer of employment. *Id.* Salting is not only legal but is actually protected activity under the National Labor Relations Act. *NLRB v. Town & Country Elec.*, 516 U.S. 85, 96, (1995). Because salting is protected union activity, presumably the lies a salter tells to obtain employment would be protected speech – and not a trespass.  This example squarely demonstrates that the misrepresentation provisions do encompass protected speech.

The State also suggested during oral argument that the "with the intent to cause economic or other injury" requirement present in subsection (1)(c) saves it from First Amendment scrutiny. It does not.

Certainly, misrepresentations designed to cause material harm are not protected by the First Amendment. *Alvarez*, 13 S.Ct. at 2546. But in this case the limited misrepresentations ALDF says it intends to make – affirmatively misrepresenting or omitting political or journalistic affiliations, or affirmatively misrepresenting or omitting certain educational backgrounds – will most likely not cause any material harm to the

deceived party. To illustrate, if an undercover investigator omits certain facts, like political affiliations, to secure employment with agricultural facility and then publishes a false story, the harm would stem from the publication of the false story, not the lies told to gain access to the facility. And the facility owner could seek damages for defamation. Conversely, if an undercover investigator lies to get a job at an industrial agricultural facility and then publishes a true story revealing the conditions present at the facility without causing any other harm to the facility, there is no compensable harm for fraud. *See, e.g., Food Lion, Inc. v. Capital Cities/ABC, Inc*., 194 F.3d 505, 512-513 (4th Cir. 1999). Thus, such misrepresentations would be protected speech because they are not made to cause material harm to an agricultural production facility but to expose truths about the agricultural industry.[6]

In sum, the Court finds that the misrepresentations section 18-4072 criminalizes are entitled to at least some First Amendment protection.

*(2) Ban on Audiovisual Recording*

Section 18-7042 also makes it a crime for any person – no matter how they gained access to the facility – from making audio or video recordings without the facility owner's consent.  I.C. § 18-7042(1)(d). The State justifies this ban on audiovisual

---

[6] The Court recognizes that this analysis may appear to conflict with the standing analysis. But the question of whether a plaintiff has standing to bring a First Amendment claim is vastly different than whether a statute regulates protected speech.

recording as a regulation on conduct that does not directly limit the dissemination of speech. But "laws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010).  Limits on campaign finance, for example, implicate the First Amendment because the money at issue enables subsequent political speech. *Buckley v. Valeo*, 424 U.S. 1, 19 (1976).  In this same vein, the "act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *ACLU v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012).

In fact, an undercover investigator who never publishes a video after surreptitiously filming a facility's operations will likely never be punished for the filming because, in most cases, authorities will not become aware of a violation of the statute until a video is published. Authorities will therefore only enforce the statute against investigators who choose to publish their videos. A law that expressly punished activists for publishing videos of agricultural operations would be considered a regulation of speech. As enforcement of section 18-7042 will likely have the same effect, it too should be considered a regulation of speech. The Court therefore finds that the ban on unauthorized audiovisual recording restricts speech and is subject to First Amendment scrutiny.

ORDER - 21

C. *Strict Scrutiny Applies to Section 18-7042.*

The State may regulate protected speech. But those restrictions generally must be content-neutral. Content-based restrictions on speech presumptively violate the First Amendment. *City of Renton v. Playtime Theatre*s, 475 U.S. 41, 47 (1986). A state is prohibited from restricting protected activity based on its content because such laws threaten to "manipulate the public debate through coercion rather than persuasion," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994), and allow government to "effectively drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1982). Content-based exemptions may pass constitutional muster only if they are the least restrictive means to further a compelling interest. *See Hoyle v City of Oakland*, 653 F.3d 835, 853 (9th Cir. 2011).

"A regulation is content-based if either the underlying purpose of the regulation is to suppress particular ideas or if the regulation, by its very terms, singles out particular content for differential treatment." *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc) (citation omitted). On its face, section 18-7042 targets one type of speech – speech concerning "the conduct of an agricultural production facility's operations," I.C. § 18-7042, – but leaves unburdened other types of speech at an agricultural production facility. An employee who films, without the owner's consent, animals being abused on a farm may be prosecuted and fined for violating section 18-7042; but an employee who films, without consent, the farm owner's children (presuming

the children are only visiting the facility and not working), may not. Section 18-7042 is therefore content based.

This conclusion is buttressed by the legislative history. *Valle Del Sol, Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013) (relying, in part, on legislative history to determine that day laborer provision was content-based). ADLF's complaint contains various statements from Idaho legislators suggesting a content-based legislative purpose of silencing animal activists. *Compl.* ¶¶ 61–74.  ALDF alleges that "Representative Pence was clear in her intent to prevent animal rights activists' speech, stating that by 'releasing the footage to the Internet . . . [and authoring] petitions calling for a boycott . . . the organizations involved [in an undercover investigation of a milk producer] then crossed the ethical line for me.'" *Id.* ¶ 66. ALDF also cites the statements of Representative Batt, who expressed a need to protect the dairy industry from 'the court of public opinion.'" *Id.* ¶ 68.  ALDF further alleges that other legislators referred to animal rights activists as "terrorists," "extremists," "vigilantes," and "marauding invaders" for investigating and exposing animal agriculture facilities. *Id.* ¶¶ 62–64, 67, 69.

Section 18-7042's restitution provision also reinforces the conclusion that it is a content-based restriction. The law mandates a restitution award for double the loss, including "direct out-of-pocket losses or expenses," I.C. § 19-5304(1)(a), related to any violation of the statute. I.C. §18-7042(4). Other than physical damage to property, the most likely loss that would flow from a violation of section 18-7042 would be losses associated with the publication of a video critical of an agricultural facility's practices. In

fact, the more successful an activist is in mobilizing public opinion against a facility by publishing a video or story critical of the facility the more the activist will be punished. Moreover, agricultural operations will be able to collect the same damages as in a libel action without satisfying the constitutional defamation standard, which the Supreme Court has expressly prohibited. *See Hustler*, 485 U.S. at 53.

It could even be said that section 18-7042 discriminates based on viewpoint. A regulation of speech is viewpoint based if it is motivated by the desire to suppress a particular viewpoint or it distinguished between speakers based on the viewpoint expressed. See *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc). Section 18-7042 allows job applicants who make misrepresentations to secure employment with the goal of praising the agricultural facility to skate unpunished while punishing job applicants who misrepresent themselves with the intent of exposing abusive or unsafe conditions at the facility.  I.C. § 18-7042(1)(c).  Likewise, the law only prohibits unauthorized filming, so it is more likely that those who wish to portray the agricultural facility in a positive light will be allowed to film while those critical of the industry will not. By, in effect, privileging speech that is supportive of the agricultural industry, section 18-7042 impermissibly discriminates on viewpoint.

For all of these reasons, the Court concludes that I.C. § 18-7042 must survive the highest level of scrutiny to pass constitutional muster, and that ALDF has, under that standard, stated a colorable First Amendment claim.

ORDER - 24

**4.  ALDF States a Plausible Equal Protection Claim.**

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of its laws." U.S. Const. amend. XIV, § 1. The Constitution "neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting). But the guarantee of equal protection coexists with the practical necessity that most legislation must classify for some purpose or another. *Romer v. Evans*, 517 U.S. 620, 631 (1996).

Section 18-7042 creates a classification between whistleblowers generally and whistleblowers in the agricultural industry. Typically, when a law creates a classification but does not target a suspect class or burden a fundamental right, the court presumes the law is valid and will uphold it so long as it rationally relates to some legitimate governmental purpose. *Heller v. Doe*, 509 U.S. 312, 319 (1993). The court defers to the judgment of the legislature if there is at least a debatable question whether the underlying basis for the classification is rational. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464 (1981).

However, even under the most deferential standard of review, the court must still "insist on knowing the relation between the classification adopted and the object to be obtained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). This search for a rational relationship "ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633. As a result, laws enacted with animus cannot survive rational basis review. *Dep't of Agric. v. Moreno*, 413

U.S. 528, 534 (1973). "The Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *United States v. Windsor*, 133 S.Ct. 2675 (2013) (quoting *Moreno*, 413 U.S. at 534-535).

ALDF alleges, as a matter of fact, that the Idaho legislators acted with animus in passing section 18-7042, in violation of the Equal Protection Clause. *Compl.* ¶¶ 18, 21, 56–75, 187–95.  Specifically, ALDF alleges that "the law was drafted by the Idaho Dairymen's Association 'with the express purpose of disadvantaging animal rights and whistleblower speech' and was supported by multiple legislators 'specifically because it would silence animal protection organizations.'" *Compl.* ¶¶ 72, 74.  By alleging animus, it would seem that ALDF has stated a plausible Equal Protection claim.

The State responds that ALDF's allegations of animus are irrelevant because courts may only reach the animus question if they find no other rational basis for a classification other than animus. The State is correct in arguing that a classification bears a strong presumption of validity and a legislative choice is not subject to courtroom fact-finding; indeed, it may be based on rational speculation unsupported by evidence or empirical data. *Heller v. Doe*, 509 U.S. 312, 320 (1993).  In the past, it was therefore "entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

ORDER - 26

However, in recent cases, the Supreme Court appears to have shifted its approach to equal protection cases involving allegations of animus. *SmithKline Beecham Corp. v. Abbott Lab.*, 740 F.3d 471, 481 (9th Cir. 2014). In *Windsor*, "instead of conceiving of hypothetical justifications for the law [in question], the Court evaluated the 'essence' of the law," looking to the law's 'design, purpose, and effect.'" *Id.* (quoting *Windsor*, 133 S.Ct. at 2693). As explained by the Ninth Circuit, "*Windsor* thus requires not that we conceive of hypothetical purposes, but that we scrutinize Congress's actual purposes." *Id.* at 482.

Although *Windsor* addressed a classification based on sexual orientation, the Court did not limit its prohibition against animus-based classifications to sexual orientation. In fact, the Court in *Windsor* relied heavily on *Moreno,* in which the Court invalidated an amendment to the Food Stamp Act that denied food stamps to any household containing one or more people unrelated by blood or marriage to others in the household.  *Moreno* had nothing to do with classifications based on sexual orientation. Yet it too applied "a more searching form of rational basis review" because the law exhibited a desire to harm a politically unpopular group.  *Lawrence v. Texas,* 539 U.S. 558, 580 (2003); *see also Mountain Water Co. v. Montana Dep't of Pub. Serv. Regulation*, 919 F.2d 593, 599 (9th Cir. 1990) (acknowledging that *Moreno* applied "heightened scrutiny").

In *Moreno*, the Supreme Court found that the classification in question (households of related persons versus households containing one or more unrelated

persons) was "clearly irrelevant to the stated purposes of the [Food Stamp] Act." 413

U.S. at 534. Therefore, in an effort to discern the real purpose of the law, the Court

looked to legislative history to explain the amendment. Based on the "little legislative

history" available, the Court found that the amendment was intended to prevent "hippies"

and "hippie communes" from participating in the food stamp program. *Id.*  Because the

limited legislative history revealed an animus toward "hippies" and "hippie communes,"

the Court refused to defer to hypothetical alternative justifications offered by the

government. *Id*.

        Here, ALDF's allegations arguably reveal an animus toward animal-rights

activists. And if ALDF's allegations of animus prove true, the Court must skeptically

scrutinize any offered justifications for section 18-7042 to determine whether bare

animus motivated the legislation or whether the law truly furthers the offered purposes.

To be rational, a law must serve a "legitimate" end, and antipathy can never be a

legitimate end.

        This does not necessarily mean that the Court will find that section 18-7042

violates the Equal Protection clause, but only that the Court will examine any potential

reasons for the law with particular care to determine whether the statute reflects an

impermissible bias against animal-rights activists.  Indeed, ALDF may face a very

difficult battle in proving its allegation that section 18-7402 "serves no rational, non-

animus based purpose." *Compl.* ¶ 193, Dkt. 1.

        ORDER - 28

**5.  ALDF's Preemption Claims Are Ripe for Review.**

A state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" is preempted. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Here, ALDF alleges that section 18-7042 is preempted by three different federal statutes[7] – the retaliation prohibition in the False Claims Act ("FCA"), the employee protection provision of the Food Safety Modernization Act ("FSMA"), and the employee protection provision of the Clean Water Act ("CWA") – because each of the identified statutes encourages and protects the very same whistleblowing activity that section 18-7042 criminalizes. Therefore, argues ALDF, section 18-7042 stands as an unconstitutional impediment to the vitality and enforcement of federal law.

The State argues that ALDF's "as-applied" preemption claims should be dismissed because they are not ripe for adjudication. The ripeness doctrine aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication.  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, (1967), overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105, (1977). Whether a dispute is ripe

---

[7] Amicus Curiae Idaho Building Trades Council and Idaho State AFL-CIO allege that section 18-7042 is also preempted by the National Labor Relations Act, 29 U.S.C. § 141 *et seq.* because section 18-7042 prohibits conduct that is protected under the NRLA – namely, "salting," which is to send paid union representatives to apply for positions that would enable them to solicit support among co-workers for union representation. The Court finds this argument to be compelling, but the Trades Council is neither a plaintiff nor is NLRA preemption a claim alleged in the Complaint. Therefore, the Court will not address this argument.

ORDER - 29

depends on "the fitness of the issues for judicial decision" and "the hardship to the parties" of withholding review. *Id.*

The Court must determine first whether ALDF's preemption claims are "fit for judicial determination." Fitness for resolution hinges on whether the matter involves uncertain events that may not happen at all, and whether the issues involved are legal questions or factual ones. *Id.* In this case, ALDF brings a facial preemption challenge (not an as-applied challenge, as the State contends). And the overwhelming majority of courts hold that cases involving facial challenges based upon preemption are fit for judicial review even without specific factual development or the law actually being enforced. *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev. Comm'n.,* 461 U.S. 190, 201 (1983) (resolution of preemption issue need not await development of record by state interpretation or application of statute); *see also Abbott,* 387 U.S. at 149 (statutory construction was a purely legal issue ripe for review). Accordingly, the Court finds that this matter is fit for judicial review; therefore the first factor for prudential ripeness is met.

Under the second prong of the ripeness inquiry – the potential hardship of withholding judicial resolution – the Court examines whether the challenged action creates a direct and immediate dilemma for the parties. *Chavez v. Director, Office of Workers Comp. Programs,* 961 F.2d 1409, 1415 (9th Cir. 1992). The State suggests that enactment of section 18-7042 does not create such a dilemma because ALDF's claims are subject to too many contingencies. The State points to the fact that an FCA retaliation

claim can arise only if (1) an individual seeks qui tam relief against an agricultural facility enterprise and (2) the defendant retaliates against that individual. The State argues it is entirely speculative to assume that the retaliation prohibited under the FCA would arise in the future or that the retaliatory action would be based on conduct prohibited under section 18-7042. The FSMA and CWA preemption claims, according to the State, are even more attenuated: "[t]hey funnel retaliation claims through administrative processes that the complaint does not allege has ever been initiated, much less initiated to redress employer retaliation predicated on 'whistleblower' conduct that would have subjected the employee to potential prosecution under § 18-7042 had the statute then been in effect." *Defs' Reply* at 9-10, Dkt. 35.

But ALDF does face an immediate dilemma: it must choose between complying with section 18-7042 and risking prosecution by engaging in whistleblower conduct it says federal law explicitly encourages and protects.  Multiple courts have held that the choice between refraining from conduct proscribed by an allegedly unconstitutional rule or risk running afoul of the rule creates an immediate dilemma.  *See, e.g., Abbott Labs,* 387 U.S. at 152-53; *City of Auburn v. Qwest Corp.* , 260 F.3d 1160, 1171-1172 (9th Cir. 2001), overruled on other grounds by *Sprint Telephony PCS, L.P. v. Cnty. of San* Diego, 543 F.3d 571 (9th Cir. 2008). As explained by the Supreme Court in *Abbott Laboratories,* "where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs

with serious penalties attached to noncompliance, access to the courts…must be permitted, absent a statutory bar or some other unusual circumstance." 387 U.S. at 153.

ALDF faces this exact conundrum of choosing between altering its conduct to comply with section 18-7042, which it alleges is unconstitutional, and risking criminal penalties. There can be no question that ALDF has expressed a present intention to engage in conduct that could subject it to prosecution under section 18-7042.  Just as in *Abbott Laboratories,* if it fails to observe section 18-7042 in its quest to uncover food safety issues and animal abuse, it is "quite clearly exposed to the imposition of strong sanctions." *Id.* at 154.  Nor is ALDF's dilemma speculative or conjectural.  "*Abbott Laboratories* does not require Damocles' sword to fall before we recognize the 'realistic danger of sustaining a direct injury' that is the heart of the constitutional component of ripeness." *Qwest Corp.*, 260 F.3d at 1172. Their preemption claims are therefore ripe.

The Court reiterates that it does not speak to the merits of ALDF's preemption claims – it only says they are ripe for review. It is quite possible that no conflict exists between federal law and section 18-7042, and section 18-7042 is not preempted. This question remains open.

## ORDER

**IT IS ORDERED that** Defendants' Motion to Dismiss (Dkt. 12) is GRANTED to the extent that Governor Otter will be dismissed as a defendant. Additionally, all claims under section 18-7042(1)(e) will be dismissed.  The Motion to Dismiss is DENIED in all other respects.

ORDER - 32



DATED: September 4, 2014

_____
B. Lynn Winmill
Chief Judge
United States District Court