LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation

CLAY R. SMITH, ISB #6385
CARL J. WITHROE, ISB #7051
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, ID  83720-0010
Telephone:  (208) 334-2400
Facsimile:  (208) 854-8073
clay.smith@ag.idaho.gov
carl.withroe@ag.idaho.gov
Attorneys for Defendant Wasden

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, *et al.* ) | |
| ) | |
| Plaintiffs, ) | Case No. 1:14-cv-00104-BLW |
| ) | |
| vs. ) | |
| ) | |
| C.L. "BUTCH" OTTER, in his official capacity ) | **DEFENDANT WASDEN'S** |
| as Governor of Idaho; LAWRENCE WASDEN, ) | **RESPONSE TO MOTION FOR** |
| in his official capacity as Attorney General of ) | **PARTIAL SUMMARY JUDGMENT** |
| Idaho, ) | **FILED ON NOVEMBER 18, 2014** |
| ) | |
| Defendants. ) | |

## INTRODUCTION

Plaintiffs (collectively "ALDF") request partial summary judgment against Defendant

Wasden ("Attorney General") under the First Amendment and the Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution with respect to Idaho Code § 18-

7042(1)(a) through (d).  Dkt. 74.[1]  ALDF contends that these provisions violate the First Amendment because they contain content- and view-point-based restrictions that are neither compelling nor the least intrusive alternatives and suffer from overbreadth and violate the Equal Protection Clause because they "were motivated in substantial part by animus towards animal welfare groups."  Dkt. 77-1 at 10.  ALDF does not seek summary judgment with respect to its Supremacy Clause claims under the False Claims Act, 31 U.S.C. § 3730(h), the employee protection provision of the Food Safety Modernization Act, 21 U.S.C. § 399d, and the employee protection provision of the Clean Water Act, 33 U.S.C. § 1367.

### A.    SEPTEMBER 4, 2014 MEMORANDUM DECISION

In large measure, ALDF's analysis reprises the arguments advanced in opposition to Defendants' motion to dismiss.  *See* Dkt. 23 at 3-22.  The Attorney General's legal position remains unchanged.[2]  This Court's memorandum decision granting in part and denying in part Defendant's motion thus establishes the basic parameters against which to resolve ALDF's request for partial summary judgment.   The Attorney General summarizes his understanding of the Court's analysis below.

### 1.    First Amendment.  This Court relied on *Turner Broadcasting System,*

---

[1] This Court dismissed Defendant Otter on Eleventh Amendment grounds, concluding that the enforcement connection between § 18-7042 and his responsibilities as Governor required under *Ex parte Young*, 209 U.S. 123 (1908), does not exist.  Dkt. 68 at 7-9.  It further held that ALDF's allegations in the complaint did not establish standing to challenge § 18-7042(1)(e).  Dkt. 68 at 11-12.  ALDF does not seek summary judgment as to the complaint's Supremacy Clause-based claims that, like the First and Fourteenth Amendment claims, withstood Defendants' ripeness challenge under Fed. R. Civ. P. 12(b)(1).

[2] The Attorney General raised standing challenges in the motion to dismiss as to § 18-7042(1)(c) and (e).  Dkt. 12-1 at 7-9.  This Court agreed as to subsection (1)(e) but not as to subsection (1)(c).  Dkt. 68 at 9-11.  Nothing in the several standing declarations submitted by ALDF goes beyond the complaint's allegations with respect to *mens rea* requirement in subsection (1)(c).  *See* Dkts. 75-2 – 75.23.  The Attorney General accordingly reserves his standing objection concerning that subsection.  He does not contest ALDF's standing as to subsections (1)(a), (b) and (d).

*Inc. v. FCC*, 512 U.S. 622, 640 (1994), for the proposition that "'laws that single out the press, or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny.'"  Dkt. 68 at 14.  It then stated:

> ALDF alleges that section 18–7042 specifically targets undercover investigators who intend to publish videos they make through the press and seeks to suppress speech critical of animal agricultural practices.  If ALDF's allegations prove true—that the law was not designed as a generally applicable prohibition on fraud or trespass or conversion, but rather as an indirect penalty for criticizing animal agriculture—the Court would have to apply at least some degree of heightened scrutiny.

The Court additionally held that, under *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103 (1979), "the state cannot make it a crime to publish lawfully obtained, truthful information about a matter of public significance, 'absent a need to further as state interest of the highest order.'" Dkt. 68 at 15 (distinguishing the victim-restitution provision in § 18-7042(4) from the compensatory damages remedy in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991)).

Also unpersuasive was the Attorney General's contention that § 18-7042(1) regulates conduct, not speech.  As to the prohibition of "misrepresentation[s]" in subsections (1)(a) through (1)(c), it reasoned that "[f]alse speech is still speech—period" and that "even false speech may deserve some First Amendment protection"—including strict scrutiny examination "in some circumstances."  Dkt. 68 at 17 (citing *United States v. Alvarez*, 132 S. Ct. 2537, 2548 (2012)).  It disagreed with the Attorney General that § 18-7042(1) prohibits only trespass and conversion—and not "misrepresentations" independent of those activities—because those subsections specifically proscribe trespass, thereby making "the statutory language prohibiting misrepresentation superfluous."  Dkt. 68 at 18.  The Court accordingly concluded that "section 18-7042's ban on certain misrepresentations prohibits more than just trespass or conversion."  *Id.* Although "misrepresentations designed to cause material harm are not protected by the First

Amendment," it deemed "the limited misrepresentations ALDF says it intends to make—affirmatively misrepresenting or omitting political or journalistic affiliations, or affirmatively misrepresenting or omitting certain educational backgrounds" as "most likely [to] not cause material harm to the deceived party."  Dkt. 68 at 19-20.

This Court held further that the video or audio recording subject to consent requirement in § 18-7042(1)(d) constituted speech.  In short, it extrapolated from the First Amendment right to disseminate unauthorized recordings, which is not criminalized the statute, a First Amendment right to make the them in the first instance.  *See* Dkt. 68 at 21 ("[a] law that expressly punished activists for publishing videos of agricultural operations would be considered a regulation of speech" and, given the fact that "in most cases, authorities will not become aware of a violation of the statute until a video is published[,]" the statute's enforcement "will likely have the same effect" as a law "that expressly punished activists for publishing videos of agricultural operations").

Finally, this Court construed § 18-7042 as content-based because it "targets one type of speech—speech concerning 'the conduct of an agricultural production facility's operations,' . . . –but leaves unburdened other types of speech at an agricultural production facility."  Dkt. 68 at 22.   It also referenced the complaint's allegations concerning "various statements from Idaho legislators suggesting a content-based legislative purpose of silencing animal activists."  *Id.* at 23.  The Court found the restitution remedy in § 18-7042(4) relevant because the most likely source of damage "would be losses associated with the publication of a video critical of an agricultural facility's practices."  *Id.*  It suggested that § 18-7042 may embody viewpoint discrimination by "allow[ing] job applicants who make misrepresentations to secure employment with the goal of praising the agricultural facility to skate unpunished while punishing job

applicants who misrepresent themselves with the intent of exposing abusive or unsafe conditions" or making prosecution for unconsented audio or video recording more likely for individuals "critical of the industry" that those "who wish to portray the agricultural facility in a positive light." Dkt. 68 at 24. The Court's overall analysis lead to the conclusion that "I.C. § 18-7042 must survive the highest level of scrutiny to pass constitutional muster." *Id.*

        **2.**    **Equal Protection.** This Court ruled that ALDF had stated a plausible equal protection claim. The Court noted that § 18-7042 "creates a classification between whistleblowers generally and whistleblowers in the agricultural industry." Dkt. 68 at 25. The Court recognized, too, that when classifications do not target suspect classes or burden fundamental rights, the law is presumed valid and will be upheld "so long as it rationally relates to some governmental purpose." *Id.* (citing *Heller v. Doe*, 509 U.S. 312, 319 (1993)). ALDF alleged "as a matter of fact, that the Idaho legislators acted with animus in passing section 18-7042, in violation of the Equal Protection Clause." *Id.* at 26. Thus, the Court explained, "[b]y alleging animus, it would seem that ALDF has stated a plausible Equal Protection claim." *Id.*

      Citing *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471, 481 (9th Cir. 2014), and *United States v. Windsor*, 133 S. Ct. 2675 (2013), this Court observed that "Congress's actual purposes" be considered in determining whether animus taints a law. Dkt. 68 at 27. The Court also looked to *Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), which, the Court explained, applied a form of heightened rational basis scrutiny. Dkt. 68 at 27. Central to *Moreno's* holding was that the classification was "*clearly irrelevant*" to the stated purposes of the law in question. *Id.* at 28 (citing *Moreno*, 413 U.S. at 534 (emphasis added)). Lacking a rational basis, then, the *Moreno* Court found that the legislative history revealed a purpose to prevent "hippies" and "hippie communes" from participating in the food stamp

program. *Id.* Nevertheless, the animus allegations did "not necessarily mean that the Court will find that section 18-7042 violates the equal protection clause, but only that the Court will examine any potential reasons for the law with particular care to determine whether the statute reflects an impermissible bias against animal-rights activists." *Id.*

### B. ARGUMENT SUMMARY

**1. First Amendment.** The Attorney General recognizes that this Court's memorandum decision creates a substantial obstacle to enforcement of the prohibition against "misrepresentation[s]" subject to § 18-7042(1)(a) through (c) and audio or video recording subject o § 18-7042(1)(d) under the First Amendment. ALDF's arguments mimic the Court's analysis as to the claim that the statute embodies a content-based restriction and, as such, add nothing. It is therefore essential to address those aspects of the Court's First Amendment reasoning that, in the Attorney General's view, misapply relevant precedent, most importantly *Alvarez*. The overbreadth claim advanced by ALDF falls outside the scope of memorandum decision but misconstrues the limited purpose served by the overbreadth doctrine—allowing reliance on third party interests in a First Amendment context. Even assuming the validity of the Court's First Amendment-based conclusions, however, § 18-7042(1)'s provisions can be severed to remove the constitutionally offensive terms or phrases.

**2. Equal Protection.** ALDF has failed to meet its extraordinary burden to demonstrate § 18-7042 lacks a legitimate, rational basis. The statute is a form of a trespass statute, specifically addressing generally applicable conduct on specified types of property. It does not establish classifications that would give rise to an equal protection claim. Furthermore, ALDF's animus argument rests on the incorrect assumption that animus will defeat a statute that has an accepted legitimate, rational basis. Its cases reveal that enhanced or heightened or

skeptical scrutiny has been applied when there is no rational basis for a statute or local law. But here, there are several rational bases for the law, and so animus remains irrelevant to the inquiry. Finally, even were the Court to engage in the inquiry ALDF invites—which this Court should not do—the legislative record presents a different picture than the one Plaintiffs would like to see on the canvas. It reveals a concern for protection of interests for a specific type of landowner and facility operator in response to conduct that, in the Legislature's judgment, should be prohibited. It does not, by contrast, reflect the sort of anti-whistleblower zeal ALDF claims.

## <u>RULE 56 STANDARDS</u>

Rule 56, Fed. R. Civ. P., requires this Court to "'determine, viewing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in its favor, whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law.'" *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011) (quoting *Orr v. Bank of Am., NT & SA,* 285 F.3d 764, 773 (9th Cir. 2002)). "[A] party seeking summary judgment . . . bears the initial responsibility of informing the district court of the basis for its motion" by citing to materials in the record "which it believes demonstrate the absence of a genuine issue of material fact" and may prevail where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(c)(1). "[S]ummary judgment should not be granted where contradictory inferences may be drawn from [the] facts, even if undisputed." *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985).

/ / /

/ / /

## ARGUMENT

I.   **SECTION 18-7042(1) DOES NOT VIOLATE THE FIRST AMENDMENT**

    A.   ***ALVAREZ* DOES NOT REQUIRE INVALIDATING VIEWPOINT NEUTRAL STATUTES PROHIBITING MISREPRESENTATIONS THAT FACILITATE INVASION OF ANOTHER'S PROPERTY INTEREST**

        1.   ***United States v. Alvarez***

This Court took from *Alvarez* the principle that "[f]alse statements that do not constitute defamation, fraud, or perjury are fully protected speech."  Dkt. 68 at 16. Justice Kennedy's plurality opinion, however, was careful to observe that "[a]bsent from those few categories where the law allows content-based regulation of speech is any *general* exception to the First Amendment for false statements."  132 S. Ct. at 2544 (emphasis added).  The plurality acknowledged the United States' examples of instances where lies provided the basis for criminal prosecution—18 U.S.C. § 1001 (false statements to government officials); *id.* § 1623 (perjury); and *id.* § 912 (impersonating a federal officer)—as "instances in which the falsity of speech bears upon whether it is protected."  132 S. Ct. at 2546.  Likewise unprotected are "false claims . . . made to effect a fraud or secure moneys or other valuable considerations, say offers of employment."  *Id.* at 2547.  The Stolen Valor Act, 18 U.S.C. § 704(b), departed radically from that model because it "target[ed] falsity and nothing more."  *Id.* at 2545; *id.* at 2547-48 ("[w]ere the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech, absent any evidence that the speech was used to gain a material advantage, it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition").  As such, the claimed "governmental power has no clear limiting principle."  *Id.* at 2547.

Justice Breyer, in his concurring opinion, also focused on the fact that the Stolen Valor

Act was one of "few statutes, if any, [that] simply prohibit without limitation the telling of a lie, even a lie about one particular matter" and lacked any "limiting features."  132 S. Ct. at 2555. He recognized "that many statutes and common-law doctrines make the utterance of certain kinds of false statements" but, unlike the Stolen Valor Act, "limit the scope of their application, sometimes by requiring proof of specific harm to identifiable victims; sometimes by specifying that the lies be made in contexts in which a tangible harm to others is especially likely to occur; and sometimes by limiting the prohibited lies to those that are particularly likely to produce harm."  *Id.* at 2554; *see also id.* at 2562 n.14 (Alito, J., dissenting) (citing respondent's brief as "asserting that, at most, only falsity that is proved to cause specific harm is stripped of its First Amendment protection").

Indeed, the only "limiting principle" in the Stolen Valor Act was its prohibition of a quite specific type of misrepresentation.  As the plurality opinion observed, "[p]ermitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile *a list of subjects* about which false statements are punishable."  132 S. Ct. at 2547 (emphasis added).

2.      **Section 18-7042(1)**

a.      **Misrepresentation.**  The Idaho statute contrasts starkly from the Stolen Valor Act.  "Misrepresentation" appears in § 18-7042(1)(a) through (c)—all of which subsections impose criminal liability only when the misrepresentation leads to a violation of an agricultural facility owner's right to control access to the facility or possession of its records or to protect the owner's interest against employing individuals who intend to cause economic or other injury to the facility and related interests.  Consequently, while misrepresentation may be carried out through oral or written communications, it assumes criminality only when accompanied by a

form of conduct, *i.e.*, entering a facility, acquiring its records or seeking employment with the express purpose of doing harm to the employer.  Misrepresentation, in other words, is simply one element of an offense that must be consummated through specified conduct.  Subsection (1)(c) even goes a step further; there, if an individual lies about his educational or employment background but does so without any intent to injure the agricultural facility's interests, subsection (1)(c) is not violated.

Section 18-7042(1) additionally does not proscribe misrepresentations by reference to their specific content.  Like the perjury and false statement statutes that the *Alvarez* plurality found consistent with the First Amendment, the law does not require the misrepresentation be about a particular "subject."  So, for example, it makes no difference whether an individual gains entry into an agricultural facility by claiming to be salesperson or an electricity meter inspector; it similarly makes no difference whether an individual falsely claims to be copy machine technician or a trash collector as a ruse to acquire a facility's documents.

The misrepresentations that form an element of the crimes in § 18-7042(1)(a), (b) and (c), in sum, do not stand in disembodied isolation, as did the conduct proscribed under the Stolen Valor Act.  They instead have no significance until coupled with discrete, clearly identified conduct and thus are accompanied by "limiting features."  *Cf. Alvarez*, 132 S. Ct. at 2554 (Breyer, J., concurring) ("[s]tatutes forbidding impersonation of a public official typically focus on *acts* of impersonation, not mere speech, and may require a showing that, for example, someone was deceived into following a 'course [of action] he would not have pursued but for the deceitful conduct'").  The statute also is indifferent to the content of a representation other than its divergence from the truth.  All lies carry the same legal consequences.  If anything, therefore, *Alvarez* supports the "misrepresentation" subsections' First Amendment validity.

    **b.**  **Audio and Video Recording.** *Alvarez* says nothing relevant about the validity of § 18-7042(1)(d). More generally, however, the recording restriction in § 18-7042(1)(d)—unlike the Stolen Valor Act—is content neutral even were it properly deemed speech and subject to the highly deferential reasonableness standard.

    As the Supreme Court reaffirmed recently in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), with regard to expressive conduct within an abortion clinic buffer zone, the involved Massachusetts statute "would be content based if it required 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred" but was not because "[w]hether petitioners violate the Act 'depends' not 'on what they say,' . . . but simply on where they say it." *Id.* at 2531 (citation omitted); *see also Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) ("[a] ban on the actual hand-to-hand exchange of money . . . is not content-based speech regulation" even though associated with expressive conduct). Section 18-7042(1)(d)'s unambiguous facial neutrality may not be impeached through extrinsic evidence. *E.g.*, *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) ("[i]n assessing whether a restraint on speech is content neutral, we do not make a searching inquiry of hidden motive; rather, we look at the literal command of the restraint"). Nor does it matter that recording restriction "may disproportionately affect speech on certain topics" such as, here, agricultural practices. *McCullen*, 134 S. Ct. at 2531. It also does not matter that certain conduct in an agricultural facility is not subject to § 18-7042. *See* Dkt. 68 at 22-23. As held in *McCullen*, legislatures may act narrowly to address the problem at hand. 134 S. Ct. at 2532 ("[w]hen selecting among various options for combating a particular problem, legislatures should be encouraged to choose the one that restricts less speech, not more").

    This Court's reliance on *ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), for the

conclusion that audiovisual recording is encompassed within the First Amendment's speech and freedom-of-press protections is misplaced in part because it addressed proposed activity in a public forum. Dkt. 68 at 21. The challenge to the Illinois eavesdropping statute arose in an as-applied context with respect to a program "to openly make audiovisual recordings of police officers performing their duties in public places and speaking at a volume audible to bystanders." *Id.* at 586; *see also id.* at 606 ("ACLU's proposed audio recording will be otherwise lawful—that is, not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them"). The flaw in the Illinois statute was its breadth. *Id.* ("by legislating this broadly—by making it a crime to audio record *any* conversation, even those that are *not* in fact private—the State has severed the link between the eavesdropping statute's means and its end"). Section 18-7042(1)(d), in contrast, is tailored narrowly to achieve its objective of protecting private property rights.[3]

## B.   SECTION 18-7042(1)'S LEGISLATIVE HISTORY SHOWS THAT ITS PURPOSE WAS TO PROTECT PRIVATE PROPERTY

Idaho has no obligation to subsidize expressive activity (*Ysursa v. Pocatello Educ. Ass'n,* 555 U.S. 353, 359 (2009)), and by parity of logic neither does the First Amendment compel private landowners to do so by giving others the right to act as they please on the landowners' property. *Cf. Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46 (1983) ("the

---

[3] The Court's attendant discussion of *Citizens United v. FEC,* 558 U.S. 310 (2010)—which parallels that in the Seventh Circuit decision (679 F.3d at 595-96)—cannot be squared with *Pocatello Education Association* where the claimed right was access to a school's payroll system for purposes of deducting wages for deposit in a political action fund. The presence of a constitutional right to make campaign contributions, in other words, does not mean that a concomitant entitlement exists to have a third party facilitate the right's exercise. So, too, the claimed expressive nature of recording sounds or videos of an agricultural facility's operations for subsequent public disclosure does not carry with it the right to have the facility allow the recording.

State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated") (internal quotation marks omitted).

A statute that protects the latter's right to determine whether to allow certain conduct is wholly reasonable—the applicable standard in such situations—so long as the regulation is viewpoint neutral. *Perry Educ. Ass'n*, 460 U.S. at 46; *cf. Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of Los Angeles*, 764 F.3d 1044, 1049 (9th Cir. 2014) (In nonpublic governmental forums, "the challenged restriction must be 'reasonable in light of the purpose served by the forum and 'viewpoint neutral.' . . . A restriction is 'reasonable,' . . . where it is 'wholly consistent with the [government's] legitimate interest in preserv[ing] the property . . . for the use to which it is lawfully dedicated.'") (citation omitted).   ALDF offers snippets from the legislative record for the principal purpose of establishing that "the Ag Gag law was motivated, at least in substantial part, by illegitimate motives"—*i.e.*, preventing "the agricultural industry from being tried 'in the court of public opinion.'" Dkt. 74-1 at 13; *see also id.* at 24-25 ("this legislative history leaves no doubt that overt hostility towards animal welfare groups, and moral disapproval of their operations, were substantial motivating factors for the Ag Gag law").

The "motives" of individual legislators generally are not an appropriate basis for attacking a statute's validity.  As the Supreme Court held in *United States v. O'Brien*, 391 U.S. 367 (1968), "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."  *Id.* at 383.  The core reason is quite straightforward:

> Inquiries into congressional motives or purposes are a hazardous matter. . . . What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

*Id.* at 383-84.  Such motive-finding endeavors are, as well, doomed to failure as a practical

matter.  *See Palmer v. Thompson*, 403 U.S. 217, 224-25 (1971) ("[T]here is an element of futility

in a judicial attempt to invalidate a law because of the bad motives of its supporters.  If the law is

struck down for this reason, rather than because of its facial content or effect, it would

presumably be valid as soon as the legislature or relevant governing body repassed it for

different reasons.").  So, in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), the

Supreme Court faulted a district court for invalidating an ordinance regulating adult film theaters

merely because "'*a motivating factor*' in enacting the ordinance was to restrict respondents'

exercise of First Amendment rights."  *Id.* at 47.  The Court instead held controlling the trial

court's determination that the ordinance's "'*predominate* concerns' were the secondary effects of

adult theaters" (*id.*)—*i.e.*, to "prevent crime, protect the city's retail trade, maintain property

values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods,

commercial districts, and quality of urban life'" (*id.* at 48).

   Applied here, *O'Brien* and like decisions preclude this Court from psychoanalyzing the

Idaho legislature as a whole or individual legislators to extract a subjective "motive" for enacting

§ 18-7042.[4]  But even if this Court were to engage in the feckless task of trying to discern such

---

[4] Legislators' individual "motives" for supporting or opposing a bill must be distinguished from
the bill's purpose.  *Bd. of Educ. v. Mergens*, 496 U.S. 226, 249 (1990) ("[e]ven if some
legislators were motivated by a conviction that religious speech in particular was valuable and
worthy of protection, that alone would not invalidate the Act, because what is relevant is the
legislative purpose of the statute, not the possibly religious motives of the legislators who
enacted the law"); *see also Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1033
(9th Cir. 2010) ("The dissent points to instances where individual Congressmen proclaimed, as
politicians often do in election years, the obvious religious elements of the amendment. But we
are called upon to discern Congress' ostensible and predominant purpose, not the purpose of an
individual. . . . That purpose is not the statement of one or more individual members of Congress,
but what the committees putting forth the amendment actually stated and, more important, what
the *text* of the statute says.").  No doubt exists as to the *purpose* of Senate Bill No. 1337 for the
reasons discussed in the text.  The Court of Appeals' decision in *Valle Del Sol, Inc. v. Whiting*,
709 F.3d 808 (9th Cir. 2013), upon which this Court relied as deeming consideration of
§ 18-7402's legislative history appropriate (Dkt. 68 at 23), does not stand for the contrary

motive, the legislative history relied upon by ALDF establishes only that which is set forth in the Statement of Purpose accompanying Senate Bill No. 1337 (Idaho 66th Leg. 2014): The statute's objective is "to protect agricultural production facilities from interference by wrongful conduct." Idaho legislators who supported adoption reiterated that objective from the beginning to the end of their respective chambers' deliberations.

- The chief sponsor in the Idaho Senate, Senator Patrick, explained the bill's purpose when introducing it to the Senate Agriculture Committee as follows:

> [W]hat this piece of legislation does, is it's a protection, it's Ag security, basically. We don't want wrongful entry and criminal trespass, and like I say, anyone's asked, I've always approved. We don't want theft of records, and this has occurred in some instances in our seed industry and others. Obtaining employment by wrongful means, and what that means is basically to potentially set up some sort of a hazard, video it, or whatever they might want to do, other than doing the job, Making recording in a workplace activities without the owner's consent. I've never turned anyone down, news media or others, that wanted to come in and take pictures, but I would not like them coming in without my permission because it really opens it up to potential staging of an event. And intentionally interfering with farming operations. That's really the basis of the Bill.

Dkt. 75-1 at 10. He repeated this theme in his closing remarks, pointing to the destruction of genetically modified grain crops and the release of animals being raised for their fur. *Id.* at 88. Senator Patrick further disclaimed in his closing remarks any intent "to stop whistleblowers"— noting his industry's policy to encourage them. *Id.* at 87.

- Senator Patrick's statements during the Senate floor debate followed suit: "[T]he basics of this bill are dealing with wrongful entry and criminal trespass. Trespass is illegal, but this is a little more. It's theft of records, obtaining employment by wrongful means, making records of workplace activities." Dkt. 75-1 at 96.

- Other senators expressed the same rationale for their support. *E.g.*, Dkt. 75-1 at

---

proposition. The *Valle Del Sol* panel looked to legislative history to shed light on the Arizona statute's purpose, not the motives of Arizona legislators. 709 F.3d at 815.

122 (Sen. Bair: "Senators, ultimately this bill and this debate is a property rights' issue. Everybody here has the right to own, possess, and manage their property."); *id.* at 135 (Sen. Lakey: "For me, it comes down to private property rights.  This is akin to someone to hiring a caregiver to come in to their home based on false pretenses and that person begins videotaping in their home.").

• Representative Batt opened the House of Representatives floor consideration by explaining:

> [W]e're seeing a tax on agricultural producers and operations by extreme activists that exploit agricultural's [*sic*] venerability of being visible and accessible.  Havoc has been brought on a broad spectrum of agriculture through the destruction of crops, breeding records are being destroyed, theft of intellectual property, misrepresentation of agricultural practices and physical damage that includes burning down of structures and breaking into facilities.  Idaho should not tolerate these extreme tactics.

Dkt. 75-1 at 242.  Her concern thus was not in stifling legitimate First Amendment speech but in protecting "rights of private property owners[] to be secure in their homes and their businesses." *Id.* at 260; *see also id.* at 251 (Rep. Malek: "There's no interpretation of the First Amendment that gives somebody the right to enter into a private place with a camera and take pictures of something that they find objectionable without due process under the law."); *id.* at 252 (Rep. Hartgen: "You may take pictures from a public place.  Okay?  Of whatever you can see from there.  But there is no First Amendment right to enter a personal private property owned by other individual and take pictures and gather that information."); *id.* at 254 (Rep. Andrus: "[L]et's deal with this Bill as it is: a privacy of personal property.").

What comes across unequivocally from these legislators' statements is that their concern derived not from otherwise appropriate exercise of First Amendment speech but from invasion of agricultural production facilities' property rights.  The legislature cannot be criticized for adopting legislation focused on that problem.  *McCullen*, 134 S. Ct. at 2532.  ALDF cannot

bootstrap an otherwise appropriate response to a perceived abuse into a "motive" to discourage otherwise proper conduct.  Once again, landowners have no constitutionally rooted obligation to facilitate another's concerted activity on nonpublic property, and the legislature has the constitutionally unembarrassed authority to protect landowners' determination.  Section 18-7042(1) draws no distinctions between various actors subject to its prohibitions or those actors' ideological views.  ALDF cannot claim viewpoint discrimination merely because it believes that it is, or will be, subject to a disparate impact.  *Cf. Torres Rivera v. Calderon Serra*, 412 F.3d 205, 211 (1st Cir. 2005) ("[w]e have rejected the application of a disparate impact theory in First Amendment political affiliation cases"); *AFGE TSA Local 1 v. Hawley*, 481 F. Supp. 2d 72, 96 (D.D.C. 2006) ("Plaintiffs admit that they cannot pursue their First Amendment claim under a disparate impact theory").

## C. THE OVERBREADTH DOCTRINE HAS NO RELEVANCE BECAUSE ALDF HAS FIRST PERSON STANDING TO CHALLENGE THE PROHIBITION OF MISREPRESENTATIONS AND UNCONSENTED AUDIO-VIDEO RECORDINGS

Under the overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech."  *United States v. Williams*, 553 U.S. 285, 292 (2008).  It serves to create an exception to the prudential prohibition of third-party standing.  *E.g., Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).  Because the doctrine's application is " 'manifestly strong medicine,' . . . 'there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.'"  *Id.*

ALDF argues that "while the Ag Gag statute criminalizes some conduct that is not governed by the First Amendment, it also sweeps within its scope a broad swath of expression protected by the First Amendment."  Dkt. 74-1 at 18.  This is but another way of saying that the

term "misrepresentation" in § 18-7042(1)(a) through (c) and the prohibition of nonconsented audio or video recording in § 18-7042(1)(d) violate the First Amendment.  ALDF, however, has raised those challenges in its own right and, as such, has no need to assert the rights of parties not before this Court.  *See Rumsfeld v. Forum for Academic and Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).  The overbreadth claims brings nothing to the table here.[5]

### D.    THE TERM "MISREPRESENTATION" IN § 18-7042(1) IS SEVERABLE

Even were inclusion of "misrepresentation" in § 19-7042(1)(a) through (c) proscribed by the First Amendment, the term is subject to severance under Idaho decisional law.  Idaho rules of statutory construction again govern the severability issue.  *E.g., Acosta v. City of Costa Mesa*, 694 F.3d 980, 973-74 (9th Cir. 2012); *Am. Bankers Ass'n v Lockyer*, 541 F.3d 1214, 1216-17 (9th Cir. 2007).  The session law expressly provided for severance (2014 Idaho Sess. L. ch. 30, § 2), and the Idaho Supreme Court has held repeatedly that "when the unconstitutional portion of a statute is not integral or indispensable, it will recognize and give effect to a severability clause." *Simpson v. Cenarrusa*, 130 Idaho 609, 614, 944 P.2d 1372, 1377 (1997); *see also In re SRBA No. 39576,* 128 Idaho 246, 254, 912 P.2d 614, 632 (1995) ("[w]hen determining whether the remaining provisions in a statute can be severed from the unconstitutional sections, this Court will, when possible, recognize and give effect to the intent of the Legislature as expressed through a severability clause in the statute").  The Supreme Court additionally recognizes the propriety of severing a single word where "part of a statute or ordinance is unconstitutional and

---

[5] ALDF devotes a paragraph to the scope of agricultural production facilities subject to the statute.  Dkt. 74-1 at 19-20.  Even if one assumes that the hypothetical situations that it poses would be subject to possible prosecution under § 18-7042(1), none of them raises a First Amendment issue distinct from those already at issue here; *e.g.*, it makes no First Amendment difference whether "telling a white lie about intending to buy a coffee" to gain access to a restaurant bathroom is the misrepresentation, as opposed to telling a "black" lie to gain access for the purpose observing working conditions.  No Fourteenth Amendment claim for cruel and unusual punishment exists here.  *See Furman v. Georgia*, 408 U.S. 238, 239 (1972) (per curiam).

yet is not an integral or indispensable part of the measure, the invalid portion may be stricken without affecting the remainder of the statute or ordinance." *Voyles v. City of Nampa*, 97 Idaho 597, 600, 548 P.2d 1217, 1220 (1976).

Here, severing the "misrepresentation" would not deprive the relevant subsections of their core objective—protecting agricultural production facilities from trespass, document acquisition or employment for purposes of injuring a facility's operations.  The severance provision in the 2014 Session Laws Chapter 30 could not be plainer as to the Legislature's "preference," and no legitimate doubt exists that paragraphs (a) through (c) could be given meaningful effect after severance.  It thus cannot be said that "[t]here is nothing of substance in [these paragraphs] beyond the [term 'misrepresentation']."  *Wasden v. State Bd. of Land Comm'rs*, 153 Idaho 190, 196, 280 P.3d 693, 699 (2012).  Prohibiting "misrepresentation" is not "integral or indispensable" to the subsections' operation given the unchallenged application of the other forms of conduct—*i.e.*, force, threat and trespass—as a predicate for their violation. *Boundary Backpackers v. Boundary County*, 128 Idaho 371, 378, 913 P.2d 1141, 1148 (1996).[6]

## II.    SECTION 18-7042 DOES NOT VIOLATE EQUAL PROTECTION

This Court wrote previously that "ALDF may face a very difficult battle in proving its allegation that section 18-7042 'serves no rational, non-animus based purpose.'"  Dkt. 68 at 28. ALDF's summary judgment papers prove out that observation.  Its allegations do not have the factual or legal support to move their claim beyond summary judgment.  In short, ALDF's reliance on, most importantly, *United States v. Windsor*, 133 S. Ct. 2675 (2013), and *Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), is wrong for two reasons.  First, this case is nothing close to either *Windsor* or *Moreno* because § 18-7042 does not classify individuals or

---

[6] Also severable to the extent deemed necessary to comply with the First Amendment is the victim restitution provision in § 18-7042(4).  *See* Dkt. 68 at 23-24.

entities for disadvantageous treatment and because it plainly serves legitimate interests in protecting private property interests from conduct engaged in by *anyone*—not just a select few. Second, ALDF's attempt to prove animus by selecting a handful of statements allegedly reflecting constitutionally impermissible animus demonstrates the flaw in its preferred rule. The Court need not and should not probe the minds of lawmakers to determine whether one or two or three of them held some degree of contempt for certain behavior. It is simply not relevant because the law serves legitimate purposes. But even were the court to engage in the inquiry ALDF advocates, to the extent anything can be gleaned from various statements, the committee testimony establishes a much broader motivation for the law—one that is entirely permissible.

ALDF's argument relies on the principle that courts may scrutinize the democratic, legislative judgments made by elected officials. This is wrong. "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Where, as here, a classification does not impair the exercise of a fundamental right or categorize on the basis of an inherently suspect characteristic, the Fourteenth Amendment's requirement of equal protection is satisfied so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* The Supreme Court further "has made clear that a legislature need not 'strike at all evils at the same time or in the same way,' . . . and that a legislature 'may implement [its] program step by step, . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.'" *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 466 (1981) (citation omitted)); *accord Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1142 n.8 (9th Cir. 2011).

A State, moreover, "has no obligation to produce evidence to sustain the rationality of a

statutory classification" because "a legislative choice is not subject to courtroom factfinding.'"
*Heller v. Doe,* 509 U.S. 312, 320 (1993).   It is thus "entirely irrelevant for constitutional
purposes whether the conceived reason for the challenged distinction actually motivated the
legislature." *Beach Commc'ns,* 508 U.S. at 315. The test is simply whether the involved
distinction or classification "is at least debatable." *Clover Leaf Creamery,* 449 U.S. at 464.   Once
plausible grounds are asserted, the "inquiry is at an end"—*i.e.,* rebuttal is not permitted.   *United
States R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 179 (1980).

Plaintiffs appear to accept the truth that § 18-7042 serves legitimate interests.   Indeed:

- The Legislature indisputably can act to discourage securing employment through force, threat, misrepresentation or trespass as contrary to establishing informed, truly consensual employment relationships essential to entrepreneurial success and attendant benefit for Idaho's economy—the focus of § 18-7042(1)(a).

- The Legislature indisputably can act to discourage unauthorized acquisition of an enterprise's records or documents and thereby protect the property interest possessed by the enterprise—the focus of § 18-7042(1)(b).

- The Legislature indisputably may act to discourage individuals using force, threat or misrepresentation to secure employment with the specific intent of causing injury to the employer's interests—the focus of § 18-7042(1)(c).

- The Legislature indisputably can act to discourage unauthorized use of an enterprise's facilities and thereby to protect the property interest possessed by the enterprise—the focus of § 18-7042(1)(d).

Section 18-7042 simply embodies a legislative judgment to "address[] itself to the phase of the problem which seems most acute to the legislative mind."   *Williamson v. Lee Optical of*

*Okla., Inc.*, 348 U.S. 483, 489 (1955).  The Legislature's choice to limit the statute to agricultural production facilities makes perfect sense for several reasons.

*First*, the statute responded directly to concerns raised by representatives of the agricultural industry—as ALDF repeatedly alleges.  It comes as no surprise that § 18-7042 focused on the industry prompting those concerns, particularly given the central role that agriculture plays in Idaho's economy and culture.  *See* Paul Levin *et al.*, *The Role of Agricultural Processing in Idaho's Economy: Status and Potential*, Univ. of Idaho Extension Bull. 886 (2013) ("[t]ogether the whole food processing industry and agricultural industry in Idaho account directly for 6% of jobs, 15% of sales, and 7% of GSP" in 2011), *available at* http://www.cals.uidaho.edu/edcomm/pdf/BUL/BUL886.pdf (last visited Dec. 18, 2014).

*Second*, the concerns related more specifically to activities at production animal facilities. The Legislature has long set in place responsibility for complaints over alleged maltreatment of such animals in the Idaho Department of Agriculture ("ISDA").  It could rationally conclude that limiting the new law to agricultural production facilities not only was an appropriately tailored response to the voiced concerns but also would not harm the state interest in preventing or redressing animal cruelty given ISDA's authority in this area.

*Third*, ISDA's monitoring and inspection authority as to production animal facilities is subject to constraints that balance the interests of effective law enforcement with the due process and property rights of animal production facilities.  Idaho Code §§ 25-3502(2) & (3), 25-3519. The Legislature reasonably could conclude that, given the industry concerns which prompted the legislation, limiting the law to agricultural production facilities was an adequate method to minimize the possibility that this balancing of interests would be undermined or circumvented by private, self-help conduct of the type prohibited in § 18-7042(1).  ALDF does not challenge these

legitimate interests.  Consequently, its equal protection challenge to the statute's limitation to agricultural production facilities fails under settled rational basis standards.

ALDF hangs its equal protection hat on the contention that § 18-7042 was motivated by animus against it.  It argues that despite the legitimate interests, the existence of animus invalidates the statute.  But ALDF's theory goes wrong right from the start in that it mischaracterizes what § 18-7042 actually does.  It alleges that the statute "targets animal protection groups."  Dkt. 1 at 49 ¶ 193.  For support of this, ALDF points to a handful of statements made by a handful of lawmakers and constituents.  Dkt. 74-1 at 22-24.  So, it contends, § 18-7042 is polluted with animus toward them and fails equal protection scrutiny.  ALDF does not (and cannot) argue that § 18-7042 creates any classification of persons.  The statute does not deny benefits or restrict liberties according to a class of persons.  Instead, it, just like any garden-variety criminal statute, applies to everyone based on *conduct*.  Taken to its logical and necessary end, ALDF's preferred rule would invalidate any generally applicable criminal law that happens to attract a certain kind of conduct.  This would disable States from exercising their police power, and it is not consistent with equal protection law.  Without a discriminatory classification, ALDF's equal protection claim must fail.

ALDF's animus argument continues off course by the claim that even in the face of legitimate governmental interests, legislative disfavor of "animal rights activists" renders § 18-7042 invalid.  It cites four principal cases for this theory.  None helps its argument.  Neither *Windsor* nor *Romer v. Evans*, 517 U.S. 620 (1996), nor *Moreno*, nor *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1983), stands for the proposition that animus trumps an otherwise rational basis for a statute.  In each instance, animus was the *only* perceived justification for the statute or regulation.  *Windsor*, 133 S. Ct. at 2696; *Romer*, 517 U.S. at 633,

635; *Moreno*, 413 U.S. at 538; *Cleburne*, 473 U.S. at 450.  The Ninth Circuit thus has held that "[u]nder the *Moreno* analysis, a court may hold a statute not implicating a suspect class violative of equal protection if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's enactment." *Mountain Water Co. v. Montana Dep't of Pub. Serv. Regulation*, 919 F.2d 593, 598-99 (9th Cir. 1990) (emphasis added); *see also Lyng v. Castillo*, 477 U.S. 635, 638-39 (1986) ("just as in . . . *Moreno*—the decision which the District Court read to require 'heightened scrutiny'—the 'legislative classification must be sustained if the classification itself is rationally related to a legitimate governmental interest'"); *Wisc. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 654 (7th Cir. 2013) ("Where, as in *Moreno*, an act furthers no legitimate government interest, it fails rational basis review.  *Moreno* is not a case . . . where the Court suggested a statute would have passed rational basis review but for animus towards a particular group.  As unfortunate as it may be, political favoritism is a frequent aspect of legislative action.").    Because in this case there *is* a legitimate, rational basis for § 18-7042, this enhanced rational basis analysis Plaintiffs' favor is inapplicable.    Also contrary to ALDF's assertion is the purportedly overruled nature of *Mountain Water Co*.   It remains binding law of the circuit as to economic regulation like § 18-7042.

For these reasons, the Court should not engage ALDF's argument that the Legislature specifically targeted them.  The statements it cites are irrelevant to the validity of the law.  Nevertheless, the conclusion it wishes the Court to draw is defeated by statements that reveal other purposes—ones that cannot be attacked as bearing animus toward them.  Again, these statements, summarized above at pages 14 through 16, reveal something different than the out-to-get-them argument ALDF doggedly pursues.  Section 18-7042 was written to protect property

and entrepreneurial interests from various forms of conduct lawmakers saw fit to prohibit.

ALDF's "poor fit" argument is similarly misplaced. Dkt. 74-1 at 25-29. The existence of a legitimate, rational basis for § 18-7042 means that ALDF's extensive reliance on *Cleburne* is just wrong. The poor-fit analysis in *Cleburne* rested on a conclusion that the permit requirement "rested on an irrational prejudice against the mentally retarded, including those who would occupy the Featherston facility and who would live under the closely supervised an highly regulated conditions expressly provided for by state and federal law." 473 U.S. at 450. Moreover, the statute expressly treated one class of persons differently than another. In other words, there *was* a discriminatory classification and there *was* no rational basis for it in part because the same structure would be permissible simply if a different class of persons occupied it and that differentiation did not serve the interests the city identified. *Id.* But § 18-7042 specifically prohibits specific conduct—regardless of who engages in it—that in the Legislature's judgment needed more tailored treatment than provided under current law.

## CONCLUSION

ALDF's motion for partial summary judgment should be denied.

DATED this 19th day of December 2014.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By     /s/ *Clay R. Smith*
CLAY R. SMITH
CARL J. WITHROE
Deputy Attorneys General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of December 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that sent a Notice of Electronic Filing to the following persons:

Justin Marceau
jmarceau@law.du.edu

David P. Claiborne
david@sawtoothlaw.com

Matthew Liebman
mliebman@aldf.org

Charles A Brown
CharlesABrown@cableone.net

Matthew Strugar
matthew-s@petaf.org

Bruce D Brown
bbrown@bakerlaw.com

Paige M. Tomaselli
ptomaselli@centerforfoodsafety.org

Leslie Brueckner
lbrueckner@publicjustice.net

Richard Alan Eppink
reppink@acluidaho.org

Jeffery S. Gulley
jeffg@whistleblower.org

Maria E. Andrade
mandrade@andradelegal.com

Norman M. Semanko
nms@moffatt.com

Thomas C. Perry
tom.perry@gov.idaho.gov

Rachel Meeropol
rachelm@ccrjustice.org

Cally A. Younger
cally.younger@gov.idaho.gov

Michael J. Bartlett
bartlett@nbmlaw.com

Daniel V. Steenson
dan@sawtoothlaw.com

Marty Durand
marty@idunionlaw.com

Celeste K. Miller
ck@mcdevitt-miller.com

James M. Piotrowski
james@idunionlaw.com

AND I HEREBY certify that I have mailed or served the foregoing to the following non-CM/ECF participant via U.S. Mail:

Susannah W. Pollvogt
University of Washburn School of Law
1700 SW College Avenue
Topeka, KS  66621

       /s/ Clay R. Smith
            Clay R. Smith

DEFENDANT WASDEN'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT FILED ON NOVEMBER 19, 2014 - 26