Justin Marceau (California Bar No. 243479)
2255 E. Evans Ave., Denver, CO 80208, jmarceau@law.du.edu

Matthew Liebman (California Bar No. 248861)
170 E. Cotati Ave., Cotati, CA 94931, mliebman@aldf.org

Matthew Strugar (California Bar No. 232951)
2154 W. Sunset Blvd., Los Angeles, CA 90026, matthew-s@petaf.org

Paige M. Tomaselli (California Bar No. 237737)
303 Sacramento St., 2nd Floor, San Francisco, CA 94111, ptomaselli@centerforfoodsafety.org

Leslie A. Brueckner (California Bar No. 140968)
555 12th St., Suite 1230 Oakland, CA 94607, lbrueckner@publicjustice.net

Richard Alan Eppink (Idaho Bar No. 7503)
ACLU of Idaho Foundation, P.O. Box 1897, Boise, ID 83701, reppink@acluidaho.org

Maria Andrade, (Idaho Bar No. 6445)
3775 Cassia Street, Boise, ID 83705, mandrade@andradelegal.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LAWRENCE WASDEN, in his official capacity as Attorney General of Idaho,<br><br>State. | Case No. 1:14-00104-BLW<br><br>PLAINTIFFS' REPLY BRIEF ON THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT |

**Introduction**

The State's response to Plaintiffs' Motion for Summary Judgment has three notable features. First, the State all but concedes that unless this Court changes course and backtracks from the sound reasoning underlying its order, Dkt 68, the Ag Gag statute must be struck down as unconstitutional. Dkt 88 at 6 (acknowledging that this Court's prior order "creates a substantial obstacle to enforcement of the" Ag Gag law's misrepresentations and recording provisions). As discussed below, the State's effort to discredit this Court's prior reasoning and conclusions is foreclosed by existing First Amendment and Equal Protection doctrine. Second, the State does not contest standing as to three of the four sections of the statute under review, 18-7402(a),(b) and (d).[1] Dkt 88 at 2, n. 2. Third, the State erroneously argues that the patently unconstitutional portions of the Ag Gag statute can be severed from the rest of the statute, and in so doing *concedes* that the "misrepresentation" prohibition in each subsection is not necessary to the "core objective" of the Ag Gag law. Dkt 88 at 19.

I.  **_UNITED STATES v. ALVAREZ_ SUPPORTS PLAINTIFFS' CLAIM THAT THE AG GAG LAW VIOLATES THEIR FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH.**

   A.  **Lies That Facilitate Undercover Investigations Promote the Values Underlying the First Amendment.**

In *United States v. Alvarez*, 132 S. Ct. 2537 (2012), the Supreme Court struck down the federal Stolen Valor Act on the ground that it violated the First Amendment's free speech guar-

---

[1] The State "reserves" its objection to Plaintiffs' standing to challenge subsection (1)(c), arguing that Plaintiffs' standing declarations fail to allege the necessary mens rea to violate that subsection. The Court already rejected this argument, finding that Plaintiffs' intended undercover investigations "could hurt a facility's profits and reputation and economically injure its business." Dkt 68 at 10. Plaintiffs' standing declarations reiterate the intent to conduct such investigations and the State makes no argument that the Court's original ruling on this point was in error. More to the point, recent Supreme Court precedent forecloses the State's argument on this point. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345, (2014) ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law."); *see also* Dkt 49 (summarizing *Susan B. Anthony*).

antee. In doing so, as the State concedes, Dkt 88 at 8, the *Alvarez* plurality rejected the idea that there is "any general exception to the First Amendment for false statements." *Id*. at 2544. The concurring Justices agreed with that principle. *Id*. at 2553 (Breyer, J., concurring) (noting that past "judicial statements cannot be read to mean 'no protection at all' for false factual statements"). Perhaps no feature of the decision is more striking than the fact that the *Alvarez* Court applied robust First Amendment protection even *without recognizing any value* in the defendant's false statements. *Id*. at 2542. The lies used by Mr. Alvarez "were but a pathetic attempt to gain respect that eluded him," *id*.; they did not have any tangible, political value as protected speech.

By contrast, lies used to facilitate undercover investigations, like those at issue in this case, actually advance the core values underlying the First Amendment in important ways by exposing hidden misconduct to the public eye and facilitating deliberation about important matters of public concern such as animal welfare, workplace safety, and food safety.[2] The types of lies prohibited by the Idaho Ag Gag statute actively and meaningfully contribute to public discourse on issues of political salience, and therefore have high First Amendment value. This distinguishes the Plaintiffs' speech from the types of lies recognized by *Alvarez* as not covered by the First Amendment, which all *undermine* the values promoted by free speech—facilitating democratic self-governance, the search for truth, and individual autonomy. Stated more directly, the lies protected in cases like *Alvarez* have at most a tangential or attenuated relationship to the values underlying the First Amendment, but the speech criminalized by the Ag Gag statute affirma-

---

[2] This case does not raise the distinct concerns that might arise if a law criminalized access or recording relating only to purely private, or intimate details as opposed to commercial interests. To be sure, the First Amendment provides heightened protection for speech related activities that relate to matters of public concern. *See, e.g., Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011); *Dunn & Bradstreet v. Green Moss Builders*, 472 U.S 749, 759 (1985).

tively and directly serves the core purposes of the First Amendment by facilitating political debate on an issue of considerable public interest.

### B. *Alvarez* Establishes That Lies That Do Not Cause Material Harm to Third Parties Are Covered by The First Amendment.

In its Response Brief, the State mischaracterizes *Alvarez* by suggesting that the Court's primary reasoning for invalidating the Stolen Valor Act was that it prohibited lies and nothing more. Dkt 88 at 8. While it is true that the Stolen Valor Act could be violated entirely by a speech act, *Alvarez* quite clearly articulates the relevant limiting principle—the government may regulate false statements of fact only when those statements cause a "legally cognizable harm." *Alvarez*, 132 S. Ct. at 2545. Thus, for example, the First Amendment does not prohibit government regulations of false statements of fact that cause *tangible and material* harms to a third party, such as direct financial or property losses. *Id*. 2546-48.

In light of *Alvarez*'s actual holding, the States' assertion that the Idaho Ag Gag law cannot be violated by speech alone, Dkt 88 at 10, is completely beside the point. They argue that the Ag Gag law only prohibits speech when it is accompanied by other types of conduct, such as entering an agricultural facility or gaining employment with the intent to cause economic injury. *Id*. But the point of *Alvarez* is not that speech unaccompanied by other conduct is protected (for example, fraud is speech unaccompanied by other conduct, as is defamation, but both are *not* protected); rather, *Alverez* holds that lies *that cause material harms* are not covered by the First Amendment—and, conversely, that lies that *do not* cause such harm are *protected* by the First Amendment.

Here, the *Alvarez* test for material harm fails for at least two reasons. First, as this Court previously held, the type of harm alleged by State is not cognizable as a legal matter. To be sure, the ultimate consequence of Plaintiffs' investigations will be publication that may lead to boy-

3
PLAINTIFFS' REPLY BRIEF ON MOTION FOR PARTIAL SUMMARY JUDGMENT

cotts, public scrutiny or other economic injury. However, such harm—non-defamatory reputational injuries—is not the type of material harm that *Alvarez* contemplates. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988). As this Court correctly observed in its Order denying the State's Motion to Dismiss:

> [T]he limited misrepresentations ALDF says it intends to make – affirmatively misrepresenting or omitting political or journalistic affiliations, or affirmatively misrepresenting or omitting certain educational backgrounds – *will most likely not cause any material harm to the deceived party*. To illustrate, if an undercover investigator omits certain facts, like political affiliations, to secure employment with agricultural facility and then publishes a false story, the harm would stem from the publication of the false story, not the lies told to gain access to the facility. And the facility owner could seek damages for defamation. Conversely, if an undercover investigator lies to get a job at an industrial agricultural facility and then publishes a true story revealing the conditions present at the facility without causing any other harm to the facility, there is no compensable harm for fraud. *See, e.g., Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 512-513 (4th Cir. 1999). *Thus, such misrepresentations would be protected speech because they are not made to cause material harm to an agricultural production facility but to expose truths about the agricultural industry.*

Dkt 68 at 19-20 (emphases added).

This Court's prior conclusions make good sense. The misrepresentations targeted by the Ag Gag law are not made to cause material harm; to the contrary, they are intended to expose the truth about certain practices in the animal industry. Any harms that result from a deception-based investigation are self-inflicted—they stem not from the lies, but from accurate and truthful accounts of the agricultural industry's underlying conduct being exposed to public scrutiny. Such reputational injury is not cognizable outside of the constitutionally defined contours of defamation law. The agricultural industry seeks to hide behind Ag Gag laws, which shield its actual practices from criticism; however, *Alvarez*, does not permit the suppression of protected speech in the manner accomplished by Idaho's statute.

Second, even if the type of harm at issue here were legally cognizable under *Alvarez*, the States' arguments necessarily fail because they have not created an issue of material fact on this

point sufficient to withstand a motion for summary judgment. The state has not even attempted to dispute that no tangible loss is caused by the lies that investigators, journalists, and activists use to gain access to agricultural facilities to expose their unsavory practices. While the State asserts an unspecified interest in controlling access to agricultural facilities and in protecting owners from "employing individual[s] who intend to cause economic or other injury to the facility and related interests," Dkt 88 at 9, they present no evidence to raise *an issue of fact* on the question of whether undercover investigations cause any tangible harm. As the Fourth Circuit has held, even the wages paid to undercover investigators serving as employees will not constitute cognizable injury. *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 514 (4th Cir. 1999) (rejecting the claim that lies and resume misrepresentations caused a cognizable monetary harm where the undercover workers performed their assigned tasks at a reasonable level of competence). Thus, even if the State was right about *Alvarez* as a legal matter (they are not), they still cannot withstand summary judgment because they have failed to proffer any proof on this point.

## II. THE AG GAG LAW IS A CONTENT-BASED RESTRICTION TO WHICH STRICT SCRUTINY APPLIES.

The State also argues that the recording provision of the law, § 18-7042(1)(d), is not content-based.[3] Dkt 88 at 11-12. For the reasons set forth in this Court's prior order, the Ag Gag law "is a content-based restriction." Dkt 68 at 23-24.

Laws may be content-based in either of two ways: "if either the underlying purpose of the regulation is to suppress particular ideas, or if the regulation, by its very terms, singles out particular content for differential treatment." *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir.

---

[3] If the misrepresentation provisions are protected speech under *Alvarez*, then their distinction between true and untrue messages as well as their agricultural focus makes these sections content-based. The State does not argue to the contrary, and focus instead only on other portions of the Ag Gag law. The State has thus waived any argument that the misrepresentation provisions are not content-based.

2009) (en banc) (internal citation omitted). The underlying purpose of the Ag Gag law is undoubtedly to suppress the ideas of critics of animal agriculture. *See* Dkt 74-1 at 5-6, 22-24 (summarizing the legislative history). The law also facially discriminates among content by its very terms.

The law selectively burdens speech related to agricultural activities for criminalization. An employee who, without the owner's consent, films animals being abused on a farm may be punished under the law; the same employee, who without consent films the owner's children, may not. As the State concedes in its opposition, a law is content-based if law enforcement officials must view the material in question to determine whether it is prohibited. Dkt 88 at 11; *see also G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1078 (9th Cir. 2006). In enforcing the Ag Gag law, law enforcement personnel would certainly need to view suspect video or audiotape to determine whether it captures agricultural operations and thus is prohibited. Moreover, the State's decision to criminalize whistleblowing in only a single industry evinces an intent to distort the political debate about modern agricultural production. *Cf.* Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 414 (1971) (recognizing that the content-based inquiry is often a search for the inappropriate motives of lawmakers).

Contrary to the State's characterization of the law as drawing no content based distinctions, Dkt 88 at 17, in fact the Ag Gag law even constitutes viewpoint discrimination—a form of content discrimination in which the government distinguishes between different viewpoints taken on the same subject—because it silences critics of certain agricultural practices while permitting speech that promotes the same agricultural practices. *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 969 (9th Cir. 1999). If an applicant misrepresents himself on a job appli-

cation with the intent of praising the husbandry practices of the employer, the Ag Gag law does not apply. I.C. § 18-7042(1)(c) (requiring an intent to harm the agricultural facility's interests). Similarly, by criminalizing all video recordings except for those made with the express consent of the facility's owner, I.C. § 18-7042(1)(d), the law impermissibly criminalizes only critical video recording while permitting video recording that would place the facility in a positive light. *See Boos v. Barry*, 485 U.S. 312, 328 (1988) (striking down ordinance prohibiting signs critical of a foreign government).

Moreover, the State relegates the restitution provision to a footnote in which it argues the provision could be severed from the rest of the statute,[4] Dkt 88 at 19 n.6, and essentially assumes that the provision is irrelevant to the inquiry as to whether the law is content-based. Nothing could be further from the truth. In fact, the restitution provision colors the entirety of the statute by exposing an improper, content-based motive for the law—the desire to prevent negative publicity from whistleblowing investigations. The restitution provision, which applies to each type of criminalized activity under review by this Court, I.C. § 18-7042(1)(a)-(d), allows for an award for double the loss, including "direct out-of-pocket losses or expenses," I.C. § 19-5304(1)(a), related to any violation of the statute. I.C. § 18-7042(4). The most likely loss related to any misrepresentation or unauthorized image capture at an agricultural facility is the loss of profits generated by public outcry from the conduct depicted in the video. The Ag Gag law, thus, not only

---

[4] Plaintiffs dispute the State's contention that the unconstitutional portions of the Ag Gag statue can be severed for several reasons and respectfully request an opportunity to specifically brief this question if the Court is considering this remedy.  In a nutshell, severability fails for several reasons: (1) the equal protection claim precludes severability because the entire statute is implicated by the animus; (2) the core purpose of this legislation was to prevent future investigations like the one conducted at an Idaho dairy, thus eliminating the recording and misrepresenting provisions undermines the core objectives of the law; and (3) if the statute is content-based, the other portions of the statute must also be severed, because even though some forms of speech, such as "true threats" aren't protected speech, they cannot be proscribed in a manner that is content-discriminatory. *R.A.V. v. St. Paul*, 505 U.S. 377, 386 (1992).

criminalizes the gathering of content but, through the restitution provision, also its publication. *See Hustler*, 485 U.S at 53 (explaining indirect penalties for harms resulting from publication must satisfy defamation standard). It would be perverse to create a law under which the more salacious and publicly significant the scandal exposed by the speech activity, the greater the damage award to the exposed business.

The State's general reliance on the Supreme Court's recent decision in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), is equally unavailing. Dkt 88 at 11. *McCullen* did not announce any new rule in content-neutrality; it simply reaffirmed the holding in *Hill v. Colorado*, 530 U.S. 703 (2000), that buffer zones outside of abortion clinics are content-neutral because they apply evenhandedly and without reference to the content of regulated speech. *Id*. at 719-20; *see also McCullen*, 134 S. Ct. at 2531 ("petitioners can violate the Act merely by standing in a buffer zone, without displaying a sign or uttering a word"). By contrast, the Ag Gag law singles out content and viewpoint at multiple levels: by applying only to speech concerning "the conduct of an agricultural production facility's operations," I.C. § 18-7042(1)(d); by premising liability on acts carried out without the "facility owner's express consent," *id*.; by restricting speech made with the intent to cause reputational harm to an agricultural facility while permitting the same speech made with intent to commend the facility, I.C. § 18-7042(1)(c); and by allowing the criticized facility to recover twice its reputational damage for any violation. I.C. § 18-7042(4).

Moreover, central to *McCullen*'s holding was the fact that the Massachusetts legislature sought to remedy "a problem that was, in its experience, limited to abortion clinics." 134 S. Ct. at 2532. "There was a record of crowding, obstruction, and even violence outside such clinics. There were apparently no similar recurring problems associated with other kinds of healthcare facilities," thus suggesting that speech restrictions in the abortion context are unique. *Id*. A varie-

ty of Idaho industries have been subjected to undercover investigations in recent years. SUMF ¶¶ 35-48. The State does not contest these facts. Dkt 88-1 ¶ 21 (raising only hearsay objections). Unlike *McCullen*, the Idaho legislature addressed an issue—investigative journalism and whistleblowing—that applies to a *wide variety of industries*. But instead of addressing the issue in a content-neutral manner, the legislature impermissibly singled out one industry for protection, and one set of critics for criminal prohibition.[5]

In this way, the Ag Gag law functions as an equivalent to the law struck down in *Valle Del Sol, Inc., v. Whiting*, 709 F.3d 808 (9th Cir. 2013), which prohibited day laborers from soliciting work from stopped cars. The state defended the law as content-neutral, claiming it sought to address traffic problems. *Id*. at 820. The Ninth Circuit rejected that argument on two separate grounds: 1) the law's differential treatment between labor solicitors and others who impeded traffic showed content-discriminations; and 2) the facts showed that the state's *purpose* was to suppress day labor solicitation. *Id*. The same grounds exist here—the State subjects misrepresentation and audio-visual capture related to agricultural facilities to criminal punishment but does not criminalize such speech in other industries, and a substantial motivation for the law was to silence critics of industrial animal agriculture.

### III. AS A CONTENT- AND VIEWPOINT-BASED RESTRICTION ON PURE SPEECH AND CONDUCT PREPARATORY TO SPEECH, THE AG GAG LAW CANNOT SURVIVE STRICT SCRUTINY.

Content based laws are subject to strict scrutiny. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 4 (2010) (applying strict scrutiny to the conduct of materially supporting terror-

---

[5] The State argues that the agricultural industry is uniquely deserving of protection of whistleblowing because the industry is so large and prominent in "Idaho's economy and culture." Dkt 88 at 19. In other words, just as some banks are too big to fail, the state of Idaho asserts that Idaho agriculture is too big and too politically important to be subject to whistle-blowing. Such an argument turns the First Amendment on its head. The volume of sales, jobs, and subsidies to Idaho agriculture make whistle-blowing distinctively important to the First Amendment.

ism). The Ag Gag law fails that test. The State cannot and does not offer any meaningful claim that the Ag Gag law is narrowly tailored in contradiction of Plaintiffs' argument on this point. Dkt 74-1 at 11-18. Instead, the State in its severability argument actually implicitly concedes that the law is not narrowly tailored. The application of heightened scrutiny to this law means that each challenged portion of the statue must be absolutely necessary to the compelling government interest. *Id* at 16-18 (examining heightened scrutiny in the First Amendment context). The challenged misrepresentation provisions, however, cannot simultaneously be narrowly tailored (as required by the First Amendment) *and* outside of the "core objective" of the law (as required for severability). Accordingly, the State's concessions that the sections of the statute under review can be severed insofar as they are not central to the law's purpose are fatal to this law when narrow tailoring is applied.[6]

## IV.   THE AG GAG LAW VIOLATES THE FIRST AMENDMENT BECAUSE IT IS OVERBROAD.

Even if the court found that the Ag Gag law was content- and viewpoint-neutral, the law would still be unconstitutional because it restricts significantly more speech than the First Amendment allows. *New York v. Ferber*, 458 U.S. 747, 733 (1982). The State is wrong in arguing that Plaintiffs' overbreadth claim "brings nothing to the table here" and seeks merely to invoke an exception to the prohibition to third-party standing. Plaintiffs seek no such thing. They have standing in their own right. Indeed, as the State recognizes, Plaintiffs' overbreadth claim is "another way of saying that [the law] violate[s] the First Amendment," separate and apart from

---

[6] The State also attempts to recast Plaintiffs' claim as one seeking the State to "facilitate the right's exercise," analogizing to a case where the claimed right was access to public payroll systems for the purpose of funding union political activities.  Dkt 88 at 12 n.3.  Plaintiffs are not seeking access to any government records or any other facilitation from the state; they simply seek an injunction against the state imprisoning them for their protected speech.

whether it is content- or viewpoint neutral. Dkt 88 at 17-18. The State's citation to *Rumsfeld v. Forum for Academic and Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006), is not to the contrary—it simply held that, in discussing a multi-plaintiff challenge, the Court would focus its discussion to the party with the strongest standing.

In analyzing whether a criminal prohibition facially violates the First Amendment, the Court must first assess the breadth of the statute. *United States v. Stevens*, 559 U.S. 460, 474 (2010). In a facial challenge, assessing the breadth of the statute is not limited to the plaintiff's intended speech or conduct—if it were, there would be no need to distinguish between facial and as-applied challenges.

The Ag Gag law is overbroad because it criminalizes capturing images or sounds at a facility not open to the public without "express consent or pursuant to judicial process or statutory authorization," even when the person is otherwise lawfully permitted to be there, including in the workplace. I.C. § 18-7042(1)(d). And, as shown above, it prohibits employment-based undercover investigations by criminalizing the act of applying for a job and failing to disclose certain political viewpoints or associational affiliations if the applicant seeks to harm the facility's "business interests"—i.e., its future profits or bottom line. I.C. § 18-7042(1)(c). The statute also criminalizes failing to disclose political viewpoints or associational ties in the act of entering an agricultural facility, I.C. § 18-7042(1)(a), or obtaining any "record"—a term left undefined by the statute—from a facility. I.C. § 18-7042(1)(b). The statute defines its scope so broadly that it applies not only to factory farms and slaughterhouses, but also to public parks, restaurants, nursing homes, grocery stores, pet stores, and virtually every public accommodation and private residence in the state. I.C. § 18-7042(2)(a)–(b). To give another example of the statute's breadth,

taking a video of one's own child in the restaurant of a private country club without the owner's permission is punishable by a year imprisonment and a $5,000 fine.[7]

Moreover, as the State concedes, the overbreadth doctrine provides for a form of third-party standing. Dkt 88 at 17. The plain language of the statute prohibits "salting," a protected union activity whereby union members obtain employment for the purpose of organizing workers. Dkt 68 at 19; Dkt 30 at 3. Plaintiffs challenge this statute as overbroad insofar as it prohibits their protected First Amendment activities as well as those of union organizers in the state.

The second step of overbreadth analysis is to determine whether the challenged law prohibits a substantial amount of protected activity. *City Counsel of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984). The examples above show that it clearly does.

As it did in its Motion to Dismiss, the State attempts to justify the ban on audiovisual capture on the basis that its restriction on an antecedent to speech is justified because it protects private property. Dkt 88 at 12. If the First Amendment protected only disseminating speech, and not also collecting and preparing for it, then "the State could effectively control or suppress speech by the simple expedient of restricting an early step in the speech process rather than the end result." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012). It is firmly established that "laws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010). In short, acts preparatory to speech—such as funding speech, taking notes, or conducting audiovisual recordings—are constitutionally protected no less than the speech itself. *See Anderson v. City of Hermosa Beach*, 621

---

[7] The State appears to concede the tremendous breadth of the statute, admitting that "it makes no First Amendment difference whether 'telling a white lie about intended to buy coffee' to gain access to a restaurant bathroom . . . [or] tell[s] a 'black' lie to gain access for the purpose of observing working conditions." Dkt 88 at 18 n.5.

12

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PARTIAL SUMMARY JUDGMENT

F.3d 1051, 1062 (9th Cir. 2010) (rejecting a "hard line between the essays John Peter Zenger published and the act of setting the type" in striking down ban on tattooing on First Amendment grounds); *People v. Clark*, 2014 IL. 115776 (Ill. Mar. 20, 2014) (finding Illinois' two-party consent recording statute facially unconstitutional under the First Amendment). In short, regardless of exactly how the Ag Gag law is characterized, it criminalizes a substantial amount of speech and is thus unconstitutionally overbroad.

## V. EVEN IF STRICT SCRUTINY DOES NOT APPLY, THE AG GAG LAW STILL FAILS INTERMEDIATE SCRUTINY.

Even if the Court accepted the State's argument that strict scrutiny should not apply—either because misrepresentations do not warrant strict scrutiny, because the audiovisual recording is pure "conduct" and not an act preparatory to speech, or because the law is not content-based—the law would still be subject to intermediate scrutiny. Intermediate scrutiny requires the regulation be "justified without reference to the content of the regulated speech, that [it is] narrowly tailored to serve a significant government interest, and that [it] leave[s] open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-52 (1994). Even under intermediate scrutiny, the Ag Gag law fails to withstand constitutional challenge.

Under intermediate scrutiny, the State bears the burden of establishing that the law is narrowly tailored, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (quoting *Turner Broad. Sys.*, 512 U.S. at 665). The State, however, make no effort to show narrow tailoring; indeed they seem to concede that the law is *not* narrowly tailored. As indicated above, the law's sweep is incredible, covering not only slaughterhouses but also restaurants, grocery stores, pet stores, and virtually every public accommodation and

private residence in the state. I.C. § 18-7042(2)(a)–(b). And even the one section of the statute that applies only to facilities not open to the public, I.C. § 18-7042(2)(d), applies to private country clubs, member only grocery stores, and many other areas in addition to traditional agricultural facilities. It is not conceivable that a law of such breadth could be construed as narrowly tailored. Dkt 74-1 at 12-18. The State fails to meet its burden and the Ag Gag law should be struck down even if the Court applies intermediate scrutiny.

## VI. THE AG GAG STATUTE CANNOT SATISFY HEIGHTENED RATIONAL BASIS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

Nothing the State has argued remotely alters the conclusion that the Ag Gag law violates Equal Protection; a substantial body of briefing already before this Court makes this point clear. *See, e.g.*, Dkts 78-1 (amicus of Equal Protection scholars); Dkt 23 at 14-23 (Opposition to Motion to Dismiss); Dkt 88 at 20-28 (Summary Judgment Motion).

The State makes two primary points with regard to this claim: (1) the legislation was not motivated exclusively by hostility or disapproval of animal rights groups; and (2) even if it was, legislative motive is entirely irrelevant to the constitutional inquiry. Dkt 88 19-24. As to the latter point, the State relies repeatedly on *United States v. O'Brien*, 391 U.S. 367 (1968), and *City of Renton v. Playtime Theatres*, 475 U.S. 41 (1986), for the proposition that it is "a familiar principle of constitutional law" that a law cannot be invalidated because of "illicit legislative motive." Dkt 88 at 13-14. Significantly, *Renton* is a case that proves the opposite of what the State argues—the Court looked at legislative intent in assessing whether a statute was unconstitutional. *Renton*, 475 U.S. at 47-48 (considering the legislative motive for a city's action). Moreover, if the out of context snippets from *O'Brien* that the State relies on ever were intended to be used as the State suggests, it is now clear that legislative motive is an integral part of the Equal Protec-

tion inquiry.[8] *United States v. Windsor*, 133 S. Ct. 2675, 2707 (2013) (Scalia, J., dissenting) (acknowledging that the majority holding rejects the once "familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive"). Similarly, the State's lengthy effort to find some redeeming non-animus purposes for the Ag Gag law, Dkt 88 at 15-18, has no legal significance. In cataloging every possible example of allegedly legitimate motives for the Ag Gag law, the State fails to acknowledge that so long as animus was a "motivating factor" behind the law, then careful scrutiny applies.[9] *Village of Arlington Heights v. Metro. Hous. Corp.*, 429 U.S. 252, 265–66 (1977). There is no need for a consensus or unanimity of legislative motive; indeed, the Court has recognized that such a showing would be impossible. *Id.* Moreover, as Plaintiffs and amici have previously pointed out, there is no reported federal decision with more evidence of animus. The context from which this legislation arose as a backlash to a successful undercover investigation in Idaho, and the fact that the legislative history contains multiple hostile references to animal rights groups or their investigations, makes this statute uniquely deserving of invalidation under

---

[8] The State also relies extensively on Equal Protection cases from the *Williamson v. Lee Optical*, 348 U.S. 483, 489 (1955) line of precedent in support of their claim that legislative motive does not matter and rational basis does not tolerate second-guessing legislative judgments. Dkt 88 at 20-24. As explained previously, Dkt 23 at 14-23; Dkt 58-1 at 8-9, the non-animus Equal Protection precedent is entirely distinct from the sort of scrutiny that is required if animus is a motivation for the law. The reliance on these cases is of no utility in this context.

[9] In addition, the quoted examples of "appropriate" legislative motive, Dkt 88 at 17, tend to confirm rather than refute animus. The legislative history quoted by the State often justifies the law by reference to the harm caused by defamation; the relied upon legislative history asserts that the law is necessary in order to prevent "potential staging of an event", or to avoid the "misrepresentation of agricultural practices." Defamation is already prohibited in Idaho, there is no allegation or evidence of past defamation in the context of agricultural whistle-blowing in Idaho (or any state), and an attempt to criminalize reputational injury that *does not* satisfy the elements of defamation is patently unconstitutional. *Garrison v. Louisiana*, 379 U.S. 64, 67 (1964) (striking down a criminal libel statute); *Hustler*, 485 U.S. at 52. Accordingly, any supposedly "legitimate" government rationale in avoiding negative publicity is constitutionally foreclosed.

the Equal Protection clause. Dkt 78-1 at 19-21 (noting that in *Moreno* there were only one or two passing references to hippies in the entire legislative history, and emphasizing that the law in question actually only created a distinction on neutral, non-suspect grounds of relatedness not based on one's status as a hippy). In sum, the State's Equal Protection arguments represent little more than an effort to distract from the unequivocal evidence that the Ag Gag law was motivated *in part* by animus, and thus justifies a form of careful scrutiny—a level of scrutiny the law cannot survive.

## Conclusion

For the foregoing reasons, the Court should grant Plaintiffs' Partial Motion for Summary Judgment.

DATED this 12th day of January 2015.

Respectfully submitted,

_____

Justin Marceau, *pro hac vice*
University of Denver, Sturm College of law
2255 E. Evans Avenue
Denver, CO 80208
(617) 256-9073
jmarceau@law.du.edu

Ritchie Eppink
ACLU of Idaho Foundation
P.O. Box 1897,
Boise, ID 83701
(208) 344-9750 phone
reppink@acluidaho.org

Matthew Strugar, *pro hac vice*
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
(323) 210-2263
Matthew-S@petaf.org

Maria Andrade
3775 Cassia Street
Boise, ID 83705
(208) 342-5100
mandrade@andradelegal.com

Matthew Liebman, *pro hac vice*
Animal Legal Defense Fund
170 East Cotati Avenue

Paige Tomaselli, *pro hac vice*
Center for Food Safety
303 Sacramento St., 2nd Floor

| | |
|---|---|
| Cotati, CA 94931 | San Francisco, CA 94111 |
| (707) 795-2533, ext. 1028 | (415) 826-2770 |
| mliebman@aldf.org | ptomaselli@centerforfoodsafety.org |

Leslie A. Brueckner
Senior Attorney
Public Justice, P.C.
555 12th St., Suite 1230
Oakland, CA 94607                    Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 12th day of January, 2015, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Clay Smith             clay.smith@ag.idaho.gov

Carl J. Withroe        carl.withroe@ag.idaho.gov

OFFICE OF THE ATTORNEY GENERAL OF IDAHO

Thomas C. Perry        tom.perry@gov.idaho.gov

Cally A. Younger       cally.younger@gov.idaho.gov

OFFICE OF THE GOVERNOR OF IDAHO

*Attorneys for Defendants*

DATED this 12th day of January, 2015.

                          /s/ Justin Marceau