**DANIEL V. STEENSON**
[Idaho State Bar No. 4332]
**DAVID P. CLAIBORNE**
[Idaho State Bar No. 6579]
**SAWTOOTH LAW OFFICES, PLLC**
Golden Eagle Building
1101 W. River St., Ste. 110
P. O. Box 7985
Boise, Idaho  83707
Telephone: (208) 629-7447
Facsimile: (208) 629-7559
E-mail: dan@sawtoothlaw.com,
david@sawtoothlaw.com

**Attorneys for The Idaho Dairymen's
Association, Inc.**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO (SOUTHERN DIVISION)

| | |
|---|---|
| **ANIMAL LEGAL DEFENSE FUND**, *et al.* | ) |
| | ) Case No. 1:14-cv-00104-BLW |
| Plaintiffs, | ) |
| | ) |
| vs. | ) **SECOND BRIEF OF** *AMICUS* |
| | ) *CURIAE* **THE IDAHO DAIRYMEN'S** |
| **C.L. "BUTCH" OTTER**, in his official capacity | ) **ASSOCIATION, INC. RE:** |
| as Governor of Idaho; and **LAWRENCE** | ) **PLAINTIFFS' MOTION FOR** |
| **WASDEN**, in his official capacity as Attorney | ) **PARTIAL SUMMARY JUDGMENT** |
| General of Idaho, | ) **FILED ON NOVEMBER 18, 2014** |
| | ) |
| Defendants. | ) |
| | ) |

**COME NOW** The Idaho Dairymen's Association, Inc. ("IDA"), by and through its

attorneys of record, Sawtooth Law Offices, PLLC, and submits the following as a friend of the

Court brief in **OPPOSITION** to Plaintiffs' *Motion for Partial Summary Judgment*, filed

November 18, 2014, Dkt. 74 ("*MPSJ*").  For the reasons set forth herein, the *MPSJ* ought to be

**DENIED**.

## I.       INTRODUCTION.

The State of Idaho has a compelling interest in protecting an ordered system of liberty, personal privacy, and the right to control one's own property.  That is essentially what the State of Idaho accomplishes with the agricultural security legislation.  The rights of privacy and property protected by Section 18-7042 are not subordinate to the right of free speech.  All of these rights are guaranteed by both the United States and Idaho Constitutions.  ALDF seeks to have the Court impose a preference for the right of free speech, allowing persons to go upon the private property of others, unfettered and undeterred, all under the auspices of conduct preparatory to speech.  The First Amendment is not a license to steal, a license to trespass, a license to lie, or a license to threaten.  The State of Idaho has carefully, and in a measured and controlled fashion, adopted legislation that protects a vulnerable segment of society[1] from those that would use the First Amendment in order to harm others.

What ALDF's legal challenge to Section 18-7042 presents is a conflict of rights.  ALDF urges the Court to choose sides and elevate the right of free speech over rights of liberty, privacy, and property.  This is fundamentally not a decision to be made by the judiciary – it is a decision for the legislative body.  Idaho's legislative body has chosen to protect rights of privacy and property in private areas, while still allowing those interested to gather information and express themselves from public areas.  This is not an unreasonable or irrational approach.  Those wishing to express views negative to agriculture are still permitted to do so.  They are free to do or say anything they want on their own property, or upon public property where not prohibited, or upon private property where they have been granted permission to be by the owner or authorized

---

[1] ALDF makes much of the fact that Section 18-7042 is limited to agriculture and not applicable to other private enterprises.  While other private enterprises face the same concerns, such as an HP or Micron, agriculture is unique in that its operations are spread out across the land where access is difficult to control.  It is easy for enterprises such as CenturyLink Arena or Micron, to ensure and control invitees from taking unauthorized records, while that is a difficult certainty for a farm or ranch to ensure.

agent.  But, the right to free speech ends when they try to express it on property where the legitimate owner has not given permission for them to do so.

The right of property ownership includes a right to exclude people from property and control what people do on property.  ALDF's argument that individuals are being illegally limited in their free speech flies in the face of the right to control incident to private property ownership.  It is precisely the duty and object of good government to protect and preserve the rights of citizens from encroachment by those who would take or jeopardize those rights.  If legitimate rights are not protected, what is the purpose of government?  Under a true recognition of the scope and limits of these two rights (liberty and speech), there is no inherent conflict, nor is there a need to strike down Section 18-7042.

## II.    STATUS OF AMICUS CURIAE.

The IDA is "an agricultural trade association and the driving force behind enactment" of Idaho's agricultural security law.  Dkt. 48, at 2.  While IDA has not been permitted intervention in this action, Dkt. 48 and 73, it has been granted status as an *amicus curiae*, or friend of the Court, Dkt. 52.  The agricultural security law at issue in this action was passed by the Idaho Legislature in 2014 in response to several instances of wrongful interference with agricultural operations; not one isolated incident.  The concern to the IDA is with conduct that invades privacy interests of IDA members, disregards private property rights of IDA members, undermines the employment relationship IDA members have with their employees, and is intended cause economic ruin to the IDA's members, and to agriculture generally.  Dkt. 16-2, at ¶ 7, 8.  Past conduct of this sort has resulted in threats of death and harm to IDA members and their families.  *Id.*

It is thus clear that IDA's members have been, and will continue to be, a target, and will need the protections provided by the Idaho Legislature in I.C. §18-7042.  As such, the IDA is uniquely interested in this action and the preservation of the agricultural security law.  The IDA offers this *Second Brief of Amicus Curiae* IDA in response to Plaintiffs' *MPSJ* seeking to invalidate I.C. §18-7042 based on the First Amendment and the Equal Protection Clause.

## III.   RELIEF SOUGHT BY PLAINTIFFS.

Plaintiffs, or ALDF, request partial summary judgment against the Attorney General under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution with respect to Idaho Code § 18-7042(1)(a) through (d).  Dkt. 74.[2] ALDF challenges the statute's prohibitions against obtaining access, records and employment by misrepresentation (contained in I.C. § 18-7042(1)(a-c)), and against recording the conduct of an agricultural facility's operations that is not open to the public without the facility owner's consent (contained in I.C.§ 18-7042(1)(d)).   ALDF challenges these statutory prohibitions because they intend to violate each one.  ALDF's  First Amendment challenge asserts that these provisions: (1) contain content- and viewpoint-based restrictions that do not advance a compelling interest by the least restrictive means, and, (2) are overbroad, restricting more speech than the First Amendment allows.   ALDF's Equal Protection challenge asserts that the statute is invalid because it "was motivated in substantial part by animus towards animal welfare groups." Dkt. 77-1 at 10.

## IV.   SUMMARY OF ARGUMENT.

ALDF's argument on the *MPSJ* essentially reiterates its arguments in opposition to

---

[2] The Court has already dismissed all claims brought against Governor Otter.  Dkt. 68 at 7-9. The Court has also already determined that Plaintiffs lack standing to challenge I.C. § 18-7042(1)(e).  Dkt. 68 at 11-12.   The only other challenge to the agricultural security law is Plaintiffs' Supremacy Clause-based claims, which have not been presented as part of the *MPSJ*.

Defendants' motion to dismiss.  *See* Dkt. 23 at 3-22.  IDA's position remains the same – there is no merit to any challenges to the constitutionality of the agricultural security law.

A.     *The First Amendment Challenge.*

The IDA maintains that the misrepresentation and audio/visual recording provisions of § 18-7042(1) do not impair speech that is protected by the First Amendment.  ALDF misconstrues and incorrectly applies relevant First Amendment interpretive case law, particularly *Alvarez*.  If the Court continues to view portions of the agricultural security law as impairing protected speech, the provisions do not restrict more speech than is necessary to further the State's compelling interest in protecting liberty, privacy and property interests from invasion.  The IDA agrees with the Attorney General that ALDF's overbreadth claim misconstrues the limited purpose served by the overbreadth doctrine—allowing reliance on third party interests in a First Amendment context.

B.     *The Equal Protection Challenge.*

The IDA also agrees with the Attorney General that ALDF has failed to meet its extraordinary burden to demonstrate that § 18-7042 lacks a legitimate, rational basis.  The agricultural security law is simply a trespass statute specific and unique to particular types of property interests – those related to agricultural production.  The statute does not set forth suspect or discriminatory classifications.  The animus arguments are unfounded in light of the existence of an accepted legitimate, rational basis for the statute.  The animus cases pointed out by ALDF relate to circumstances when there is no rational basis for a statute or local law – not the case here.  Going further, as the Attorney General explains, even were the court to engage in the inquiry ALDF invites, a clear review and understanding of the legislative record indicates demonstrable need for the agricultural security law in order to protect private property interests

of agricultural producers.

## V.     STANDARDS OF REVIEW.

### A.     *Statutory Interpretation.*

When construing I.C. § 18-7042, this Court's "role is to interpret the law as would the Idaho Supreme Court." *Planned Parenthood of Idaho, Inc. v. Wasden,* 376 F.3d 908, 925 (9th Cir. 2004). Statutory interpretation "'must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole.'" *State v. Doe*, 322 P.3d 976, 979 (Idaho 2014).  Statutory "words 'should be given the same meaning in a statute as they have among the people who rely on and uphold the statute.'" *Planned Parenthood of Idaho,* 376 F.3d at 925.  "[T]he rational and obvious meaning of a statute is always preferred to any curious, narrow, hidden sense."  *Sandpoint Indep. Highway Dist. v. Bd. of County Comm'rs*, 71 P.3d 1034, 1038 (Idaho 2003).

> '"If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written."' (Citations omitted.)  'We have consistently held that where statutory language is unambiguous, legislative history and other extrinsic evidence should not be consulted for the purpose of altering the clearly expressed intent of the legislature.'  (Citation omitted.)

*State v. Doe*, *supra*.

### B.     *Presumption and Preference of Constitutionality.*

"The party challenging a statute on constitutional grounds bears the burden of establishing that "there are no set of circumstances in which the statute would be valid." *Planned Parenthood*, 376 F.3d 908, 920 (9th Cir. 2004); (quoting *Ohio v. Akron*, 497 U.S. 502 (1990)).  "[T]he Supreme Court 'has never accepted mere conjecture as adequate to carry a First Amendment burden.'"  *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000).  When presented with a constitutional challenge to a statute, federal courts "should construe the statute

in a manner to avoid the danger of unconstitutionality," (*Ohio v. Akron*, 497 U.S. 502, 514 (1990)) while affording the "widest latitude to the state legislative power consistent with the United States Constitution." *Stoianoff v. Montana*, 695 F.2d 1214, 1218 (9th Cir. 1982).  If necessary a "reviewing court should  narrowly construe the statute's language to uphold its constitutionality, if readily susceptible to it." *California Teachers Association v. Board of Education*, 271 F.3d 1141, 1147 (9th 2001).

## VI.   ARGUMENT.

In large part, the IDA agrees with and adopts the argument and reasoning set forth in prior briefing of the Attorney General.  That briefing, together with prior briefing of the IDA, explains the basis for the IDA's position that Section 18-7042 is good legislation that does not offend any firmly established constitutional principles.  Herein, the IDA sets forth additional reasoning to support the same, attempting to avoid repetitive presentation of any argument.

### A.   *Misrepresentations that facilitate an invasion of another's privacy or property interests may be criminalized.*

Early in its analysis of I.C. § 18-7024(1)'s prohibitions against property invasions by means of misrepresentation, this Court cited *Alvarez* for the proposition that "[f]alse statements that do not constitute defamation, fraud, or perjury are fully protected speech."  Dkt. 68 at 16. This statement incorrectly implies that any lie that does not constitute defamation, fraud or perjury is protected by the First Amendment.  The Court later explained that *Alvarez* stands for the principle that "misrepresentations designed to cause material harm are not protected by the First Amendment."  *Id*. at 19.  This later, less restrictive interpretation more accurately reflects *Alvarez*.  Lying to obtain access, records, or employment with the intent to cause harm, are within the ambit of this principle.

In the Court's plurality opinion, Justice Kennedy was careful to note and observe that

there are circumstances where false statements can be the basis for criminal prosecution. 132 S. Ct. at 2544. Justice Kennedy noted such instances as false statements to government officials, perjury, and impersonating a federal officer. 132 S. Ct. at 2546. He also noted that lies made to take the money or property of another, such as in employment offers, can be criminalized. *Id.* at 2547. Further, Justice Kennedy indicated that laws may permissibly forbid impersonating a public official with a showing that "*someone was deceived into following a 'course [of action] he would not have pursued but for the deceitful conduct*.'" *Id.* at 2554 (citation omitted) (emphasis added). That is precisely what the agricultural security law intends to address.

While *Alvarez* focused on the Stolen Valor Act, the agricultural security law contrasts starkly from the Stolen Valor Act. "Misrepresentation" is not itself prohibited by the statute. Subsections 1(a-c) of I.C. § 18-7042 prohibit obtaining access to, records of, and employment with an agricultural facility "*by*" misrepresentation. These subsections should be read to require "false factual statements made with knowledge of their falsity and with the intent that they be taken as true." *U.S. v. Alvarez*, 132 S. Ct. 2537, 2552-2553 (2012) (Breyer. J., concurring); *see also, Trees v. Kersey*, 56 P.3d 765, 772 (Idaho 2002). For criminal prosecution, these subsections require a material causal link between the misrepresentation and the access, records or employment obtained thereby. An agricultural facility owner must rely upon the misrepresentation when deciding to provide access, records or employment to the prevaricator. It must be shown that the owner would not have provided the prevaricator access, records or employment but for the prevaricator's deceitful conduct. Whether a misrepresentation is a material cause and is reasonably relied upon are questions of fact to be decided in a particular case, not a speculative basis for a constitutional challenge to a statute that has never been applied. *See, Broadrick v. Oklahoma,* 413 U.S. 601, 615-616 (1973).

Unlike the Stolen Valor Act, communicating a misrepresentation is not itself sufficient to violate the Idaho statute.  Rather, the Idaho statute requires, minimally: (1) a misrepresentation; (2) made with knowledge of its falsity and the intent that it be taken as true; (3) for the purpose of obtaining access to, records of, or employment with an agricultural production facility; (4) that is reasonably relied upon by the facility owner, (5) to provide the prevaricator access, records or employment that the facility owner would not have otherwise provided.  Subsection (1)(c) includes the **_additional element_** that the misrepresentation be made with intent to cause injury to the agricultural facility.  The statute's prohibitions against misrepresentation thus contain these "limiting features," including material interference with an agricultural facility operator's "real and substantial interest in protecting [the owner's] private property" rights to control access to the owner's property and to its records, and to hire employees who are truthful and will honor their obligations to act in the owner's best interests.

> B.      *Prohibiting unauthorized recording on non-public property is a permissible means to protect privacy and property rights.*

In its memorandum decision, the Court concluded that § 18-7042(1)(d)'s prohibition of unauthorized audio or video recording on non-public property restricts protected speech without addressing the legal authority presented by the Attorney General and the IDA that, while such recording *on public property* is protected as conduct preparatory to speech, **_recording on private property or public property that is not open to the public is afforded no such protection under the First Amendment_**.  *See* Dkt. 35 at 4-5; Dkt. 56 at 8-10.  Consequently, subsection (1)(d) cannot be invalidated on First Amendment grounds.  The Court should not decide the present motion for summary judgment without addressing that authority and the argument presented by the Attorney General.  *See* Dkt. 88 at 11-12.

C.    *If the challenged provisions of the agricultural security law constitute protected speech, then the statute's restrictions are balanced and necessary to protect compelling state interests in protecting privacy and property rights.*

As previously mentioned, this Court has acknowledged "that the State has a real and substantial interest in protecting private property."  Dkt. 68 at 2.  The statutory language, statement of purpose, and legislative history amply demonstrate that interest.  The essential privacy and property rights that are protected by § 18-7042 are the right to control access to one's property and records, and in exercising that right to maintain farmers' privacy and protect their families, workers, proprietary interests, trade secrets, and property from vandalism, theft and other interference.  *See* Dkt. 56 at 17-18.  Lying to obtain access and records undermines these rights.

The State's interest in protecting employment relationships is reflected in the common law covenant of good faith and fair dealing that is implicit in every employment contract, and the employee's duty of loyalty and trust to his employer, as explained in the IDA prior amicus brief.  *See* Dkt. 56 at 7-8.  A prospective employee who lies to an agricultural facility owner with the intent to injure the owner cannot honor these duties.  Further, as explained in prior briefing, by adopting and deferring to a common law meaning of "misrepresentation," the statute adopts elements of materiality and reliance, which serve to ensure that no more speech than is necessary is prohibited.

D.    *The legislative history of the agricultural security law demonstrates it is intended to protect fundamental privacy and property rights.*

The IDA completely agrees with the Attorney General's argument, at Dkt. 88 at 12-17, that Section 18-7042 was adopted by the Idaho Legislature for the purpose of protecting the privacy and property rights of Idaho's agricultural community – a group of individuals in particular need of protection given that there operations are spread over wide areas where access

is difficult to control.  A careful and close review of the legislative history bears this out.

At the outset, it should come as no surprise to the Court that the Idaho Legislature is particularly concerned with protecting and promoting Idaho's agricultural economy and families. The dairy industry itself constitutes a large part of the Idaho economy, generating cash receipts of $2.421 billion in 2012.  Dkt. 16-2 at 3.  The IDA, as one of Idaho's leading agricultural sectors, came to the Idaho Legislature in 2014 seeking passage of the agricultural security law. Dkt. 16-2 at 5.  Among many concerns the IDA had with vulnerability of agricultural operations was a concern related to individuals obtaining employment under false pretenses and then violating duties of care and loyalty owed to the agriculture enterprise by obtaining evidence of animal harm and withholding that evidence from the operator thereby depriving animals of needed care.  Dkt. 16-2 at 3-4.  Another concern related to threats of death and harm being made against dairy operators and their spouses and children.  *Id.*  The legislative history demonstrates that the Idaho legislature shared these concerns, among many others, and acted appropriately, within the bounds allowed by the Constitution.

In the *Statement of Facts* offered by ALDF, ALDF cherry-picks pieces of the legislative history of Section 18-7042, and takes statements out of context.  *See generally* Dkt. 75.  The Court should not blindly accept ALDF's biased interpretation of the legislative history.  The legislative history reveals that the substantial and motivating factor for the Idaho Legislature in the adoption of Section 18-7042 was protection of privacy and property rights of agricultural operations from improper interference.  The following detail of the legislative history exemplifies the same.

1.    SENATE COMMITTEE HEARING.  Section 18-7042 began as Senate Bill 1337 in the 2014 Regular Session of the Idaho Legislature.  Dkt. 75-1, Ex. A at 1.  It was

introduced before the germane Senate Agriculture Committee by its chief sponsor, Senator Patrick, a farmer himself, who indicated a need and desire to protect agriculture operations from wrongful entry, trespass, theft of records and obtaining employment by deceit or trickery. Dkt. 75-1, Ex. A at 2. Daniel Steenson, as legal counsel for the IDA, presented the details of Senate Bill 1337 and explained the unique need for these protections given that "***Idaho farmers live and work spread out across the land where they're uniquely vulnerable to interference by wrongful conduct***." Dkt. 75-1, Ex. A at 4. *Compare* Dkt. 75-1, Ex. A at 28 (statement by Canyon County farmer Sid Freeman). Mr. Steenson correctly observed that Idaho farmers have the same ***rights of privacy*** as anyone else, and that they ***need to feel secure in their homes and livelihoods***. *Id.* Later in the hearing, Senators Brackett and Tippets observed a need to prohibit unauthorized entry on farms in order to ***protect against the spread of disease and harmful organisms*** to crops and livestock. Dkt. 75-1, Ex. A at 11-12. Roger Batt, representing the Idaho Eastern Oregon Seed Association, reiterated a need to protect the seed industry from anti-GMO activists and related an incident where such activists destroyed a seed research plot in Oregon costing a farm ***$5 million in damages*** and the ***loss of seven years of research***. Dkt. 75-1, Ex. A at 16-17.

The Senate committee further learned that "undercover investigators" of the ilk of Plaintiffs are ***not part of law enforcement***, do not enter with approval of law enforcement, and are ***being paid/supported by animal activists organizations*** not loyal to the farm. Dkt. 75-1, Ex. A at 25-28. Further examples were provided to the committee of activists harming other industries, such as timber producers and fur producers, and where the Legislature acted similarly in response to those threats. Dkt. 75-1, Ex. A at 35. Other evidence was presented of activists taking records and then ***publishing them out-of-context in an effort to cause economic harm*** to industries. Dkt. 75-1, Ex. A at 44. Importantly, when the ACLU of Idaho's representative

spoke, she represented to the Senate committee that "*there is no constitutionally enforceable right to engage in undercover reporting on private property*", a position the ACLU has apparently now abandoned.  Dkt. 75-1, Ex. A at 49.  The Idaho Farm Bureau Federation, near the closing of testimony, stressed the need for the legislation in order to *protect private property rights* from others intending to invade upon those rights to cause harm.  Dkt. 75-1, Ex. A at 61-62.  Then, in closing, Senator Patrick highlighted what many already know – that *farms and ranches are more than businesses, they are family homes*.  Dkt. 75-1, Ex. A at 78-80.  Idaho's farm families need protections in the place where they both live and work.  *Id.*

After testimony closed at the hearing, and in committee debate, the comments of the committee members demonstrated recognition that there were fundamental constitutional protections of agricultural operations (privacy and property rights) being protected by the bill, and it was important to ensure that those rights not be infiltrated by rogue activists in search of crime or corruption not associated with law enforcement, not ensuring any due process, not loyal to the farm or ranch, and not really interested in ensuring mistreated animals are promptly attended to.  Dkt. 75-1, Ex. A at 81-84.

Written evidence was presented to the committee, including an opinion of the Attorney General advising that the bill was constitutional and void of any First Amendment concerns, provided one correction was made, which was done before hearing.  Dkt. 56-2 at 28-29.  Also included was a letter from Bettencourt Dairies detailing an attack upon its operation by means of threatening behavior and economic boycott.  Dkt. 56-2 at 37-38.  These attacks were mounted months after apparent mistreatment of animals occurred at the operation, and months after the perpetrators had been terminated from employment and criminally charged – in essence, months after correction had been accomplished.  *Id.*  The attacks included *threats to kill* Mr. Bettencourt,

***threats to beat and drag his family members***, and ***threats of violence against employees***.  *Id.*  As Mr. Bettencourt indicated, "***For the first time ever, I was very concerned about the safety of my family***."  *Id.*  Further evidence was presented of threats and harm inflicted upon Jerome Cheese because it purchased milk from Bettencourt.  Dkt. 56-2 at 39-40.  The committee was presented with actual documentation of the threats, which are crude, foul, alarming and disturbing.  Dkt. 56-2 at 41-75.

Senate Bill 1337 passed out of the Senate Agriculture Committee with a do-pass recommendation.  Dkt. 75-1, Ex. A at 84-85.

2.     SENATE FLOOR DEBATE.  The Senate floor debate echoed the concerns raised by witnesses and senators before the Senate Agriculture Committee.  Dkt. 75-1, Ex. B at 1-35.  The agricultural security law passed the Senate by a vote of 23-10, with 2 absent.  Dkt. 75-1, Ex. B at 42.

3.     HOUSE COMMITTEE HEARING.  The testimony presented to the germane House Agriculture Committee contained the same body of evidence presented to the Senate committee.  Dkt. 75-1, Ex. C.  The most compelling testimony before the House committee came from Rick Onaindia, CFO for Bettencourt Dairies.  Dkt. 75-1, Ex. C at 87.  He explained the history of the "undercover investigation" at that dairy.  Dkt. 75-1, Ex. C at 87-89.  Mr. Onaindia related to the House committee members the effect that "investigation" had on his employer.  *Id.* He explained how an animal activist infiltrated the agricultural operation by lying about his identity and intentions, how this person observed mistreatment of his employer's animals and hid that information from the employer, ***depriving animals of needed care and attention***, and how the person then exploited the information some two months later, after the problems had been addressed and corrected, in order only to cause harm to Bettencourt.  *Id.*  The biased media

presentations that followed resulted in threats against Bettencourt, other employees, and Mr. Onaindia. *Id.* The ***threats went so far as to include death***. *Id.* Not once has the animal activist or associated groups followed up to ensure the affected animals were cared for, or corrective action taken, which is particularly revealing of their true motivations. *Id.* Senate Bill 1337 passed out of the House Agriculture Committee with a do-pass recommendation. Dkt. 75-1, Ex. C at 101-103.

        4.     HOUSE FLOOR DEBATE. Not unlike floor debate in the Senate, the House floor debate echoed the concerns raised by witnesses and senators before the House Agriculture Committee. Dkt. 75-1, Ex. D at 1-19. The agricultural security law passed the House by a vote of 56-14. Dkt. 75-1, Ex. D at 19.

        5.     SUMMARY. Certainly the State of Idaho has a rational and legitimate interest in protecting vulnerable members of its society (i.e. agricultural operations spread out across the land) from acts of deceit, dishonesty, trickery, violence, theft, trespass, etc. Providing such protection was clearly the motivating factor considered in legislative comments, debate and testimony. The agricultural security law is not intended to quell speech, legitimate public debate or to harm any political group – rather it is intended to provide protection to agricultural operations from wrongful and harmful conduct perpetrated by improper means – it is intended to protect and preserve basic, common-sense expectations of privacy and control of private property.

      E.     *The agricultural security law is not unconstitutionally overbroad.*

ALDF claims I.C. § 18-7042 is unconstitutionally overbroad by restricting more speech than is permissible because: (1) ALDF alleges Section 18-7042 forbids misrepresentations that may be made for a legitimate reason, such as engaging in federally-protected activity like salting

or whistleblowing; (2) ALDF alleges Section 18-7042 criminalizes all recordings on agricultural production facilities, and contends such image capture is protected speech; and (3) ALDF contends that Section 18-7042's definition of an "agricultural production facility" too broadly encompasses public accommodations and spaces, as well as private homes and clubs.  These arguments lacks legal merit and rely upon a strained and improper interpretations of the statutory text.

       1.    "MISREPRESENTATION" IS NOT AN OVERBROAD TERM.  With respect to misrepresentations, they only become criminal under Section 18-7042 if the words uttered are ***material to wrongful conduct***, and then only if the misrepresentations relate to speech not otherwise protected by the First Amendment.  For example, a misrepresentation made in order to gain entry upon premises is only criminal if the person is not otherwise employed by the facility. In essence, the misrepresentation is made to commit a trespass, which is not protected speech at common law and forms the basis for a tort action.[3]  Similarly, a misrepresentation made in order to obtain records of the facility is criminal, but that in essence is an act of theft and is clearly actionable at common law.  Finally, a misrepresentation made to obtain employment becomes criminal only if it is made with intent to cause injury or harm to the facility.  So, even here, there is a requirement of evil intent, such as yelling fire in a crowded theater in order cause chaos or disruption meant only to harm others, either physically or economically.

       Moreover, regardless of the context in which the misrepresentation is made, an element

---

[3] Misrepresentations made to trespass on the property of another, or to steal personal property (such as records) of another, are types of speech traditionally protected by the First Amendment and formed the basis of a tort action at common law.  In order to gain entry on the property of another, or in order to gain control over personal property of another, consent is a necessary element.  Consent means the owner is in fact willing to allow the entry or control. RESTATEMENT (SECOND) OF TORTS § 892, cmt. b (1979).  If the person giving consent is induced to give consent by misrepresentation as to the nature or purpose of the entry or exercise of control, then the consent is invalidated and a common law tort has occurred.  RESTATEMENT (SECOND) OF TORTS § 892B, cmt. a (1979).  This reasoning is largely accepted in the Ninth Circuit.  *See, e.g.*, *Medical Laboratory Management Consultants v. ABC*, 30 F.Supp.2d 1182, 1201-02 (D. Ariz. 1998) (also rejecting Seventh Circuit holdings in *Dietemann*); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1072-73 (9th Cir. 2003).

of materiality applies.   As such, white lies or untruths made in the context of obtaining employment, such as by misrepresenting the quality or quantity of your work, is not actionable because, *first*, there would be a lack of intent to injure the facility, and, *second*, there would be a lack of materiality in the statement.   The word "misrepresentation" is a term of legal art and carries a specific legal meaning.   Idaho decisional law requires that a misrepresentation involve the publication of a statement or representation that is false and material.   *Trees v. Kersey*, 56 P.3d 765, 772 (Idaho 2002).   White lies and untruths that are not material to the criminal offense are not criminal under Section 18-7042.

        2.    THE APPLICATION OF IMAGE CAPTURE IS VERY NARROW.   With respect to the act of image capture, Section 18-7042 is not overbroad because it expressly limits the application of the restriction on audiovisual recording to those recordings (1) made while the person making the recording is physically present upon (2) an agricultural production facility, (3) not open to the public, (4) without the owners express consent or pursuant to judicial process or statutory authorization, and (5) the recording is of the facility's operations.   This provision has very narrow application to the act of image capture and is careful to only make that conduct criminal in areas where no First Amendment protections are afforded and where the business owner has a reasonable expectation of privacy.

The image capture must be taken upon a facility not open to the public.   Images may be taken from adjoining properties or other public areas, such as streets, and that is not criminal. Further, if the facility is generally open to the public, image capture is not criminal from those areas open to the public.   So, for instance, taking pictures of cattle on BLM range would not be criminal, but taking pictures in a seed company's private research room would be criminal.   A person or business has every right to prohibit image capture upon private property not open to

the public, and the First Amendment guarantees no such privilege to those that enter private areas and make recordings without consent.  *See, e.g.*, *Medical Laboratory*, 30 F.Supp.2d at 1203 (explaining that property owners have every right to prohibit both visible and secretive filming and recording on their property, perhaps even in areas open as a public accommodation).

Section 18-7042, with respect to image capture, further narrows its application by limiting its application to recordings of operations.  So, a person may capture an image of a sunset, or of birds flying overhead, or of his co-workers eating lunch at their pickup trucks, even without owner consent, and the act is not criminal.  It only becomes criminal if the person begins capturing images of operations, such as recording images of livestock genetics testing results or seed research records.

Additionally, Section 18-7042 does not criminalize the publication of recordings, only the taking of recordings.  As such,  news-gathering agency does not offend the statute by publishing wrongfully obtained recordings.  However, the person who took the recording would have criminal liability.

Given all of the above, it is clear that the image capture provision of Section 18-7042 is carefully and narrowly tailored so as not to be overbroad in application.

3.    "AGRICULTURAL PRODUCTION FACILITY" IS NOT AN OVERBROAD TERM.
ALDF's argument that the definition of "agricultural production facility" is itself overbroad and takes in too much flows from a strained and improper interpretation of the text.  ALDF argues that the definitions of "agricultural production" and "agricultural production facility" include non-agricultural activities and places such as public parks, restaurants, nursing homes, grocery stores, pet stores, and virtually every public accommodation and private residence in the state.  ALDF makes no effort to identify the statutory words or explain the interpretive reasoning from

which it derives this boundless interpretation.  Exemplifying the absurdity of its interpretation, ALDF suggests that the statute applies to a person recording one's own child in the restaurant of a private country club.

Contrary to ALDF's unlimited interpretation, the statute unambiguously applies only to "agricultural production facilities."  The statute defines "agricultural production" as "activities associated with the production of agricultural products for food, fiber, fuel and other lawful uses," and then provides a non-exclusive list of such activities.  "Agricultural production facility" is defined as a "structure or land, whether privately or publicly owned, leased or operated, that is being used for agricultural production."  The common meaning of "agriculture" is "cultivating the soil, harvesting crops, and raising livestock . . .the production of plants and animals useful to man."  *Webster's Third New International Dictionary*, at 44 (2002). "Agricultural" commonly means "characterized by or engaged in farming as the chief occupation" *Id*. at 43.  The statute's definitions are based on the definitions of "agricultural operation" and "agricultural facility" (I.C. § 22-4502) in Idaho's *Right to Farm Act*.  (I.C. § 22-4501 *et seq.*), the purpose of which is to protect agricultural facilities on farmland from nuisance suits.

While agriculture and farming encompass a broad range of activities associated with raising plants and animals to produce agricultural products, it is not reasonable to interpret the statute to apply to non-agricultural places where agricultural products may be cooked, consumed or sold as pets.  Agricultural commodities are the result of agricultural production.  The subsequent sale, consumption and use of agricultural commodities does not constitute agricultural production.  There is nothing overbroad about the definition of "agricultural production facility" in Section 18-7042.

F.      *The agricultural security law does not violate equal protection.*

The IDA agrees with the Attorney General's argument, Dkt. 88 at 19-25, that Section 18-7042 does not violate any well-accepted principles of equal protection.  The argument set forth above, in prior briefing of the IDA, and prior briefing of the Attorney General, firmly establishes the existence of a legitimate and rational basis for the adoption of Idaho's agricultural security law.

## VI.    CONCLUSION.

For the reasons set forth herein, and for those reasons set forth in the Defendant's Response to the *MPSJ*, Dkt. 88, and for those reasons set forth in prior briefing of the IDA, Dkt. 56, *Plaintiffs' Motion for Partial Summary Judgment* ought to be **DENIED**, and instead the court ought to enter summary judgment in favor of the Defendant, **DISMISSING**, with prejudice, Plaintiffs' First, Second and Fourth causes of action.

DATED this 30th day of January, 2015.

SAWTOOTH LAW OFFICES, PLLC


By___/s/ *Daniel V. Steenson*_____
        DANIEL V. STEENSON


By___/s/ *David P. Claiborne*_____
        DAVID P. CLAIBORNE

SECOND BRIEF OF AMICUS CURIAE THE IDAHO DAIRYMEN'S ASSOCIATION, INC. - 20

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of January, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that sent a Notice of Electronic Filing to all counsel of record for the parties and other *amicus curiae* participants, including but not limited to the following persons:

Justin Marceau
jmarceau@law.du.edu

Matthew Liebman
mliebman@aldf.org

Matthew Strugar
matthew-s@petaf.org

Paige M. Tomaselli
ptomaselli@centerforfoodsafety.org

Richard Alan Eppink
reppink@acluidaho.org

Maria E. Andrade
mandrade@andradelegal.com

Thomas C. Perry
tom.perry@gov.idaho.gov

Cally A. Younger
cally.younger@gov.idaho.gov

Carl J. Withroe
Carl.withroe@ag.idaho.gov

Celeste K. Miller
ck@mcdevitt-miller.com

Susannah W. Pollvogt
Susannah.pollvogt@washburn.edu

Clay R. Smith
Clay.smith@ag.idaho.gov

Charles A Brown
CharlesABrown@cableone.net

Bruce D Brown
bbrown@bakerlaw.com

Leslie Brueckner
lbrueckner@publicjustice.net

Jeffery S. Gulley
jeffg@whistleblower.org

Norman M. Semanko
nms@moffatt.com

Rachel Meeropol
rachelm@ccrjustice.org

Michael J. Bartlett
bartlett@nbmlaw.com

Marty Durand
marty@idunionlaw.com

James M. Piotrowski
james@idunionlaw.com


       /s/ *David P. Claiborne*
          David P. Claiborne

SECOND BRIEF OF AMICUS CURIAE THE IDAHO DAIRYMEN'S ASSOCIATION, INC. - 21