UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, et al., | Case No. 1:14-cv-00104-BLW |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER |
| v. | |
| C.L. BUTCH OTTER, in his official capacity as Governor of Idaho; and LAWRENCE WASDEN, in his official capacity as State of Idaho, | |
| Defendants. | |

**INTRODUCTION**

Last year, Mercy for Animals, a Los Angeles-based animal rights' group, released a video of workers using a moving tractor to drag a cow on the floor by a chain attached to her neck and workers repeatedly beating, kicking, and jumping on cows. *Pls.' SOF* ¶ 1. The video was recorded at the Bettencourt Dairies' Dry Creek Dairy in Hansen, Idaho. *Id.* Mercy for Animals secretly captured the abuse while conducting an undercover investigation of the dairy. *Naerebout Aff.* ¶ 7, Dkt. 16-2. The video drew national attention. *Id.* ¶ 2.

ORDER - 1

The Idaho Dairymen's Association, a trade industry organization that represents every dairy farmer and producer in the state, responded to the negative publicity by drafting and sponsoring a bill that became Idaho Code § 18-7042. The bill proposed criminalizing the types of undercover investigations that exposed the activities at the Dry Creek Dairy.

According to the bill's supporters, the Mercy for Animals investigator who made the video at the Dry Creek Dairy "failed to immediately report [the abuse] to the dairy operator or to local or state authorities . . . , allowing additional animal abuse to occur and depriving the animals of immediate care and treatment." *Naerebout Aff.* ¶ 10, Dkt. 16-2. The investigator instead gave his recordings to Mercy for Animals, which "provided edited recordings to the Idaho State Department of Agriculture ("ISDA")." *Id.* The ISDA immediately investigated and informed the dairy owner of the abuse. After the ISDA finished its investigation, Mercy for Animals published the video and urged at least one of the dairy owner's customers to stop buying milk products supplied by the dairy owner. *Id.*

After the outcry the Mercy for Animals' publicized video produced in the dairy industry, the Idaho legislature passed the bill quickly. It was signed by Governor Otter on February 14, 2014, and it was eventually codified as Idaho Code §18-7042. *Pls.' SOF* ¶ 6, Dkt. 75.

The Animal Legal Defense Fund, as well as various other organizations and individuals, (collectively, "ALDF"), challenge Idaho Code § 18-7042 as unconstitutional. ALDF alleges that § 18-7042 has both the purpose and effect of stifling public debate

about modern agriculture "by (1) criminalizing all employment-based undercover investigations; and (2) criminalizing investigative journalism, whistleblowing by employees, or other expository efforts that entail images or sounds." *Compl.* ¶ 14, Dkt. 1. Based on these allegations, ALDF's complaint raises two substantive constitutional challenges against the State—violation of the Free Speech Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment—as well as preemption claims under three different federal statutes. *Id.* ¶¶ 144-68.

ALDF moves for summary judgment on their First Amendment and Equal Protection Clause claims—their first, second, and fourth causes of action (Dkt. 74). For the reasons set forth below, the Court will grant ALDF's motion.

## BACKGROUND AND SUMMARY OF DECISION

Idaho Code § 18-7042 creates the new crime, "interference with agricultural production." I.C. 18-7042. A person commits the crime of interference with agricultural production if the person knowingly:

> (a) is not employed by an agricultural production facility and enters an agricultural production facility by force, threat, misrepresentation or trespass;
>
> (b) obtains records of an agricultural production facility by force, threat, misrepresentation or trespass;
>
> (c) obtains employment with an agricultural production facility by force, threat, or misrepresentation with the intent to cause economic or other injury to the facility's operations . . .
>
> (d) Enters an agricultural production facility that is not open to the public and, without the facility owner's express consent or pursuant to judicial

ORDER - 3

process or statutory authorization, makes audio or video recordings of the conduct of an agricultural production facility's operations; or

(e) Intentionally causes physical damage or injury to the agricultural production facility's operations, livestock, crops, personnel, equipment, buildings or premises.

I.C. § 18-7042(1)(a)–(e).

In passing §18-7042, Idaho legislators described the concerns they believe the types of undercover investigations criminalized by the statute pose to the agricultural industry in Idaho. One senator compared animal rights investigators to "marauding invaders centuries ago who swarmed into foreign territory and destroyed crops to starve foes into submission." *Pls.' SOF* ¶ 8, Dkt. 75. During a committee hearing, the same senator compared undercover investigations to "terrorism, [which] has been used by enemies for centuries to destroy the ability to produce food and the confidence in the food's safety." *Senator Patrick*, Wall Decl., Ex. A, p. 81, lns. 1–8. Defending the legislation, this senator also said, "This is the way you combat your enemies." *Senator Patrick*, Wall Decl., Ex. A, p. 81, lns. 7–8.

Members of the House of Representatives similarly stated that their support for the bill stemmed from a need to protect members of the dairy industry from undercover investigators. One representative described undercover investigators as "extreme activists who want to contrive issues simply to bring in the donations." *Representative Bateman*, Wall Decl., Ex. D, p. 4, lns. 5–7. Another representative accused animal rights activists of taking the dairy industry hostage and seeking to persecute them in the court of public opinion. *Representative Batt*, Wall Decl., Ex. D, p. 2, lns. 17–19.

ORDER - 4

The drafter of the legislation, Dan Steenson, likewise expressed a desire to shield Idaho dairymen and other farmers from undercover investigators and whisteblowers who expose the agricultural industry to "the court of public opinion": "The most extreme conduct that we see threatening Idaho dairymen and other farmers occurs under the cover of false identities and purposes, extremist groups implement vigilante tactics to deploy self-appointed so-called investigators who masquerade as employees to infiltrate farms in the hope of discovering and recording what they believe to be animal abuse." *Mr. Steenson*, Wall Decl., Ex. C, p. 8, lns. 25-26, p. 9, lns. 1–3. Steenson continued by criticizing such groups for publishing their recordings and calling for boycotts: "After the infiltrator's work is done, the vigilante operation assumes the role of prosecutor in the court of public opinion by publishing edited recordings and advocating that the farmer's customers go elsewhere." *Mr. Steenson*, Wall Decl., Ex. C, p. 9, lns. 4–6.

Another supporter of the bill called the groups terrorists and insinuated that their investigations were defamatory: "This is about exposing the real agenda of these radical groups that are engaging in farm terrorism. Activists use intimidating tactics to damage the business of the producers and their customers. These farm terrorists use media and sensationalism to attempt to steal the integrity of the producer and their reputation, and their ability to conduct business in Idaho by declaring him guilty in the court of public opinion." *Mr. VanderHulst*, Wall Decl., Ex. C, p. 30, lns. 3–8.

Based upon these assumptions, the legislators drafted and passed a law creating a criminal felony offense for activities that facilitate undercover investigations at

ORDER - 5

agricultural facilities. Under the law, a journalist or animal rights investigator can be convicted for not disclosing his media or political affiliations when requesting a tour of an industrial feedlot, or applying for employment at a dairy farm. I.C. § 18-7042(1)(a), (c). An employee can be convicted for videotaping animal abuse or life-threatening safety violations at an agricultural facility without first obtaining the owner's permission. I.C. § 18-7042(1)(d). Any person who violates the law—whether an animal rights' investigator, a journalist, or an employee—faces up to a year in jail. In addition, a journalist or whistleblower convicted under the law can be forced to pay publication damages pursuant to a restitution provision that requires payment for "twice" the "economic loss" a business suffers as a result of any exposé revealing animal abuse or unsafe working conditions. *Id.* § 18-7042(4).

In other words, § 18-7042 seeks to limit and punish those who speak out on topics relating to the agricultural industry, striking at the heart of important First Amendment values. The effect of the statute will be to suppress speech by undercover investigators and whistleblowers concerning topics of great public importance: the safety of the public food supply, the safety of agricultural workers, the treatment and health of farm animals, and the impact of business activities on the environment. Indeed, private party media investigations, such as investigative features on 60 Minutes, are a common form of politically salient speech. A review of Idaho media reports in recent years reveals a range of undercover investigations from life on the streets, to wolf-hunting contests, to family-planning services, to public-school safety. *Pls.' SOF* ¶¶ 35-38. Such investigations into

private matters, both by government and private actors, are recognized and embraced as important political speech in Idaho. *Id.* ¶¶ 35–38.

The story of Upton Sinclair provides a clear illustration of how the First Amendment is implicated by the statute. Sinclair, in order to gather material for his novel, *The Jungle*, misrepresented his identity so he could get a job at a meat-packing plant in Chicago. William A. Bloodworth, Jr., UPTON SINCLAIR 45–48 (1977). Sinclair's novel, a devastating exposé of the meat-packing industry that revealed the intolerable labor conditions and unsanitary working conditions in the Chicago stockyards in the early 20th century, "sparked an uproar" and led to the passage of the Federal Meat Inspection Act, as well as the Pure Food and Drug Act. *National Meat Ass'n v. Harris*, 132 S.Ct. 965 (2012). Today, however, Upton Sinclair's conduct would expose him to criminal prosecution under § 18-7042.

The State responds that § 18-7042 is not designed to suppress speech critical of certain agricultural operations but instead is intended to protect private property and the privacy of agricultural facility owners. But, as the story of Upton Sinclair illustrates, an agricultural facility's operations that affect food and worker safety are not exclusively a private matter. Food and worker safety are matters of public concern. Moreover, laws against trespass, fraud, theft, and defamation already exist. These types of laws serve the property and privacy interests the State professes to protect through the passage of § 18-7042, but without infringing on free speech rights.

ORDER - 7

With this background and context, the Court finds that § 18-7042 violates the First Amendment right to free speech. In addition, the Court finds that § 18-7042 violates the Equal Protection Clause because it was motivated in substantial part by animus towards animal welfare groups, and because it impinges on free speech, a fundamental right.

**ANALYSIS**

**1.  First Amendment**

    **A.  *First Amendment Framework***

Generally speaking, a First Amendment challenge proceeds in three steps. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). In the first step, the plaintiff bears the burden of "demonstrat[ing] that the First Amendment even applies" to the activity he or she claims is protected as expression. *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 n. 5 (1984). If the conduct or speech is protected, the court proceeds to the second step to analyze the context in which the expression took place and determine which First Amendment standard or standards apply. *See Cornelius*, 473 U.S. at 797. In the third step, the court assesses whether the government's justifications for restricting the conduct or speech satisfy the applicable standard or standards. *Id.*

    **B.  *Section 18-7042 Is a Content-Based Restriction on Speech Subject to Strict Scrutiny.***

In its earlier decision granting in part and denying in part the State's motion to dismiss, the Court found that § 18-7042 is "is a content-based restriction" to which the highest level of scrutiny applies. *Memorandum Decision and Order re Motion to Dismiss*

ORDER - 8

at 23–24, Dkt. 68. Specifically, the Court found that § 18-7042 "targets undercover investigators who intend to publish videos they make through the press and seeks to suppress speech critical of animal agricultural practices." *Id.* at 14, Dkt. 68. The Court was not persuaded by the State's primary argument that § 18-7042 regulates conduct, not speech, and therefore does not implicate the First Amendment. *Id.* at 15.

Given the Court's previous finding that § 18-7042 regulates content-based speech and must survive the highest level of scrutiny, the Court could skip directly to the third step: deciding whether § 18-7042 is "narrowly tailored to promote a compelling Government interest." *United States v. Playboy Entm't Grp.,* 529 U.S. 803, 813 (2000). But the State argues that the Court misunderstood governing precedent in reaching these conclusions. To address the State's concerns, the Court will revisit the arguments the State reprises from its earlier motion to dismiss.

*(1) The Misrepresentation Provisions Criminalize Protected Speech.*

The State correctly recognizes it faces an uphill battle in defending the constitutionality of the misrepresentation provisions found in subsections 18-7042(1)(a) through (c). Nonetheless, the State attempts to defend these provisions by arguing that the Supreme Court's decision in *United States v. Alvarez*, 132 S. Ct. 2537 (2012), contrary to the Court's previous ruling, actually supports the validity of the misrepresentation provisions.

In *Alvarez*, the Supreme Court struck down the Stolen Valor Act, a federal statute making it a crime to lie about receiving military decorations or medals, on the ground that

ORDER - 9

it violated the First Amendment's free-speech guarantee. Here, the State argues that § 18-7042 "contrasts starkly from the Stolen Valor Act" because it targets more than false speech: the prohibited misrepresentations "assume[] criminality only when accompanied by a form of conduct, i.e., entering a facility, acquiring its records, or seeking employment with the express purpose of doing harm to the employer." *Def's Resp. Br.* at 9, Dkt. 88.

But the Court in *Alvarez* did not invalidate the Stolen Valor Act because it only prohibited lies and nothing more. Perjury statutes prohibit lies and nothing more; yet, perjury is not protected speech "because perjury undermines the function and province of the law and threatens the integrity of judgments." *Alvarez*, 132 S. Ct. at 2540. Nor did the Court in *Alvarez* say that the government may prohibit false speech if it also prohibits conduct in connection with the false speech. Like perjury, fraud is speech unaccompanied by other conduct, as is defamation, but both types of false speech are also *not* protected. Instead, the plurality in *Alvarez* held that the government may criminalize false statements only when those statements themselves cause a "legally cognizable harm." *Id.* at 2545.

Some deceptive speech *directly* causes material harm to those it misleads. "Deception may mislead consumers to financial or medical ruin. It may ravage reputations. It may distort politics and undermine the proper functioning of our representative democracy. It may threaten corruption of our government and the effective functioning of our economy." Jonathan D. Varat, *Deception and the First Amendment: A Central, Complex, and Somewhat Curious Relationship*, 53 UCLA L. Rev. 1107 (2006). For this reason, laws barring perjury, fraud, defamation, deceptive commercial or political

ORDER - 10

advertising, material misrepresentations in stock offerings, and the like, do not run afoul of the First Amendment.

Here, however, the State has done nothing to show the lies it seeks to prohibit cause any legally cognizable harm. Section 18-7042 does not limit its misrepresentation prohibition to false speech amounting to actionable fraud, defamation, conversion, or trespass. Rather, it sweeps into its prohibition all lies used to gain access to property, records, or employment—regardless of whether the misrepresentations themselves cause any material harm. As the Court noted in its earlier decision, "the limited misrepresentations ALDF says it intends to make—affirmatively misrepresenting or omitting political or journalistic affiliations, or affirmatively misrepresenting or omitting certain educational backgrounds—will most likely not cause any material harm to the deceived party." *MDO re Motion to Dismiss*, p. 19–20.

Instead, the most likely harm that would stem from an undercover investigator using deception to gain access to an agricultural facility would arise, say, from the publication of a story about the facility, and not the misrepresentations made to gain access to the facility. *Id.* In this scenario, there would not be compensable harm for fraud or defamation based on the lies the investigator told to gain access to the facility. *See, e.g., Food Lion, Inc. v. Capital Cities/ABC, Inc*., 194 F.3d 505, 512-513 (4th Cir. 1999). And harm caused by the publication of true story is not the type of direct material harm that *Alvarez* contemplates. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 42 (1988).

ORDER - 11

It is true that the *Alvarez* plurality at one point said those false claims "made to . . . secure moneys or other valuable considerations, say offers of employment," are not protected. 132 S. Ct. at 2547. But the State has submitted no evidence that the lies an undercover investigator might tell or the omissions an investigator might make to gain access or secure employment at an agricultural production facility are made for the purpose of material gain. Rather, undercover investigators tell such lies in order to find evidence of animal abuse and expose any abuse or other bad practices the investigator discovers. Thus, the proposed misrepresentations at issue here do not fit the *Alvarez* plurality's description of unprotected lies because they would not be used to gain a material advantage. *Id.* (holding Stolen Valor Act violated First Amendment because it prohibited lies "without regard to whether the lie was made for the purpose of material gain"). Indeed, the lies used to facilitate undercover investigations actually advance core First Amendment values by exposing misconduct to the public eye and facilitating dialogue on issues of considerable public interest. This type of politically-salient speech is precisely the type of speech the First Amendment was designed to protect.

Permitting the State to decree this speech to be a criminal offense, whether or not the prohibited lies or omissions directly cause a material harm or are made to gain a material advantage, "would endorse government authority to compile a list of subjects about which false statements are punishable." *Alvarez*, 132 S. Ct. at 2547. Such government power has no clear limiting principle. *Id.* "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth. . . . The mere potential for the

ORDER - 12

exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *Id.* at 2547-48 (citing G. Orwell, Nineteen Eighty–Four (1949) (Centennial ed. 2003)).

*(2) The Recording Provision Regulates Content-Based Speech.*

The Court likewise stands by its earlier decision finding that the audiovisual recording provision not only restricts protected speech but, in fact, discriminates based on both content and viewpoint. *MDO re Motion to Dismiss*, p. 20-21, Dkt. 68.

Audio and visual evidence is a uniquely persuasive means of conveying a message, and it can vindicate an undercover investigator or whistleblower who is otherwise disbelieved or ignored. Prohibiting undercover investigators or whistleblowers from recording an agricultural facility's operations inevitably suppresses a key type of speech because it limits the information that might later be published or broadcast. *See, e.g., Citizens United v. Federal Elections Comm'n*, 130 S.Ct. 876, 896 (2010) ("laws enacted to control or suppress speech may operate at different parts in the speech process."). As the Ninth Circuit has observed, the First Amendment does not fix a line between the act of creating speech and speech itself: "Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation." *Anderson v. City of Hermosa Beach,* 621 F.3d 1051, 1061–62 (9th Cir. 2010). In this way, just as "the processes of writing down words on paper, painting a picture, and playing an instrument are purely expressive activities," the act of audiovisual recording is a purely expressive activity

"entitled to full First Amendment Protection." *Id. See also American Civil Liberties Union v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012).

Section 18-7042's ban on certain audiovisual recordings is especially dangerous because it is content based. Laws may be content based in either of two ways: "if either the underlying purpose of the regulation is to suppress particular ideas, or if the regulation, by its very terms, singles out particular content for differential treatment." *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc). As the Court previously found, the recording provision facially discriminates based on content because it only targets speech concerning the "conduct of an agricultural production facility's operations" while leaving unburdened other types of speech at agricultural production facilities. *MDO re Motion to Dismiss*, p. 22, Dkt. 68. The evidence also indicates that § 18-7042's underlying purpose is to silence animal activists. For this reason as well, the Court previously found that the law is content based. *Id.* at 23.

The State, however, again attempts to persuade the Court that the recording prohibition is not a content-based restriction on protected-speech activity. The State suggests that the recording prohibition is content neutral because it does not regulate speech based on *what* is said (i.e. content) but instead on *where* it is said, i.e. at an agricultural production facility. In making this argument, the State relies on *McCullen v. Coakley*, 134 S.Ct. 2518 (2014).

In *McCullen*, the Supreme Court reaffirmed its holding in *Hill v. Colorado*, 530 U.S. 703 (2000), that buffer zones outside of abortion clinics are content neutral. The

ORDER - 14

Court reasoned that the challenged statute "would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *Id.* at 2531 (internal quotation marks omitted). But, according to the Court, it did not. "Whether petitioners violate the Act depends not on *what* they say . . . but simply on *where* they say it. *Id.* (internal quotation marks and citation omitted)(emphasis added). "Indeed," noted the Court, "petitioners can violate the Act merely by standing in a buffer zone, without displaying a sign or uttering a word." *Id.*

But § 18-7042 differs significantly from the statute upheld in *McCullen*. Unlike the statute in *McCullen*, a person cannot violate § 18-7042 merely by standing in an agricultural production facility. In fact, a person, such as an employee, would not violate § 18-7042 if he or she stood in an agricultural production facility and surreptitiously filmed the agricultural facility owner having a private conversation with his spouse. This same employee, however, could be prosecuted under § 18-7042, *and* face up to a year in jail, *and* be liable for reputational harm to the owner, if the employee, without the owner's consent, filmed his fellow workers repeatedly beating, kicking, and jumping on cows, or using a moving tractor to drag a cow on the floor by a chain attached to her neck. In other words, § 18-7042 is nothing like the statute in *McCullen* because law enforcement authorities would need to view suspect video or audiotape to determine whether a particular recording violates the statute. The recording prohibition is therefore a classic example of a content-based restriction.

ORDER - 15

Moreover, the State ignores that a law can be content based if the underlying purpose of the law is to suppress particular ideas. *Berger*, 569 F.3d at 1051; *see also Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 820 (9th Cir. 2013) (finding district court's conclusion that law was content based was not an abuse of discretion in light of the facts showing that the purpose of the day labor provisions was to suppress labor solicitation speech). Indeed, "the government's purpose is the controlling consideration" in determining content neutrality. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) And as already discussed in the Court's prior decision, a review of § 18-7042's legislative history leads to the inevitable conclusion that the law's primary purpose is to protect agricultural facility owners by, in effect, suppressing speech critical of animal-agriculture practices.

Further evidence of the State's content-based motive is found in its decision to include the restitution provision, which forces a person convicted under the law to pay publication damages arising from any negative publicity to the agricultural facility owner. § 18-7042(4). Presumably, if a favorable video of an agricultural facility's operations is published, a "victim" under the statute will not incur any losses. Instead, the only loss that a victim is likely to suffer from any misrepresentation or unauthorized image captured at a facility is the loss of profits generated by public outcry from the conduct depicted in an unfavorable video. *Id.* The imposition of such a harsh penalty for speech critical of an agricultural production facility evinces an intent to suppress such speech.

ORDER - 16

In each of these ways, § 18-7042 operates more like the statute found unconstitutional in *Whiting*, 709 F.3d at 819, than the statute in *McCullen*. In *Whiting*, the Ninth Circuit rejected the state's argument that the statute was a content-neutral restriction designed solely to address traffic problems. *Id.* at 819. The Circuit found that the day-labor provisions, on their face, targeted one type of speech—day-labor solicitation that impeded traffic—but said nothing about other types of roadside solicitation and were "therefore classic examples of content-based restrictions." *Id.* The Circuit found further confirmation for this conclusion from "the stated purpose of the provisions, their legislative history and the disproportionate sanctions they impose for traffic problems arising from day labor solicitation," which all indicated that the statute was designed to suppress day-labor solicitation, and not address traffic problems as the state claimed. *Id.*

Similarly, like the statute struck down in *Whiting*, § 18-7042's recording prohibition targets one type of speech activity—audiovisual recordings capturing "the conduct of an agricultural production facility's operations"—while saying nothing about other types of recordings made at an agricultural production facility. And also like the statute in *Whiting*, the facts show that the State's purpose in enacting the statute was to protect industrial animal agriculture by silencing its critics. Finally, § 18-7042 mirrors the statute in *Whiting* in that it imposes disproportionate sanctions for harms arising from undercover investigations that target the agricultural industry. All of these facts suggest that § 18-7042 was designed to suppress speech critical of the agricultural industry, and not protect private property as the State claims.

ORDER - 17

In fact, § 18-7042 discriminates not only based on content but also on viewpoint. The natural effect of both the audiovisual recording prohibition and the misrepresentation provision found in § 18-7042(1)(c) is to burden speech critical of the animal-agriculture industry. *Id.* at 24. The recording prohibition gives agricultural facility owners veto power, allowing owners to decide what can and cannot be recorded, effectively turning them into state-backed censors able to silence unfavorable speech about their facilities. I.C. § 18–7042(1)(d). Section 18-7042(1)(c) effects the same result by criminalizing only a subset of misrepresentations made to gain employment with an agricultural production facility with the intent to cause economic or other injury. This means, under § 18-7042(1)(c), a job applicant who lies to secure employment with the goal of praising the agricultural production facility will skate unpunished. But a job applicant who fails to mention his affiliation with an animal welfare group with the intent of exposing abusive or unsafe conditions at the facility will face the full force of the law. *MDO re Motion to Dismiss*, p. 24.

Because the Court finds that § 18-7042 is both content and viewpoint based, it must survive the highest level of scrutiny.

### C. *Section 18-7042 Cannot Survive Strict Scrutiny.*

"Content-based speech restrictions are generally unconstitutional unless they are narrowly tailored to a compelling state interest." *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 680 (1994). "This is an exacting test." *Id.* Even if the goals of the law are "legitimate, or reasonable, or even praiseworthy," this is not enough. *Id.* "There

must be some pressing *public* necessity, some essential value that has to be preserved; and even then the law must restrict as little speech as possible to serve the goal." *Id.* (emphasis added).

The State's interest in protecting personal privacy and private property is certainly an important interest. But in the First Amendment sense, these are not compelling interests in the context presented here. *Alvarez*, 132 S. Ct. at 2549 (noting that the Government's interest in protecting integrity of Medal of Honor was beyond question, but finding this interest did not satisfy the Government's heavy burden when seeking to regulate protected speech). Content-based restrictions on speech have been permitted "only when confined to the few 'historic and traditional categories [of expression] long familiar to the bar," like obscenity, "fighting words," defamation, and child pornography. *Alvarez*, 132 S.Ct. at 2544. The journalistic and whistleblower speech that § 18-7042 aims to suppress certainly does not fall in those categories.

Nonetheless, the State would have the property and privacy interests of agricultural production facilities supersede all other interests. But food production is a heavily regulated industry. And agricultural production facilities already must suffer numerous intrusions on their privacy and property because of the extensive regulations that govern food production and the treatment of animals. Given the public's interest in the safety of the food supply, worker safety, and the humane treatment of animals, it would contravene strong First Amendment values to say the State has a compelling interest in affording these heavily regulated facilities extra protection from public scrutiny.

O RDER - 19

However, even if the State's interest in protecting the privacy and property of agricultural facilities was "compelling" in the First Amendment sense, § 18-7042 is not narrowly drawn to serve those interests. "When the Government seeks to regulate protected speech, the restriction must be the least restrictive means among available, effective alternatives." *Alvarez*, 132 S.Ct. at 2540 (internal quotation marks omitted). Criminal and civil laws already exist that adequately protect those interests without impinging on free-speech rights. It is already illegal to steal documents or to trespass on private property. In addition, laws against fraud and defamation already exist to protect against false statements made to injure or malign an agricultural production facility. Because the State has "various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech," it has not shown any need to have a special statute specific and unique to agricultural production facilities. *See Comite de Jornaleros v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) (en banc).

Indeed, § 18-7042 not only restricts more speech than necessary, it poses a particularly serious threat to whistleblowers' free speech rights. To convict a whistleblower under the statute, the State does not need to prove that the whistleblower entered a production facility under false pretenses or trespass. Thus, as discussed above, if a diligent and trusted longtime employee witnesses animal abuse or life-threatening safety violations and records it without authorization, the employee could face up to a year in jail and be forced to pay damages to agricultural production facility owner for "twice" the economic loss the owner suffers because of the employee's whistleblowing activity, *even*

*if* everything depicted on the video is true and accurate. *Id.* § 18– 7042(3) & (4). In other words, the statute circumvents long-established defamation law and whistleblowing statutes by punishing employees for publishing true and accurate recordings on matters of public concern. The expansive reach of this statute is hard to reconcile with basic speech, whistleblower, and press rights. By legislating this broadly—by making it a crime for even employees to film matters of public concern at the workplace—"the State has severed the link between the [] statute's means and its end." *American Civil Liberties Union v. Alvarez*, 679 F.3d at 597.

Nor is the Court persuaded by the State's argument that § 18-7042 is narrowly tailored to protect private property because it only seeks to limit the capture of audiovisual recordings in a private forum. In making this argument, the State attempts to contrast § 18-7042 with the Illinois eavesdropping statute struck down in *American Civil Liberties Union v. Alvarez*. 679 F.3d at 597. The statute challenged in that case would have prevented the ACLU's plans to openly record police officers performing their duties in public places and speaking at a volume audible to bystanders. *Id.* at 595. Because the Illinois statute affected speech activity in a public forum, the State argues, it differs from § 18-7042, which only limits recordings in a "private forum."

This argument is flawed for two reasons. First and foremost, the State completely ignores that food production is not a private matter. As already discussed, animal agriculture is a heavily-regulated industry and food production and safety are matters of the utmost public concern. "Speech on matters of public concern . . . is at the heart of the

ORDER - 21

First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011)(citation omitted). Indeed, as the Seventh Circuit pointed out in *ACLU v. Alvarez*, "[t]he freedom of speech and press embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment. *Id.* (internal quotation marks and citation omitted).

Second, the State discounts the fact that § 18-7042 criminalizes recordings even when made by a person who is otherwise lawfully permitted to be there, i.e., the trusted employee who seeks to do right by exposing animal abuse. Like the proposed recording in *ACLU v. Alvarez*, at least some of the recordings banned under § 18-7042 would be otherwise lawful—that is, not disruptive of the workplace, and carried out by people who have a legal right to be in a particular location and to watch and listen to what is going on around them. *Id.* at 606.

The disconnect between the State's stated interest and § 18-7042 is not the only way in which the statue is not actually necessary to achieve the State's stated interest. *Alvarez*, 132 S.Ct. at 2549. The State has not shown why counterspeech would not suffice to achieve its interest of protecting agricultural production facilities from interference by wrongful conduct. *Id*. If an undercover investigator "staged a video" at an agricultural production facility, as some Idaho legislators fear, (Dkt. 75-1 at 10), not only could the facility owner sue the investigator for fraud or defamation, but the facility owner could launch its own public relations campaign to refute the video.

Order - 22

The remedy for misleading speech, or speech we do not like, is more speech, not enforced silence: "The remedy for speech that is false is speech that is true….The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *Alvarez*, 132 S.Ct. at 2550 (citing *Whitney v. California,* 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)). "Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." For all of these reasons and for those reasons stated in its earlier decision, the Court finds § 18-7042 violates the First Amendment.

## 2.  Equal Protection

ALDF also contends that § 18-7042 violates the Equal Protection Clause. The equal protection claim in this case undoubtedly closely overlaps the First Amendment interests at play. *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 94–95. "As in all equal protection cases, however, the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment." *Id.* at 95.

The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. *Plyler v. Doe,* 457 U.S. 202, 216 (1982). In seeking to enforce this mandate, courts have settled upon standards for determining the validity of state legislation or other official action that is challenged as denying equal protection. "Under traditional equal protection analysis, a legislative

classification must be sustained, if the classification itself is rationally related to a legitimate governmental interest." *U. S. Dept. of Agriculture v. Moreno* , 413 U.S. 528, 533 (1973).

The State contends that the purpose of § 18-7042 is to protect the private property of agricultural facility owners by guarding against such dangers as trespass, conversion, and fraud. But the State fails to explain why already existing laws against trespass, conversion, and fraud do not already serve this purpose. The existence of these laws "necessarily casts considerable doubt upon the proposition that [§ 18-7042] could have rationally been intended to prevent those very same abuses." *Moreno*, 413 U.S. at 536–37.

Likewise, the State fails to provide a legitimate explanation for why agricultural production facilities deserve more protection from these crimes than other private businesses. The State argues that agricultural production facilities deserve more protection because agriculture plays such a central role in Idaho's economy and culture and because animal production facilities are more often targets of undercover investigations. The State's logic is perverse—in essence the State says that (1) powerful industries deserve more government protection than smaller industries, and (2)  the more attention and criticism an industry draws, the more the government should protect that industry from negative publicity or other harms. Protecting the private interests of a powerful industry, which produces the public's food supply, against public scrutiny is not a legitimate government interest.

ORDER - 24

A review of the legislative record in search of a legitimate purpose does nothing to help the State's cause. *C.f. Moreno*, 413 U.S. at 533 (looking to legislative history "to illuminate the purposes of the 1971 amendment" to the Food Stamp Act after finding the challenged statutory classification was irrelevant to the stated purposes of the Act). The overwhelming evidence gleaned from the legislative history indicates that § 18-7042 was intended to silence animal welfare activists, or other whistleblowers, who seek to publish speech critical of the agricultural production industry. Many legislators made their intent crystal clear by comparing animal rights activists to terrorists, persecutors, vigilantes, blackmailers, and invading marauders who swarm into foreign territory and destroy crops to starve foes into submission. Other legislators accused animal rights groups of being extreme activists who contrive issues solely to bring in donations or to purposely defame agricultural facilities.

As the Supreme Court has repeatedly said, "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest if equal protection of the laws is to mean anything." *Moreno*, 413 U.S. at 534. As a result, a purpose to discriminate and silence animal welfare groups in an effort to protect a powerful industry cannot justify the passage of § 18-7042. *Id.* at 534–35.

The State also argues that § 18-7042 cannot violate the Equal Protection Clause because it does not create an impermissible classification. "[I]n order to subject a law to any form of review under the equal protection guarantee, one must be able to demonstrate that the law classifies persons in some manner." *Christy v. Hodel*, 857 F.2d 1324,

ORDER - 25

1331 (9th Cir. 1988) (internal quotation marks omitted). A law may create a classification in one of three ways: by showing that the law discriminates on its face; by showing that the law is applied in a discriminatory fashion; or by showing that the law, although neutral on its face and applied in accordance with its terms, was enacted with a purpose of discriminating. *Id.*

Here, § 18-7042 discriminates both on its face and through its purpose. Section 18-7042 discriminates on its face by classifying between whistleblowers in the agricultural industry and whistleblowers in other industries. In addition, ALDF has come forward with abundant evidence that the law was enacted with the discriminatory purpose of silencing animal rights activists who conduct undercover investigations in the agricultural industry. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–68 (1977) (courts may consider various sources of evidence in determining whether a law was adopted "because of" its adverse effects on a group). Thus, § 18-7042 is properly subject to review under the Equal Protection Clause.

Because ALDF has shown that enactment of § 18-7042 was animated by an improper animus toward animal welfare groups and other undercover investigators in the agricultural industry, and the law furthers no other legitimate or rational purpose, the Court finds that the law violates the Equal Protection Clause.

Amicus Erwin Chemerinsky raises a different equal protection argument that also bears consideration. He argues that § 18-7042 unjustifiably discriminates on the basis of a fundamental right—free speech—and therefore is subject to strict scrutiny. When a state

discriminates based on the exercise of a fundamental right, strict scrutiny applies.

*Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) (noting strict scrutiny

is applied when laws impinge on personal rights protected by the Constitution). A state

cannot pick and choose what type of speech or expressive conduct it will allow based on

content.

      For example, in *Mosley*, the Court found unconstitutional a city ordinance

prohibiting all picketing within 150 feet of a school, except labor picketing, because the

ordinance made an impermissible distinction between peaceful labor picketing and other

peaceful picketing. 408 U.S. at 95–96. According to the Court, the central problem with

the ordinance was that it described "permissible picketing in terms of its subject matter."

*Id.* at 95. "Peaceful picketing on the subject of a school's labor-management dispute [was]

permitted, but all other peaceful picketing [was] prohibited. The operative distinction

[was] the message on a picket sign. *Id.*

      Similarly, in this case, the central problem with § 18-7042 is that it distinguishes

between different types of speech, or conduct facilitating speech, based on content. As

already discussed in the context of the First Amendment claim, an employee can make an

unauthorized recording of an agricultural facility owner's children visiting the facility

without running afoul of § 18-7042, but the same employee could not make an

unauthorized recording of workers abusing animals. I.C. § 18-7042(1)(d). Likewise, an

undercover journalist who misrepresents his identity to secure a job at an agricultural

production facility so he can publish a laudatory piece about the facility would not violate

ORDER - 27

the statute. I.C. § 18-7042(1)(c). But an undercover journalist who misrepresents his identity to secure a job at the same facility seeking to expose illegal, inhumane, or unsafe behavior would violate the statute. *Id.* The operative distinction is the message the employee or undercover journalist wishes to convey.

"[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Mosley*, 408 U.S. at 96. Although the State may not agree with the message certain groups seek to convey about Idaho's agricultural production facilities, such as releasing secretly-recorded videos of animal abuse to the Internet and calling for boycotts, it cannot deny such groups equal protection of the laws in their exercise of their right to free speech. Far from being tailored to a substantial governmental interest, § 18-7042 classifies activities protected by the First Amendment based on content. Therefore, under the Equal Protection Clause, it cannot stand.

## ORDER

IT IS ORDERED that ALDF's Motion for Summary Judgment (Dkt. 74) is GRANTED.



DATED: August 3, 2015

B. Lynn Winmill
Chief Judge
United States District Court