**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND; PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS INC; AMERICAN CIVIL LIBERTIES UNION OF IDAHO; CENTER FOR FOOD SAFETY; FARM SANCTUARY; RIVER'S WISH ANIMAL SANCTUARY; WESTERN WATERSHEDS PROJECT; SANDPOINT VEGETARIANS; IDAHO CONCERNED AREA RESIDENTS FOR THE ENVIRONMENT; IDAHO HISPANIC CAUCUS INSTITUTE FOR RESEARCH AND EDUCATION; COUNTERPUNCH; FARM FORWARD; WILL POTTER; JAMES MCWILLIAMS; MONTE HICKMAN; BLAIR KOCH; DANIEL HAUFF, | No. 15-35960 <br><br> D.C. No. 1:14-cv-00104-BLW |
| *Plaintiffs-Appellees*, | |
| v. | OPINION |
| LAWRENCE G. WASDEN, in his official capacity as Attorney General of Idaho, | |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the District of Idaho

B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted May 12, 2017
Seattle, Washington

Filed January 4, 2018

Before:  M. Margaret McKeown, Richard C. Tallman,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Bea

---

## SUMMARY[*]

---

### Civil Rights

The panel affirmed in part and reversed in part the district court's entry of summary judgment in favor of the Animal Legal Defense Fund and vacated in part the district court's permanent injunction against enforcement of Idaho's Interference with Agricultural Production law,  Idaho Code § 18-7042.

The Interference with Agricultural Production law was enacted after a disturbing secretly-filmed expose of operations at an Idaho dairy farm went live on the internet. The statute—targeted at undercover investigation of agricultural operations—broadly criminalizes making

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

misrepresentations to access an agricultural production facility as well as making audio and video recordings of the facility without the owner's consent.

The panel held that Idaho's criminalization of misrepresentations to enter a production facility, § 18-7042(1)(a), could not survive First Amendment scrutiny. The panel held that the subsection criminalized innocent behavior, was staggeringly overbroad, and that the purpose of the statute was, in large part, targeted at speech and investigative journalists. The panel also struck down the statute's subsection which banned audio and video recordings of a production facility's operations, § 18-7042(1)(d). The panel held that the Recordings Clause regulated speech protected by the First Amendment and was a classic example of a content-based restriction that could not survive strict scrutiny.

The panel held that § 18-7042(1)(b)—which criminalizes obtaining records of an agricultural production facility by misrepresentation—protected against a legally cognizable harm associated with a false statement and therefore survived constitutional scrutiny under *United States v. Alvarez*, 567 U.S. 709 (2012). Finally, the panel upheld the constitutionality of § 18-7042(1)(c), which criminalizes obtaining employment by misrepresentation with the intent to cause economic or other injury. The panel rejected plaintiffs' argument that the statute would reach "a person who overstates her education or experience to get a job for which she otherwise would not have qualified, whether the person is an undercover investigator or not," because in such a case, the law's requisite intent to injure would not be satisfied.

Dissenting in part and concurring in part, Judge Bea stated that subsection § 18-7042(1)(a), pertaining to the

criminalization of misrepresentations to enter a production facility, should survive First Amendment review.  Judge Bea would hold that the ability to hold property or to exercise control of it requires recognition by courts of the owner's right to exclusive possession of the land—the right to exclude anyone from entry, at any time, and for any reason at all or indeed for no reason.

## COUNSEL

Carl Jeffrey Withroe (argued) and Clay R. Smith, Deputy Attorneys General; Steven L. Olsen, Chief of Civil Litigation; Lawrence G. Wasden, Attorney General; Office of the Attorney General, Boise, Idaho; for Defendant-Appellant.

Justin F. Marceau (argued), Of Counsel, Animal Legal Defense Fund, Denver, Colorado; Matthew Liebman, Animal Legal Defense Fund, Cotati, California; Alan K. Chen, University of Denver, Sturm College of Law, Denver, Colorado; Matthew Strugar, PETA Foundation, Los Angeles, California; Leslie A. Brueckner, Oakland, California; Paige M. Tomaselli and Cristina R. Stella, Center for Food Safety, San Francisco, California; Richard Alan Eppink, American Civil Liberties Union of Idaho Foundation, Boise, Idaho; Maria Andrade, Boise, Idaho; for Plaintiffs-Appellees.

James J. Pizzirusso and Sarah R. LaFreniere, Hausfeld, Washington, D.C., for Amicus Curiae Plant Based Foods Association.

Marty Durand and James Piotrowski, Herzfeld & Piotrowski PLLC, Boise, Idaho, for Amici Curiae Idaho Building Trades Council and Idaho AFL-CIO.

Sarah L. Nash, Government Accountability Project Food Integrity Campaign, Washington, D.C.; Craig H. Durham, Ferguson Durham PLLC, Boise, Idaho; for Amicus Curiae Government Accountability Project.

R. Bruce Rich and Jonathan Bloom, Weil Gotshal & Manges LLP, New York, New York, for Amici Curiae Association of American Publishers, American Booksellers for Free Expression, Authors Guild Inc., Freedom to Read Foundation, and Media Coalition Foundation.

Hannah Connor, Center for Biological Diversity, Washington, D.C.; Tarah Heinzen, Food & Water Watch, Washington, D.C.; for Amici Curiae Center for Biological Diversity and Food & Water Watch.

David A. Schulz, Media Freedom & Information Access Clinic, New York, New York; Jonathan M. Manes, New Haven, Connecticut; for Amici Curiae Abrams Institute for Freedom of Expression and Scholars of First Amendment and Information Law.

Bruce D. Brown, Gregg P. Leslie, and Michael J. Lambert, Reporters Committee for Freedom of the Press, Washington, D.C., for Amici Curiae Reporters Committee for Freedom of the Press and 22 Media Organizations.

Deepak Gupta, Gupta Wessler PLLC, Washington, D.C., for Amicus Curiae Erwin Chemerinsky.

Andrew P. Bridges, Alexis I. Caloza, and Kathleen Lu, Fenwick & West LLP, San Francisco, California, for Amicus Curiae United Farm Workers of America. Geoffrey J. McConnell, McConnell Wagner Sykes & Stacey PLLC, Boise, Idaho, for Amicus Curiae Susannah W. Pollvogt, Scholar of the Law of Unconstitutional Animus.

Shayana Kadidal, Center for Constitutional Rights, New York, New York, for Amici Curiae Professors Brooke Kroeger and Ted Conover.

Mahesha P. Subbaraman, Subbaraman PLLC, Minneapolis, Minnesota, for Amici Curiae Food Law & Policy Scholars.

## OPINION

McKEOWN, Circuit Judge:

Investigative journalism has long been a fixture in the American press, particularly with regard to food safety.[1] In the early 1900s, Upton Sinclair highlighted conditions in the meat-packing industry in *The Jungle*, a novel based on his time working incognito in a packing plant.[2] This case also originates in the agricultural sector—a secretly-filmed exposé of the operation of an Idaho dairy farm. By all accounts, the video was disturbing: dairy workers were shown dragging a cow across the ground by a chain attached

---

[1] *See* Brooke Kroeger, *Undercover Reporting: An American Tradition*, IRE J. 20 (Spring 2014).

[2] Upton Sinclair, *The Jungle* (Dover Thrift eds., Dover Publications 2001) (1906).

to her neck; twisting cows' tails to inflict excruciating pain; and repeatedly beating, kicking, and jumping on cows to force them to move.[3]

After the film went live on the Internet, both the court of public opinion and the Idaho legislature responded, with the latter eventually enacting the Interference with Agricultural Production law. Idaho Code § 18-7042. That legislation—targeted at undercover investigation of agricultural operations—broadly criminalizes making misrepresentations to access an agricultural production facility as well as making audio and video recordings of the facility without the owner's consent. Statutes of this genre—dubbed by some as Ag-Gag laws—have been passed in several western states.[4]

This appeal highlights the tension between journalists' claimed First Amendment right to engage in undercover investigations and the state's effort to protect privacy and property rights in the agricultural industry. Idaho challenges the district court's determination that four subsections of the statute—§ 18-7042(1)(a)–(d)—are unconstitutional on First Amendment and Equal Protection grounds. The Animal

---

[3] Mercy for Animals, *Burger King Cruelty–Video Exposes Horrific Animal Abuse at a Burger King Dairy Supplier*, YouTube (Oct. 9, 2012), https://www.youtube.com/watch?v=lN_YcWOuVqk&oref=https%3A%2F%2Fwww.youtube.com%2Fwatch%3Fv%3DlN_YcWOuVqk&has_verified=1.

[4] *See* Rita-Marie Cain Reid & Amber L. Kingery, *Putting A Gag on Farm Whistleblowers: The Right to Lie and the Right to Remain Silent Confront State Agricultural Protectionism*, 11 J. FOOD L. & POL'Y 31, 35–36 (Spring 2015) (Montana, Kansas, North Dakota); Lewis Bollard, *Ag-Gag: The Unconstitutionality of Laws Restricting Undercover Investigations on Farms*, 42 Envtl. L. Rep. News & Analysis 10960, 10963-66 (Oct. 2012) (Iowa, Utah).

League Defense Fund and various other animal rights organizations (collectively "ALDF") urge us to uphold the district court's injunction against enforcement of the statute, arguing that the law criminalizes whistleblower activity and undercover investigative reporting—a form of speech that has brought about important and widespread change to the food industry, an arena at the forefront of public interest.

Our analysis is framed by the Supreme Court's decision in *United States v. Alvarez*, which addressed the First Amendment and false speech. 567 U.S. 709 (2012). We conclude that Idaho's criminalization of misrepresentations to enter a production facility, § 18-7042(1)(a), and ban on audio and video recordings of a production facility's operations, § 18-7042(1)(d), cover protected speech under the First Amendment and cannot survive constitutional scrutiny. In contrast, in accord with *Alvarez*, Idaho's criminalization of misrepresentations to obtain records and secure employment are not protected speech under the First Amendment and do not violate the Equal Protection Clause. § 18-7042(1)(b)–(c). Thus, we affirm in part and reverse in part the district court's entry of summary judgment in favor of ALDF and vacate in part its permanent injunction against enforcement of the statute.

We are sensitive to journalists' constitutional right to investigate and publish exposés on the agricultural industry. Matters related to food safety and animal cruelty are of significant public importance. However, the First Amendment right to gather news within legal bounds does not exempt journalists from laws of general applicability. For this reason, we uphold the provisions that fall within constitutional parameters, but strike down those limitations that impinge on protected speech.

## Background

**The Investigation**

In 2012, an animal rights activist went undercover to get a job at an Idaho dairy farm and then secretly filmed ongoing animal abuse there. Mercy for Animals, an animal rights group, publicly released portions of the video, drawing national attention. The dairy farm owner responded to the video by firing the abusive employees who were caught on camera, instituting operational protocols, and conducting an animal welfare audit at the farm. Local law enforcement authorities launched an investigation that culminated in the conviction of one of the employees for animal cruelty. After the video's release, the dairy farm owner and his family received multiple threats.

**Idaho's Interference with Agricultural Production Statute**

In February 2014, Idaho enacted a law criminalizing "interference with agricultural production" to protect Idaho farmers. *See* Idaho Code § 18-7042. Relevant here, a person commits the crime of interference with agricultural production if the person knowingly:

> (a)    Is not employed by an agricultural production facility and enters an agricultural facility by force, threat, misrepresentation or trespass;

> (b)    Obtains records of an agricultural production facility by force, threat, misrepresentation or trespass;

(c) Obtains employment with an agricultural facility by force, threat, or misrepresentation with the intent to cause economic or other injury to the facility's operations, livestock, crops, owners, personnel, equipment, buildings, premises, business interests or customers; [or]

(d) Enters an agricultural production facility that is not open to the public and, without the facility owner's express consent or pursuant to judicial process or statutory authorization, makes audio or video recordings of the conduct of an agricultural production facility's operations[.][5]

Idaho Code § 18-7042(1)(a)–(d).

For purposes of this statute, the term "agricultural production" broadly covers "activities associated with the production of agricultural products for food, fiber, fuel and other lawful uses," and other activities such as "[p]reparing land for agricultural production" and "[h]andling or applying pesticides . . . ."[6] Id. § 18-7042(2)(a). The term "agricultural

---

[5] The statute also criminalizes physical damage to an agricultural production facility's operations, Idaho Code § 18-7042(1)(e), but that provision has not been challenged in this case.

[6] In full, the law defines "agricultural production" to mean "activities associated with the production of agricultural products for food, fiber, fuel and other lawful uses," including but not limited to: "construction, expansion, use, maintenance and repair of an agricultural production facility; preparing land for agricultural production; handling or applying pesticides, herbicides or other chemicals, compounds or substances labeled for insects, pests, crops, weeds, water or soil;

production facility" is broad and covers "any structure or land, whether privately or publicly owned, leased or operated, that is being used for agricultural production." *Id.* § 18-7042(2)(b).

Interference with agricultural production is a misdemeanor punishable by up to one year in prison or a fine not in excess of $5,000, or both. *Id.* § 18-7042(3). A person convicted of this crime must pay restitution to the victim in an amount of twice the damage resulting from violation of the statute. *Id.* § 18-7042(4). This damages payment includes a victim's "economic loss[es]." *Id.* § 19-5304.

The legislative history reveals a complex series of motivations behind the statute. The bill was drafted by the Idaho Dairymen's Association, a trade organization representing Idaho's dairy industry. When the Association's lawyer addressed legislators, he stated that one goal of the bill was "to protect Idaho farmers from wrongful interference. . . . Idaho farmers live and work spread out across the land where they're uniquely vulnerable to interference by wrongful conduct." Another goal was to shield the agricultural industry from undercover

---

planting, irrigating, growing, fertilizing, harvesting or producing agricultural, horticultural, floricultural and viticultural crops, fruits and vegetable products, field grains, seeds, hay, sod and nursery stock, and other plants, plant products, plant byproducts, plant waste and plant compost; breeding, hatching, raising, producing, feeding and keeping livestock, dairy animals, swine, furbearing animals, poultry, eggs, fish and other aquatic species, and other animals, animal products and animal byproducts, animal waste, animal compost, and bees, bee products and bee byproducts; processing and packaging agricultural products, including the processing and packaging of agricultural products into food and other agricultural commodities; [and] manufacturing animal feed." Idaho Code § 18-7042(2)(a).

investigators who expose the industry to the "court of public opinion," which destroys farmers' reputations, results in death threats, and causes loss of customers.

At the time of the passage of this legislation, Idaho already had a law relating to interference with agricultural research—which has not been challenged—prohibiting knowingly damaging or obtaining property at an agricultural research facility with intent to hinder agricultural research; obtaining access to an agricultural research facility by misrepresentation with the intent to perform acts that would hinder agricultural research; entering an agricultural research facility with the intent to damage, alter, duplicate or obtain unauthorized possession of records or property related to the agricultural research; obtaining control over records or property of an agricultural research facility with intent to destroy such property without authorization of the facility; and releasing, stealing, or causing death or injury to an animal at an agricultural research facility. Idaho Code § 18-7040(1). The Idaho Dairymen's Association used this interference with agricultural research law as the framework for § 18-7041.

Legislators discussed the bill as protecting against two types of perceived harm to agricultural producers. First, lawmakers expressed concern about physical and operational damage caused by animal rights activists who gain access to agricultural production facilities. For example, some legislators discussed concerns about farm security and privacy. Others voiced concerns about the intentional destruction of crops, breeding records, and farm structures.

Lawmakers also discussed damage caused by investigative reporting: "One of the things that bothers me a lot about the undercover investigation [at the dairy], and

the fact that there's videos, well, we're being tried and persecuted and prosecuted in the press." Other legislators used similar language demonstrating hostility toward the release of these videos, and one supporter of the legislation dubbed animal rights groups as "terrorists" who "use media and sensationalism to attempt to steal the integrity of the producer and their reputation." One legislator stated that the dairy industry's reason behind the legislation was "[t]hey could not allow fellow members of the industry to be persecuted in the court of public opinion." Another described these videos as used to "publicly crucify a company" and "as a blackmail tool." Finally, one legislator indicated that if the video had not been published, she did not "think this bill would ever have surfaced."

**Procedural Background**

In March 2014, ALDF filed suit against Lawrence G. Wasden as Attorney General of Idaho.[7] The complaint alleges that the purpose and effect of the statute "are to stifle political debate about modern agriculture by (1) criminalizing all employment-based undercover investigations; and (2) criminalizing investigative journalism, whistleblowing by employees, or other expository efforts that entail images or sounds." ALDF asserts violations of the First and Fourteenth Amendments. Although ALDF claimed preemption under the False Claims Act, Food Safety Modernization Act, and Clean Water Act, ALDF did not address those issues on appeal.

---

[7] ALDF also brought claims against Governor C.L. "Butch" Otter, but the district court dismissed him as a defendant. His dismissal is not challenged on appeal.

The district court granted ALDF's motion for summary judgment on its First Amendment and Equal Protection claims. The district court concluded that the prohibitions on misrepresentations in § 18-7042(1)(a)–(c) (the "Misrepresentation Clauses") criminalize speech protected by the First Amendment because Idaho could not "show the lies it seeks to prohibit cause any legally cognizable harm." The court explained that the regulation on audio and video recordings under § 18-7042(1)(d) (the "Recordings Clause") covers speech protected by the First Amendment and discriminates based on content because it criminalizes only "recordings of the conduct of an agricultural production facility's operations." The district court further reasoned that subsections (c) (misrepresentation to gain employment) and (d) (the Recordings Clause) discriminate on the basis of viewpoint because they "burden speech critical of the animal-agriculture industry." Applying strict scrutiny to all challenged provisions, the district court resolved that even if the state's interests in privacy and property were compelling, the restrictions were neither narrowly tailored nor the least restrictive means available to protect those interests.

The district court also determined that all four challenged subsections violate the Fourteenth Amendment's Equal Protection Clause and fail rational basis review. The subsections fail on their face because they classify between whistleblowers in the agricultural industry and whistleblowers in other industries. The subsections also fail through their purpose because they were "animated by an improper animus toward animal welfare groups and other undercover investigators in the agricultural industry" and "further[] no other legitimate or rational purpose." The court noted that there was "abundant evidence that the law was enacted with the discriminatory purpose of silencing animal

rights activists who conduct undercover investigations in the agricultural industry."

The district court deemed moot ALDF's remaining claims and permanently enjoined enforcement of the challenged subsections.  Idaho appeals the district court's grant of summary judgment, which we review de novo. *Roberts v. Continental Ins. Co.*, 770 F.2d 853, 855 (9th Cir. 1985).

## Analysis

## I.  The Misrepresentation Clauses:  Idaho Code § 18-7042(1)(a)–(c)

Subsections (a), (b) and (c) criminalize misrepresentations used to gain entry to agricultural production facilities, obtain records, and, under certain circumstances, secure employment.  Relevant here, a person commits the crime of interference with agricultural production if the person knowingly:

> (a)      Is not employed by an agricultural production facility and enters an agricultural facility by force, threat, *misrepresentation* or trespass;

> (b)      Obtains records of an agricultural production facility by force, threat, *misrepresentation* or trespass; [or]

> (c)      Obtains employment with an agricultural facility by force, threat, or *misrepresentation* with the intent to cause economic or other injury to the facility's operations,      livestock,      crops,      owners,

> personnel, equipment, buildings, premises, business interests or customers[.]

Idaho Code § 18-7042(1)(a)–(c) (emphasis added).

Idaho argues that the "misrepresentation" component of these provisions regulates conduct induced by false statements of fact. ALDF counters that the subsections regulate pure speech, effectively prohibiting investigative reporters from accessing agricultural production facilities and therefore blocking reporters' access to material for journalistic exposés.

The First Amendment, applied to states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. Const., amend I. Our first task is to determine whether the misrepresentations prohibited in the Idaho statute constitute speech protected by the First Amendment. *See Cornelius v. NAACP Legal Def. Fund & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). If the government's actions do not implicate speech protected by the First Amendment, we "need go no further." *Id.*

In *Alvarez*, the Supreme Court examined the Stolen Valor Act, 18 U.S.C. § 704 ("the Act"), a statute criminalizing false claims that the speaker had received the Congressional Medal of Honor. 567 U.S. 709 (2012). Justice Kennedy's plurality opinion (joined by the Chief Justice and Justices Ginsburg and Sotomayor), as well as Justice Breyer's concurring opinion (joined by Justice Kagan), concluded that the Act's flat prohibition of such lies constituted an impermissible restriction on speech protected by the First Amendment. *Id.* at 729–30 (plurality opinion); *id.* at 739 (Breyer, J., concurring). In deciding that lying about receiving the Medal of Honor, without more, is protected speech, the plurality and concurrence "reject[ed]

the notion that false speech should be in a general category that is presumptively unprotected." *Id.* at 722 (plurality opinion); *accord id.* at 731–32 (Breyer, J., concurring).

However, neither the plurality nor the concurrence in *Alvarez* held that false statements are *always* protected under the First Amendment. Instead, as the plurality outlines, false speech may be criminalized if made "for the purpose of material gain" or "material advantage," or if such speech inflicts a "legally cognizable harm." *Id.* at 723, 719. The concurring justices agreed: statutes that criminalize falsities typically require proof of specific or tangible harm. *Id.* at 734–36. We thus focus our attention on misrepresentations of the type singled out by the Court—false statements made for material gain or advantage or that inflict harm.

## A. Idaho Code § 18-7042(1)(a): Entry by Misrepresentation

Subsection (a) criminalizes entry into an agricultural production facility "by force, threat, misrepresentation or trespass." Notably, ALDF challenges only the "misrepresentation" prong of this subsection.[8] And, as we note below, Idaho can easily address the problematic term by simply excising "misrepresentation" from this subsection. Thus, entry by force, threat or trespass would continue to be a criminal violation.

---

[8] The same is true of subsections (b) and (c); ALDF challenges only the misrepresentation prongs. In its opening brief, Idaho limits the definition of a "misrepresentation" to an affirmative misrepresentation—not an omission: "[t]his means that the representations must be affirmative; omissions are insufficient. And they must be knowingly false. Mistakes or opinions will not support a prosecution."

Guided by *Alvarez*, we conclude that subsection (a)'s misrepresentation provision regulates speech protected by the First Amendment. The targeted speech—a false statement made in order to access an agricultural production facility—cannot on its face be characterized as "made to effect a fraud or secure moneys or other valuable considerations." *Alvarez*, 567 U.S. at 723 (plurality opinion). Nor can the misrepresentation provision be characterized as simply proscribing conduct. Like the statute in *Alvarez*, subsection (a) "seeks to control and suppress all false statements [related to access] in almost limitless times and settings. And it does so entirely without regard to whether the lie was made for the purpose of material gain." *Id.* at 722–23 (plurality opinion). Unlike lying to obtain records or gain employment—which are associated with a material benefit to the speaker—lying to gain entry merely allows the speaker to cross the threshold of another's property, including property that is generally open to the public. The hazard of this subsection is that it criminalizes innocent behavior, that the overbreadth of this subsection's coverage is staggering, and that the purpose of the statute was, in large part, targeted at speech and investigative journalists.

Idaho's argument that "the material gain to the person telling the lie *is* the entry to the property," is not supported by any authority and does not establish how entry onto the property and *material* gain are coextensive. Under the statute, any misrepresentation to gain entry could net a criminal prosecution. Take, for example, a teenager who wants to impress his friends by obtaining a highly sought after reservation at an exclusive pop-up restaurant that is open to the public. If he were to call the restaurant and finagle a reservation in the name of his mother, a well-known journalist, that would be a misrepresentation. If the

restaurant offers up a reservation on the basis of the mother's notoriety, granting a "license" to enter the premises and sit at a table, the teenager would be subject to punishment of up to one year in prison, a fine not to exceed $5,000, or both.

The teenager risks this potential despite the fact that he might leave before ordering, be discovered and removed by the manager, or his friends might not be impressed at all. In those instances, he would not receive even the secondary benefits of having gained access. In fact, all our teenager would have to do is enter the restaurant and he could be arrested because he gave a false name to the maître d' on the phone. This entry alone does not constitute a material gain, and without more, the lie is pure speech.[9]

Or the lunch could go off without a hitch. The restaurant is none the wiser, it gets paid for the meal, and loses nothing, but the teenager could still be subject to prosecution. Once again, the lie is pure speech.

The teenager does not necessarily even gain protection from trespass liability. Idaho's criminal trespass law prohibits "[e]ntering without permission of the owner or the

---

[9] We disagree with the district court's suggestion that the only harm from gaining access to property by misrepresentation "would arise, say, from the publication of a story about the facility." Such reasoning is problematic because it assumes, among other things, that a publication about the facility will necessarily harm the facility. At issue here is the speech to gain entry to the facility, not the journalistic creation or speculative harm that may "arise" after entry. Focusing on such speculative harm sweeps in too many scenarios in which a person entering the property causes no harm to the property or its owner. This approach also places a value judgment on the reporting itself and undermines the First Amendment right to critique and criticize.

owner's agent, upon the real property of another" but limits its application to property posted with "No Trespassing" signs that meet certain parameters. Idaho Code § 18-7008(9). Thus, even if the dissent is correct that the teenager receives a license that would not otherwise have been granted, since in some circumstances the teenager may have entered the restaurant with no permission without trespassing, he gains little to nothing from his misrepresentation.[10]

Two earlier cases involving investigative reporters and trespass in the First Amendment context foreshadowed the decision in *Alvarez*, albeit in slightly different scenarios. The Fourth Circuit in *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (1999), and the Seventh Circuit in *Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d 1345 (1995), examined whether plaintiffs in a civil action could maintain a trespass claim against journalists for misrepresenting their identities. Both courts invalidated the trespass claim predicated on the misrepresentations because "the entry was not invasive in the sense of infringing the kind of interest of the plaintiffs that the law of trespass protects; it was not an interference with the ownership or possession of land." *Desnick*, 44 F.3d at 1353; *Food Lion*, 194 F.3d at 518 ("[I]f we turned successful resume fraud into trespass, we would not be protecting the interest underlying the tort of trespass—the ownership and peaceable possession of

---

[10] The dissent's citation to *Green v. Beaver State Contractors, Inc.*, 472 P.2d 307, 307 (Idaho 1970) is misplaced. This is not the case of the hapless teenager and has nothing to do with the First Amendment and entry upon property. Rather, it is a civil contract matter and the question—left unanswered—was whether there were any civil damages for trespass by a contractor who traversed land without authorization.

land.").[11]  Put differently, "consent to an entry is often given legal effect even though the entrant has intentions that if known to the owner of the property would cause him for . . . lawful reasons to revoke his consent" because that entry does not infringe upon the specific interests trespass seeks to protect.  *Desnick*, 44 F.3d at 1351.  This language is prescient in its tracking of *Alvarez*'s reasoning:  some lies quite simply do not inflict any material or legal harm on the deceived party.  *See Alvarez*, 567 U.S. at 718–19 (plurality opinion); *see also id.* at 736 (Breyer, J., concurring) (statutes properly prohibiting false statements are those with "limitations of context, or requirements of proof of injury" to narrow the prohibition to "a subset of lies where specific harm is more likely to occur" and not "where harm is unlikely or the need for the prohibition is small.").

Re-visiting our teenager, we have already established that he is not guilty of ordinary criminal trespass in the absence of a "No Trespassing" sign.  However, as with a journalist or even a curiosity seeker who dissembles to get access to the property, under the challenged Idaho law, the teenager would be subject to criminal prosecution for nothing more than what can only be characterized as a fib.  Thus, the misrepresentation provision of subsection (a) regulates protected speech while "target[ing] falsity and nothing more."  *Alvarez*, 567 U.S. at 719 (plurality opinion).  Such regulation is subject to the "most exacting scrutiny."  *Id.* at 724 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)).  Idaho's chosen restriction on speech must

---

[11] On another claim, the Fourth Circuit determined that the reporters "committed trespass by breaching their duty of loyalty" as employees of Food Lion.  *Food Lion*, 194 F.3d at 518.  Idaho did not raise any similar arguments here and, therefore, this portion of the Fourth Circuit's holding is inapposite to our decision.

be "actually necessary" to achieve a compelling government interest, and there must be a "direct causal link between the restriction imposed and the injury to be prevented." *Id.* at 725. Subsection (a) cannot survive this high bar.

Even assuming Idaho has a compelling interest in regulating property rights and protecting its farm industry, criminalizing access to property by misrepresentation is not "actually necessary" to protect those rights. If, as Idaho argues, its real concern is trespass, then Idaho already has a prohibition against trespass that does not implicate speech in any way. If instead, as a number of the legislators made clear and the dairy lobby underscored, the statute was intended to quash investigative reporting on agricultural production facilities, then the speech aspect of the statute prohibiting misrepresentations is even more problematic. The focus of the statute to avoid the "court of public opinion" and treatment of investigative videos as "blackmail" cannot be squared with a content-neutral trespass law.

It is troubling that criminalization of these misrepresentations opens the door to selective prosecutions—for example, pursuing the case of a journalist who produces a *60 Minutes* segment about animal cruelty versus letting the misrepresentation go unchecked in the case of the teenager. As Justice Breyer aptly noted in his concurrence,

> the pervasiveness of false statements, made for better or for worse motives, made thoughtlessly or deliberately, made with or without accompanying harm, provides a weapon to a government broadly empowered to prosecute falsity without more. And those who are unpopular may fear that the government will use that weapon selectively,

> say, by prosecuting a [politically unpopular
> individual who makes false claims], while
> ignoring members of other political groups
> who might make similar false claims.

*Id.* at 734.  In this case, the targeted group—journalists and
investigative reporters—could also face enhanced penalties.
Violating Idaho's criminal trespass statute could result in up
to six months in prison, a fine not in excess of $1,000, or
both, *see* Idaho Code § 18-7011(1), whereas the penalty
under the agricultural protection provision, § 18-7042, could
be up to one year in prison, a fine not in excess of $5,000, or
both.

We are also unsettled by the sheer breadth of this
subsection given the definitions of "agricultural production
facility" and "agricultural production." *Id.* § 18-7042(2)(a),
(b).  Applying these definitions, the subsection reaches
misrepresentations not only in the context of a large-scale
dairy facility or cattle feedlot, but also grocery stores, garden
nurseries, restaurants that have an herb garden or grow their
own produce, llama farms that produce wool for weaving,
beekeepers, a chicken coop in the backyard, a field
producing crops for ethanol, and hardware stores, to name a
few.  *See Alvarez*, 567 U.S. at 722 (plurality opinion)
(criticizing the Act for having "sweeping, quite
unprecedented reach").

The subsection's reach is particularly worrisome
because many of the covered entities are, unlike large-scale
dairy facilities, places of business that are open to the public.
Imagine a situation in which an Albertsons grocery store
opens early to the first one hundred affinity cardholders to
visit the new, spectacular food court.  Given the expansive
definition of "agricultural production," the Albertsons store

would be covered under the statute as a facility where agricultural products are "process[ed] and package[ed] . . . into food." An enterprising person with no Albertsons card, but representing otherwise, or even someone using a friend's Albertsons card, falls prey to the statute simply because he wants to see the food-court extravaganza. Under subsection (a), our protagonist would be guilty of a misdemeanor and could be punished by up to one year in prison, a fine not in excess of $5,000, or both—not to mention a potential restitution award. Idaho Code § 18-7042(3), (4). The same can be said for a restaurant critic who goes undercover, claiming to be a repeat customer in order to get a prime table from which to review the restaurant's food, service, and ambiance. In these scenarios, the statute punishes speech where there is no fraud, no gain, and no valuable consideration.

The limitation that a misrepresentation must be "knowing[]" does not eliminate the threat posed by this subsection's staggering reach. The fact that the subsection regulates speech related to property far beyond a classic agricultural facility would invariably result in the chilling of lawful speech. Indeed, "a speaker might still be worried about being *prosecuted* for a careless false statement, even if he does not have the intent required to render him liable." *Alvarez*, 567 U.S. at 736 (Breyer, J., concurring) (applying intermediate scrutiny).

Nor is this subsection the "least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). We see no reason, and Idaho has not offered any, why the state could not narrow the subsection by requiring specific intent or by limiting criminal liability to statements that cause a particular harm. Idaho did exactly that with subsection (c), which covers misrepresentation

"with the intent to cause economic or other injury." It is no surprise that after the Supreme Court's decision in *Alvarez*, Congress amended the Stolen Valor Act to criminalize only those "[w]hoever, *with intent to obtain money, property, or other tangible benefit*, fraudulently hold[] oneself out to be a recipient" of a qualifying medal. 18 U.S.C. § 704(b) (2013) (emphasis added). Such a limitation would still effectuate agricultural production facility owners' property rights while complying with *Alvarez*'s relatively straightforward First Amendment requirements.

The reach of subsection (a) is so broad that it gives rise to suspicion that it may have been enacted with an impermissible purpose. *See* Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 455 (1996) ("At a certain point—when the asserted interest is insubstantial or when it does not fit the scope of the challenged regulation—the usual presumption of proper purpose topples; there is reason, then, to think that the law, though content neutral, has been tainted by impermissible purpose."). Our suspicion is not eased after reading the legislative history. The record reflects that the statute was partly motivated to protect members of the agricultural industry from "persecut[ion] in the court of public opinion," and journalists who use exposés to "publicly crucify a company." Although, for Equal Protection Clause purposes, we need not decide whether animus motivated this subsection, we do not ignore that a vocal number of supporters were less concerned with the protection of property than they were about protecting a target group from critical speech, which adds to our skepticism that the provision survives the "exacting scrutiny" required under *Alvarez*. *See FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 387 n.18 (1984) (expressing skepticism about the

motivation behind a bill when some supporters were concerned with protecting themselves from critical speech).

In the same vein, if intermediate scrutiny is the standard, as Justice Breyer advocates in *Alvarez*, then this subsection would still fail. Subsection (a) criminalizes speech that inflicts no "specific harm" on property owners, "ranges very broadly," and risks significantly chilling speech that is not covered under the statute. *Alvarez*, 567 U.S. at 736–37 (Breyer J., concurring). Additionally, it is "possible substantially to achieve the Government's objective in less burdensome ways" with "a more finely tailored statute." *Id.* at 737. Even under intermediate scrutiny, the subsection "works disproportionate constitutional harm." *Id.* at 739.

There is, of course, an easy fix to this First Amendment problem: simply strike the word "misrepresentation" from the subsections. Idaho explicitly invites this result in its discussion of the statute's severability clause, and ALDF's surgical challenge indirectly endorses this remedy. Under Idaho law, an invalid portion of a statute may be severed where "part of a statute . . . is unconstitutional and yet is not an integral or indispensable part of the measure." *Voyles v. City of Nampa*, 548 P.2d 1217, 1220 (Idaho 1976). Because the proscription on misrepresentations is neither integral nor indispensable to the subsection's goal of protecting property rights, the offending term "misrepresentation" should be stricken, leaving the remainder of the subsection intact. In light of this resolution, we need not analyze subsection (a) under the Equal Protection Clause.

### B. Idaho Code § 18-7042(1)(b): Obtaining Records by Misrepresentation

Subsection (b)—which criminalizes obtaining records of an agricultural production facility by misrepresentation[12]—protects against a "legally cognizable harm associated with a false statement" and therefore survives constitutional scrutiny under *Alvarez.* 567 U.S. at 719. *Alvarez* highlights that a false statement made in association with a legally cognizable harm or for the purpose of material gain is not protected. *Id.* at 719, 723. Unlike false statements made to enter property, false statements made to actually acquire agricultural production facility records inflict a property harm upon the owner, and may also bestow a material gain on the acquirer.

This subsection is aimed at conduct—obtaining records—that has long been prohibited in Idaho. For decades, Idaho has lawfully proscribed similar types of conduct that infringe on property rights. For example, Idaho criminalizes conversion, which involves "any distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein." *Wiseman v. Schaffer*, 768 P.2d 800, 803 (Idaho 1989) (citation omitted); *see also* Idaho Code §§ 18-2403(3), 18-7001(1). Idaho also criminalizes theft by false pretenses, which involves "a wrongful taking, obtaining or withholding of another's property" by conduct constituting "obtaining property, money or labor under false pretenses." Idaho Code § 18-2403(2); *State v. Larsen*, 286 P.2d 646, 648 (Idaho

---

[12] We read the statute to cover records obtained from the agricultural production facility and not as implicating records obtained via Idaho's Public Records Act, Idaho Code § 74-101 *et seq*., or other lawful avenues.

1955) (citation omitted) ("[a] false pretense may consist in any act, word, symbol, or token calculated and intended to deceive"). Larceny, which involves the "fraudulent obtaining of personal property, and carrying that property away with the intent permanently to deprive the owner thereof," is also prohibited. *State v. Jesser*, 501 P.2d 727, 736 & n.29 (Idaho 1972). Criminalizing the obtaining of records by misrepresentation is one of a variety of Idaho statutes that protect property rights. Obtaining an agricultural production facility's records by misrepresentation inflicts a "legally cognizable harm" by impairing an agricultural production facility owner's ability to control who can assert dominion over, and take possession of, his property. Additionally, obtaining records through misrepresentation may also infringe on other rights by, for example, exposing proprietary formulas, trade secrets, or other confidential business information to unwanted parties. *See* Idaho Code § 48-801 *et seq.* (prohibiting misappropriation of trade secrets).

The legislative history illustrates how such conduct has harmed, and threatens to harm, agricultural production facility owners. For example, legislators expressed general concern about damage to breeding papers, and one legislator noted an instance in which the breeding papers of a mink ranch were "tossed" into a "pile," "damag[ing] the whole operation." The agricultural industry also expressed concern about the theft of facility records, particularly when such theft leads to the release of a facility's proprietary and confidential information, including divulging locations of genetically engineered crops or valuable research documents for sale to competitors. Although some legislators wanted to silence investigative journalists reporting on the agricultural industry, the full legislative history shows that a

legitimate purpose for enacting the subsection was to prevent harm from damaged or stolen records.

Obtaining records may also bestow a "material gain" on the speaker. *See Alvarez*, 567 U.S. at 723 (plurality opinion). The records may contain confidential information, such as breeding histories of animals and livestock, and other proprietary research and development information valuable to those in the industry. Once disclosed, this information may lose its confidential or proprietary research status.

Acquiring records by misrepresentation results in something definitively more than does entry onto land—it wreaks actual and potential harm on a facility and bestows material gain on the fibber. So unlike subsection (a), subsection (b) does not regulate constitutionally protected speech, and does not run afoul of the First Amendment.[13]

Nor does subsection (b) violate the Equal Protection Clause. The district court determined that the statute was "animated by an improper animus toward animal welfare groups and other undercover investigators in the agricultural industry" and could not survive rational basis review. We agree that animus was one of the motivating factors but disagree as to the conclusion.

Legislation is generally presumed to be valid and will be sustained under the Equal Protection Clause "if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). However, neither "a

---

[13] Because we determine that subsections (b) and (c) do not burden speech protected by the First Amendment, the subsections do not discriminate on the basis of the fundamental right to speech.

bare . . . desire to harm a politically unpopular group" nor "negative attitude[s]" or "fears" about that group constitute a legitimate government interest for the purpose of this review. *Id.* at 448. When a law exhibits a desire to harm an unpopular group, courts will often apply a "more searching" application of rational basis review. *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring); *see also Cleburne*, 473 at 448–50; *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535–38 (1973). When the politically unpopular group is not a traditionally suspect class, a court may strike down the challenged statute under the Equal Protection Clause "if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's enactment." *Mountain Water Co. v. Mont. Dep't of Pub. Serv. Regulation*, 919 F.2d 593, 598 (9th Cir. 1990) (emphasis added); *Moreno*, 413 U.S. at 534.

We invoke searching scrutiny here. Although animus towards particular speech by reporters and activists was one factor driving Idaho's decision to pass the statute, to strike down the law, we must also determine whether the law serves "no legitimate governmental purpose." *Mountain Water Co.*, 919 F.2d at 598. The overall purpose of § 18-7042 is to protect agricultural production facilities from interference by wrongful conduct. As noted, the legislative history relevant to subsection (b) describes situations in which agricultural production facilities have been, or may be, harmed as a result of a misrepresentation leading to the acquisition of records. Idaho's desire to protect against harm relating to an agricultural production facility's most sensitive information—affecting both property rights and privacy interests—is a legitimate government interest. It also bears noting that the penalty provisions for falsely obtaining records under this statute are in line with the

penalties in Idaho's other statutes relating to records and property offenses. *See, e.g.*, Idaho Code §§ 18-2403(2)(d), 18-2407, 18-2408 (theft by false promise); 18-7001 (malicious injury to property); 48-803 (misappropriation of trade secrets). Subsection (b) does not offend the Equal Protection Clause because it does not rest exclusively on an "irrational prejudice" against journalists and activists. *Cleburne*, 473 U.S. at 450.

## C. Idaho Code § 18-7042(1)(c): Obtaining Employment by Misrepresentation

Subsection (c) criminalizes knowingly "[o]btain[ing] employment with an agricultural production facility by . . . misrepresentation with the intent to cause economic or other injury" to the facility's operations, property, or personnel. Almost as though the Idaho legislature drafted this provision with *Alvarez* by its side, this subsection follows the Supreme Court's guidance as to what constitutes a lie made for material gain. Indeed, the plurality in *Alvarez* explicitly stated that "[w]here false claims are made to effect a fraud or secure moneys or other valuable considerations, *say offers of employment*, it is well established that the Government may restrict speech without affronting the First Amendment." 567 U.S. at 723 (emphasis added). The misrepresentations criminalized in subsection (c) fall squarely into this category of speech.

Additionally, subsection (c) limits criminal liability to only those who gain employment by misrepresentation *and* who have the intent to cause economic or other injury to the agricultural production facility, which further cabins the prohibition's scope. Given this clear limitation, we disagree with ALDF that the statute would reach "a person who overstates her education or experience to get a job for which she otherwise would not have qualified, whether the person

is an undercover investigator or not," because the requisite intent to injure would not be satisfied. On the other hand, this subsection would apply to an employee hired with an intent to harm the employer, which, as Idaho points out, is a breach of the covenant of good faith and fair dealing that is implied in all employment agreements in Idaho. *Jenkins v. Boise Cascade Corp.*, 108 P.3d 380, 389–90 (Idaho 2005); *cf. Shackelford v. Shirley*, 948 F.2d 935, 938 (5th Cir. 1991) ("[T]hreats made with specific intent to injure and focused on a particular individual easily fall into that category of speech deserving of no first amendment protection.").

Although it may be true that "[t]he goal of undercover employment-based investigations is not to 'secure moneys or other valuable considerations' for the investigator, but rather to expose threats to the public," ALDF ignores that the Supreme Court singled out offers of employment and that these undercover investigators are nonetheless paid by the agricultural production facility as part of their employment. Of course, this does not mean that every investigative reporter hired under false pretenses intends to harm the employer. That is a critical element that requires proof.

We are also not persuaded by ALDF's arguments that the statute was enacted solely to suppress a specific subject matter or viewpoint. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 (1992). We reject ALDF's argument that the statute's restitution clause is a way to punish journalists and whistleblowers for printing exposés, because we do not interpret the restitution clause to include reputational and publication damages. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988).

The restitution clause requires a court to order a defendant "to make restitution to the victim of the offense . . . in an amount equal to twice the value of the damage

resulting from the violation" of the statute. Idaho Code §§ 18-7042(4), 19-5304. Restitution is made for the "economic loss" to the victim. Idaho Code § 19-5304(1)(a). This includes "the value of property taken, destroyed, broken, or otherwise harmed, lost wages, and direct out-of-pocket losses or expenses, such as medical expenses resulting from the criminal conduct." *Id.* It does not include "less tangible damage such as pain and suffering, wrongful death or emotional distress." *Id.*

That the statute excludes "less tangible damage" such as emotional distress indicates that reputational damages would not be considered an "economic loss," and we are not aware of a case suggesting otherwise. Rather, Idaho case law defines "economic loss" as "tangible out-of-pocket loss" which the victim "actually suffers." *State v. Straub*, 292 P.3d 273, 280 (Idaho 2013). The restitution clause focuses on actual, quantifiable economic loss as opposed to abstract damages such as reputational harm. *See id.* In the absence of Idaho case law to the contrary, we read the statute's restitution clause as excluding reputational and publication damages.[14] *See Berger v. City of Seattle*, 569 F.3d 1029, 1046 (9th Cir. 2009) (en banc) ("[W]here an unconstitutionally broad statute is readily subject to a narrowing construction that would eliminate its constitutional deficiencies, we accept that construction.") (internal quotation marks omitted).

---

[14] On a more basic level, we cannot see how the restitution provision is inevitably viewpoint based. Restitution is pegged to economic loss, not to the view expressed, which could be a positive puff piece or a negative critique. The issue is documented loss, not viewpoint.

The district court erred by granting summary judgment on this ground.

For the same reasons as provided in our analysis of subsection (b), subsection (c) does not violate the Equal Protection Clause because it serves a "legitimate governmental purpose." *Mountain Water Co.*, 919 F.2d at 598. The same property and privacy concerns apply here— employees have access to limited areas of an agricultural production facility and other confidential information that may lead to destruction or serious harm—and Idaho has a legitimate governmental purpose in restricting such employment-seeking misrepresentations. This result follows from *Alvarez*. By establishing that misrepresentations to "secure . . . offers of employment" may be restricted, the Court implicitly recognized that a government interest exists in restricting such speech. *Alvarez*, 567 U.S. at 723. Thus, this subsection has a legitimate governmental purpose beyond an "irrational prejudice" against journalists and activists. *City of Cleburne*, 473 U.S. at 450.

## II. The Recordings Clause—Idaho Code § 18-7042(1)(d)

We now turn to the Recordings Clause, which prohibits a person from entering a private agricultural production facility and, without express consent from the facility owner, making audio or video recordings of the "conduct of an agricultural production facility's operations." Idaho Code § 18-7042(1)(d). The Recordings Clause regulates speech protected by the First Amendment and is a classic example of a content-based restriction that cannot survive strict scrutiny.

We easily dispose of Idaho's claim that the act of creating an audiovisual recording is not speech protected by the First Amendment. This argument is akin to saying that even though a book is protected by the First Amendment, the process of writing the book is not. Audiovisual recordings are protected by the First Amendment as recognized "organ[s] of public opinion" and as a "significant medium for the communication of ideas." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (extending First Amendment protection to movies). Indeed, "[w]e live, relate, work, and decide in a world where image capture from life is routine, and captured images are part of ongoing discourse, both public and private." Seth F. Kreimer, *Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record*, 159 U. Pa. L. Rev. 335, 337 (Jan. 2011).

It is no surprise that we have recognized that there is a "First Amendment right to film matters of public interest." *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). It defies common sense to disaggregate the creation of the video from the video or audio recording itself. The act of recording is itself an inherently expressive activity; decisions about content, composition, lighting, volume, and angles, among others, are expressive in the same way as the written word or a musical score.

Rejecting an argument remarkably similar to Idaho's pitch here, we observed that

> neither the Supreme Court nor [the Ninth Circuit] has ever drawn a distinction between the process of creating a form of *pure* speech (such as writing or painting) and the product of these processes (the essay or artwork) in terms of the First Amendment protection

> afforded. . . . The process of expression
> through a medium has never been thought so
> distinct from the expression itself that we
> could disaggregate Picasso from his brushes
> and canvas, or that we could value Beethoven
> without the benefit of strings and woodwinds.
> In other words, we have never seriously
> questioned that the processes of writing
> words down on paper, painting a picture, and
> playing an instrument are purely expressive
> activities entitled to full First Amendment
> protection.

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010) (determining that the tattooing process is purely expressive activity protected by the First Amendment); *see also ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech."); *Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017) ("The First Amendment protects actual photos, videos, and recordings . . . and for this protection to have meaning the Amendment must also protect the act of *creating* that material.") (emphasis added).  Because the recording process is itself expressive and is "inextricably intertwined" with the resulting recording, the creation of audiovisual recordings is speech entitled to First Amendment protection as purely expressive activity.  *See Anderson*, 621 F.3d at 1062.

The Recordings Clause prohibits the recording of a defined topic—"the conduct of an agricultural production facility's operations."  This provision is an "obvious" example of a content-based regulation of speech because it "defin[es] regulated speech by particular subject matter."

*Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015); *see also United States v. Stevens*, 559 U.S. 460, 468 (2010) (a statute was content-based when it prohibited "visual [and] auditory depiction[s] . . . depending on whether they depict conduct in which a living animal is intentionally harmed" (alterations in original)).  A regulation is content-based when it draws a distinction "on its face" regarding the message the speaker conveys or "when the purpose and justification for the law are content based." *Reed*, 135 S. Ct. at 2228.  The Recordings Clause checks both boxes.  It would permit filming a vineyard's art collection but not the winemaking operation.  Likewise, a videographer could record an after-hours birthday party among co-workers, a farmer's antique car collection, or a historic maple tree but not the animal abuse, feedlot operation, or slaughterhouse conditions.

Problematically, Idaho has effectively eliminated the subject matter of any audio and visual recordings of agricultural operations made without consent and has therefore "prohibit[ed] public discussion of an entire topic." *In re Nat'l Sec. Letter*, 863 F.3d 1110, 1122 (9th Cir. 2017) (internal quotation marks omitted).  And, because the Recordings Clause prohibits the filming of agricultural "operations" but nothing else, its application explicitly pivots on the content of the recording; in other words, only by viewing the recording can the Idaho authorities make a determination about criminal liability.  *See League of Women Voters*, 468 U.S. at 383 (a statute is content-based when "enforcement authorities must necessarily examine the content of the message" to determine whether it complies with the statute).  Here, the statute depends not just on "where they say" the message but also—critically—"on what they say." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014).

As a content-based regulation, the Recordings Clause is constitutional only if it withstands strict scrutiny, meaning it "is necessary to serve a compelling state interest" and "is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Strict scrutiny is "an exacting test" requiring "some pressing public necessity, some essential value that has to be preserved; and even then the law must restrict as little speech as possible to serve the goal." *Turner*, 512 U.S. at 680. As with the Misrepresentation Clauses, Idaho asserts that the Recordings Clause protects both property and privacy interests. Even assuming a compelling government interest, Idaho has not satisfied the narrow tailoring requirement because the statute is both under-inclusive and over-inclusive.

Prohibiting only "audio or video recordings," but saying nothing about photographs, is suspiciously under-inclusive. *City of Ladue v. Gilleo*, 512 U.S. 43, 51 ("[T]hat a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles."). Why the making of audio and video recordings of operations would implicate property or privacy harms, but photographs of the same content would not, is a mystery. This distinction defies the old adage that "a picture is worth a thousand words."

Nor has Idaho explained how limiting the filming of operations, but nothing else, effectuates its interests better than eliminating all audio and video recordings at agricultural production facilities. Presumably, for example, an unauthorized recording of the agricultural production facility's buildings would still implicate Idaho's concerns about property, and the unauthorized filming of an employee birthday party would implicate concerns about privacy. Without some legitimate explanation, we are left to conclude

that Idaho is singling out for suppression one mode of speech—audio and video recordings of agricultural operations—to keep controversy and suspect practices out of the public eye. *Reed*, 135 S. Ct. at 2229 (content-based laws lend themselves to use for "invidious, thought-control purposes"). The district court aptly noted that "[t]he recording prohibition gives agricultural facility owners veto power, allowing owners to decide what can and cannot be recorded, effectively turning them into state-backed censors able to silence unfavorable speech about their facilities."

The Recordings Clause is also over-inclusive and suppresses more speech than necessary to further Idaho's stated goals of protecting property and privacy. *See Lone Star Security and Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1197 (9th Cir. 2016). Because there are "various other laws at [Idaho's] disposal that would allow it to achieve its stated interests while burdening little or no speech," the law is not narrowly tailored. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) (en banc) (applying intermediate scrutiny). For example, agricultural production facility owners can vindicate their rights through tort laws against theft of trade secrets and invasion of privacy. Idaho Code § 48-801 *et seq.* (prohibiting misappropriation of trade secrets); *Taylor v. K.T.V.B., Inc.*, 525 P.2d 984, 985 (Idaho 1974) (outlining the invasion of privacy torts). To the extent the legislators expressed concern that fabricated recordings of animal abuse would invade privacy rights, the victims can turn to defamation actions for recourse. Even still, as *Alvarez* points out, "[t]he remedy for speech that is false is speech that is true"—and not, as Idaho would like, the suppression of that speech. 567 U.S. at 727.

For these reasons, the Recordings Clause cannot survive First Amendment scrutiny and is therefore unconstitutional. In light of this result, we need not analyze the Recordings Clause under the Equal Protection Clause.

In sum, we affirm the district court's grant of summary judgment with respect to §§ 18-7042(1)(a) and (d). We reverse the district court's grant of summary judgment with respect to §§ 18-7042(1)(b) and (c). The permanent injunction should be modified accordingly.

**AFFIRMED IN PART, REVERSED IN PART.**

Each party shall bear its own costs on appeal.

---

BEA, Circuit Judge, dissenting in part and concurring in part:

The majority apparently believes that unconsented entry[1] upon land is not a "legally cognizable harm" where it "merely allows the speaker to cross the threshold of another's property." But as a matter of the applicable Idaho law, such an unconsented entry constitutes a common law trespass, which is a legally cognizable harm—one from which damages are presumed to flow naturally. *Taysom v.*

---

[1] Fraud or misrepresentation vitiates consent. *Green v. Beaver State Contractors, Inc.*, 472 P.2d 307, 307 (Idaho 1970) (finding trespass where defendant obtained permission to cross plaintiff's land by misrepresentation); Restatement (Second) of Torts § 173 (1965); *see also id.*, cmt. b ("A conscious misrepresentation as to the purpose for which admittance to the land is sought, may be a fraudulent misrepresentation of a material fact.").

*Taysom*, 349 P.2d 556, 560 (Idaho 1960) ("Nominal damage need not be proved, but naturally flows from a wrongful entry.").

I dissent because I would hold that the "ability to hold property or to exercise control of it" requires recognition by courts of the owner's right to exclusive possession of the land—the right to exclude anyone from entry, at any time, and for any reason at all or indeed for no reason.[2]  The majority brushes aside this longstanding principle of property in concluding that entry by misrepresentation "does not infringe upon the specific interests trespass seeks to protect."  The majority's result contradicts the "universally held" principle that the "right to exclude" is "a fundamental element of the property right."  *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979).  Whilst the majority opinion relies on out-of-circuit cases which seemingly limit a landowner's rights,[3] but which are distinguishable, I choose to rely on the law of Idaho and the common-law right of property, ages old.

"There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe."  2 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND *2.  For centuries, Anglo-American

---

[2] In a society governed by the Rule of Law, exceptions to the right of the owner to exclusive possession of his land can be made by due process of law, such as court orders and official acts.

[3] The majority cites *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345 (7th Cir. 1995), and *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 517 (4th Cir. 1999)).

law has affirmed this central feature of property—the right to exclude others—in the "general rule" that "our law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (alteration and internal quotation omitted) (quoting *Entick v. Carrington*, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), "a case 'undoubtedly familiar' to 'every American statesman' at the time of the Founding"). The Supreme Court of the United States has repeatedly held that "as to property reserved by its owner for private use, 'the right to exclude others is "one of the most essential sticks in the bundle of rights that are commonly characterized as property."'" *See, e.g., Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (alteration omitted)). I therefore dissent from the majority opinion as to subsection (a) of the Idaho statute at issue. I otherwise concur in the majority opinion.

The majority analyzes this case under *United States v. Alvarez*, in which the Supreme Court invalidated under the First Amendment the Stolen Valor Act, 18 U.S.C. § 704, a federal statute which made criminal false claims that the speaker had received the Congressional Medal of Honor. 567 U.S. 709 (2012). At the outset, it is important to note that subsection (a) of the Idaho statute at issue in this case differs from the version of the Stolen Valor Act at issue in *Alvarez* in at least one crucial aspect: Whereas the Stolen Valor Act prohibited the act of *lying* about a particular subject (receipt of military decorations or medals), 18 U.S.C. § 704, subsection (a) of Idaho's statute prohibits the act of *entering* a particular type of property ("agricultural production facilities") by particular means (including

"misrepresentation"), Idaho Code § 18-7042(1)(a).[4]  By the plain meaning of the statute, liability attaches only to those who "enter[]" an agricultural production facility through lying, not to any and all who tell lies to agricultural facility owners or to the public about such owners.  *Id.*  In other words, subsection (a) of the Idaho statute does not prohibit "pure speech."  Although under *Alvarez* a lie—without "more"—is pure speech,[5] the Idaho statute is directed at something "more": the conduct of knowingly entering an agricultural facility through the use of a lie.  The use of the term "enters" is a clear invocation of the standards and interests of the law of trespass.[6]  This provision no more

---

[4]  Idaho Code § 18-7042 provides that a person commits the misdemeanor crime of "interference with agricultural production" if the person "knowingly" "(a) [i]s not employed by an agricultural production facility and enters an agricultural production facility by force, threat, *misrepresentation*, or trespass" (emphasis added).

[5]  In *Alvarez*, the Supreme Court explicitly distinguished cases of "defamation, fraud, or some other legally cognizable harm associated with a false statement" from cases that confront "a measure, like the Stolen Valor Act, that targets falsity and *nothing more*."  567 U.S. at 719 (emphasis added).

[6]  "One who intentionally *enters* land in the possession of another is subject to liability to the possessor for a trespass, although his presence on the land causes no harm to the land, its possessor, or to any thing or person in whose security the possessor has a legally protected interest."  Restatement (Second) of Torts § 163 (1965) (emphasis added).  The term "enters land" is defined "to include, not only coming upon land, but also remaining on it, and, in addition, to include the presence upon the land of a third person or thing which the actor has caused to be or to remain there."  *Id.* § 158.

regulates pure speech than do prohibitions on larceny by trick or false pretenses.[7]

Therefore, I don't see how *Alvarez* is applicable, or that a First Amendment analysis is at all necessary to subsection (a) of the subject Idaho statute. *See Pickup v. Brown*, 740 F.3d 1208, 1230 (9th Cir. 2014)[8] ("[A]n act that 'symbolizes nothing,' even if employing language, is not 'an act of communication' that transforms conduct into First Amendment speech." (quoting *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126–27 (2011))).[9]    Here, as in

---

[7] For example, in Idaho "[t]heft includes a wrongful taking, obtaining or withholding of another's property . . . committed . . . [b]y deception . . . [or] [b]y conduct heretofore defined or known as . . . common law larceny by trick . . . . [or] obtaining property, money or labor under false pretenses." Idaho Code § 18-2403; *see also* 18 U.S.C. § 1708 ("Whoever . . . by fraud or deception obtains . . . from or out of any mail, post office, or station thereof, letter box, mail receptacle . . . or other authorized depository . . . any article or thing contained therein . . . [s]hall be fined under this title or imprisoned not more than five years, or both.").

[8] In *Pickup*, the plaintiffs brought a First Amendment challenge to California Senate Bill 1172 ("SB 1172"), which banned state-licensed mental health providers from engaging in "sexual orientation change efforts" with patients under 18 years of age. 740 F.3d at 1221. The district court granted a preliminary injunction enjoining enforcement of the law and California appealed. *Id.* at 1222. This court engaged in plenary review, *id.*, upheld SB 1172, *id.* at 1236, and reversed the grant of the preliminary injunction, *id.* The panel found that SB 1172 regulated professional conduct, rather than speech, by banning a certain form of treatment, and so was "subject to deferential review just as are other regulations of the practice of medicine." *Id.* at 1229–31.

[9] In *Carrigan*, the petitioner, the Nevada Commission on Ethics, investigated respondent Carrigan under Nevada's "Ethics in Government" law, which required public officials to recuse themselves

*Pickup* and *Carrigan*, a common law trespass "symbolizes nothing." It seems plain to me that Idaho's political branches could enact a general criminal trespass law that includes in its definition of "trespass" entry obtained by fraud or misrepresentation. *Cf. Rowe v. City of Pocatello*, 218 P.2d 695, 701 (Idaho 1950) ("[T]he city could ban the practice of uninvited intrusion upon private residences . . . The city could . . . merely declare it a misdemeanor."); Idaho Code § 18-2403 (prohibiting theft by deception, trick, or false pretenses). If that is so, I see nothing to prevent Idaho legislators from extending such protection only to certain types of properties, such as nuclear facilities, *see* 10 C.F.R. § 160.3 (prohibiting trespass on "facilities, installations, and real property subject to the jurisdiction . . . of the Nuclear Regulatory Commission."). The relative importance of nuclear facilities and "agricultural production facilities" is in the eyes of the beholder, or, in this case, the Idaho state legislature.

Even assuming that *Alvarez* is applicable here, subsection (a) survives First Amendment review under *Alvarez*. As the majority recognizes, false speech may be criminalized if made "for the purpose of material gain" or

---

from voting on or advocating a vote on matters in which a reasonable person would be materially affected by their private interests. 564 U.S. at 119–20. The Commission concluded that Carrigan violated the law by voting to approve a hotel/casino project in which his campaign manager was involved. *Id.* at 120. The Nevada Supreme Court found the ethics law overbroad, and the U.S. Supreme Court granted certiorari. *Id.* at 121. The Court held that a legislator's vote is "nonsymbolic conduct" and reversed. *Id.* at 127, 129. "[T]he act of voting symbolizes nothing. It *discloses*, to be sure, that the legislator wishes (for whatever reason) that the proposition on the floor be adopted, just as a physical assault discloses that the attacker dislikes the victim. But neither . . . is an act of communication." *Id.* at 126–27.

"material advantage," or if it inflicts a "legally cognizable harm." *Alvarez*, 567 U.S. at 719, 723 (plurality opinion). Similarly, in his concurrence with Justice Kennedy's plurality opinion in *Alvarez*, Justice Breyer distinguished the Stolen Valor Act from presumptively constitutional statutes, such as those prohibiting fraud, impersonation, trademark infringement etc., which prohibit "a subset of lies where *specific harm* is more likely to occur." *Id.* at 734–36 (Breyer, J., concurring) (emphasis added).    To the extent that subsection (a) prohibits misrepresentations as well as entries, I have no difficulty concluding that "enter[ing]" the property of another "by . . . misrepresentation" inflicts a "legally cognizable harm," *Alvarez*, 567 at 719, is done for the purpose of material gain, *id.* at 723, and involves "a subset of lies" where the "specific harm" of trespass "is more likely to occur," *id.* at 736 (Breyer, J., concurring).

The state of Idaho has long recognized that a violation of a property owner's *exclusive* dominion over his land is a legally cognizable harm.  *See Marshall v. Niagara Springs Orchard Co*, 125 P. 208, 212 (Idaho 1912) ("[I]t is the appellant's right by reason of his ownership of the land to have *exclusive* possession of said land." (emphasis added)); *see also Walter E. Wilhite Revocable Living Tr. v. Nw. Yearly Meeting Pension Fund*, 916 P.2d 1264, 1274 (Idaho 1996) ("Trespass is a tort against possession committed when one, without permission, interferes with another's *exclusive* right to possession of the property." (emphasis added)); Idaho Code § 22-2402 (defining "landowner" to mean "[a] person with an interest in a parcel of land such that the person has the right to exclude others from possession of the parcel").

The majority's proposal to count as a "legally cognizable harm" only those trespasses that violate Idaho's *criminal*

code is thus foreclosed by the contrary substantive law of Idaho and other common law jurisdictions. "One who intentionally enters land in the possession of another is subject to liability to the possessor for a trespass, although his presence on the land causes no harm to the land, its possessor, or to any thing or person in whose security the possessor has a legally protected interest." Restatement (Second) of Torts § 163 (1965). To vindicate his right of exclusive dominion, a landowner may recover nominal damages for trespass—even absent evidence of any physical or pecuniary injury—because "[n]ominal damage need not be proved, but naturally flows from a wrongful entry." *Taysom v. Taysom*, 349 P.2d 556, 560 (Idaho 1960); *see also Nelson v. Holdaway Land & Cattle Co.*, 691 P.2d 796, 799 (Idaho Ct. App. 1984) (owner was entitled to recover nominal damages for trespass "even though no actual damages were proven"). Furthermore, a landowner has a general right to exclude others from his lands by reasonable force, under certain circumstances. Restatement (Second) of Torts § 77 (1965). Generally speaking, a landowner can use such reasonable force to defend "his exclusive possession of land" from others for any reason at all, even "personal dislike or hostility to the other." *See id.* cmt. c; *Rowe v. City of Pocatello*, 218 P.2d 695, 700 (Idaho 1950) ("A man's house is still his castle. He may exclude whom he chooses.").

In fact, no less an authority than the Supreme Court of Idaho has found an actionable trespass where the defendant used a misrepresentation to gain access to the plaintiff's property and the defendant merely crossed the property. In *Green v. Beaver State Contractors, Inc.*, the contractor went to plaintiff Lula M. Green and sought permission to enter and remove "lava rock" from her land. 472 P.2d 307, 307 (Idaho 1970). The contractor offered to pay $1 plus 5 cents "per yard of rock removed" from Green's land, and she

agreed. *Id.* at 307–08. In reality, however, the contractor removed rock only from land adjoining Green's land and was merely using Green's land as a means of access to obtain the rock from the third party, thus avoiding any obligation to pay Green for "rock removed." *Id.* at 308. "In view of the circumstances," namely the "misrepresentation . . . by [the contractor]," the Idaho Supreme Court found a common-law trespass and remanded the case for a determination of Green's damages. *Id.* at 310. Therefore, the Supreme Court of Idaho has recognized that employing misrepresentation to gain entry inflicts a legally cognizable harm, even if the invader entered "merely . . . to cross the threshold of another's property."

In the case of *Jacque v. Steenberg Homes, Inc.*, 563 N.W.2d 154 (Wisc. 1997), the Supreme Court of Wisconsin affirmed the value of the right to exclude even more emphatically. It affirmed an eye-popping award of punitive damages for the precise sort of "mere" threshold-crossing that the majority pooh-poohs here. In that case, the defendant, Steenberg Homes, had sold a mobile home to a neighbor of the Jacques, who were retired farmers. It determined that "the easiest route" to deliver the mobile home would be to cut across the Jacques' land. *Id.* at 157. The "only alternative" was to haul the mobile home through a sharply-curved private road which was covered in seven feet of snow at the time. *Id.* Understandably, Steenberg saw a material advantage in "merely . . . cross[ing] the threshold" of the Jacques' property. The Jacques refused permission to haul the mobile home across their land, but Steenberg did so anyway. *Id.* at 157–58. The jury awarded nominal damages of $1 and punitive damages of $100,000, *id.* at 158, and the Supreme Court of Wisconsin, upheld the award in full. *Id.* at 166. Not only did the jury properly award nominal damages because "[t]he law infers some damage from every

direct entry upon the land of another," *id.* at 160 (quoting *Prosser and Keeton on Torts*, § 13 (5th ed. 1984)), the jury also properly awarded punitive damages to vindicate the strong interest of individual landowners and of society in protecting private property from trespass, *id.*

The Idaho trespass statute cited in the majority opinion is not relevant. The majority cites Idaho Code § 18-7008(9) for the proposition that only lands posted with "No Trespassing" signs can be trespassed upon under Idaho law. But while the cited statute so limits actions seeking *criminal* penalties for "willful and intentional[]" trespass, it does not otherwise override or eliminate common law trespass in Idaho.[10] Nor does Idaho Code § 6-202, which provides for treble damages in civil actions for "willful and intentional[]" trespass and also requires posted "No Trespassing" signs:

> [T]he Idaho statutes governing trespass only apply when the trespass is shown to have been wilful and intentional, and the wronged party seeks treble damages therefor, as authorized by Section 6-202. In all other circumstances, the common law principles relating to trespass actions apply. The court is unaware of any recent Idaho cases to the contrary, and the 1976 amendments to the

---

[10] "The common law of England, so far as it is not repugnant to, or inconsistent with, the constitution or laws of the United States, in all cases not provided for in these compiled laws, is the rule of decision in all courts of this state." Idaho Code § 73-116. "[C]hanges in the common law by the adoption of a statute may not be presumed, nor may such changes be accomplished by legislation of doubtful implication. *Indus. Indem. Co. v. Columbia Basin Steel & Iron Inc.*, 93 Idaho 719, 723 (Idaho 1970).

statutes did nothing to alter this interpretation
. . . .

*Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1548 (D. Idaho 1992) (citing *Menasha Woodenware Co. v. Spokane Int'l. Ry.*, 115 P. 22 (Idaho 1911)).[11] Thus, the "imaginations" and "affections" of Idahoans are not so different from those of greater mankind. *See* Blackstone, *supra*. Unauthorized entry upon the land of another is common-law trespass in Idaho and thus a legally cognizable harm.[12]

The majority also argues, based on two out-of-circuit cases, that not all misrepresentations necessarily vitiate consent to entry. The majority cites *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345 (7th Cir. 1995), and *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 517 (4th Cir. 1999). Both *Desnick* and *Food Lion* note, in discussing the common law of various other jurisdictions, that there is no

---

[11] In *Menasha*, the plaintiff alleged that the defendant went on its lands and cut and removed timber. 115 P. at 23. The trial court awarded treble damages and the defendant appealed. *Id.* at 24. The Supreme Court of Idaho reversed the award of statutory treble damages. *Id.* at 24–25. The court read a willfulness requirement into the statute and reversed the award because there was no allegation that the trespass was willful. *Id.* at 24–25. In so doing, however, the court noted that the complaint was "good as an action at common law, entitling the plaintiff to his actual damage," but simply did not meet the statutory requirements for trebled damages. *Id.* at 25. Rather, the court concluded that "the damages recoverable at common law would afford an adequate reparation." *Id.* The court therefore reduced the judgment to provide only actual damages and affirmed the judgment, so modified. *Id.*

[12] Nowhere does *Alvarez* hold that a "legally cognizable harm" must also be a crime. In fact, *Alvarez* points to classic common law injuries—"defamation," "fraud," and "invasion of privacy"—as examples of "legally cognizable harms." 567 U.S. at 719.

consensus on this issue. *Food Lion, Inc.*, 194 F.3d at 517 ("[T]he various jurisdictions and authorities in this country are not of one mind in dealing with the issue."); *Desnick*, 44 F.3d at 1352–53 (noting diversity of results in entry-by-misrepresentation cases and proposing a new rule—of undisclosed origin—to reconcile them); *see also* Restatement (Second) of Torts § 173 cmt. b (1965) (providing that "[a] conscious misrepresentation as to the purpose for which admittance to the land is sought, may be a fraudulent misrepresentation of a material fact" which vitiates consent pursuant to Restatement (Second) of Torts § 892B). As relevant here, however, the law of Idaho is contrary to the *Desnick* and *Food Lion* decisions. *See Beaver State Contractors, Inc.*, 472 P.2d at 310 (finding trespass where defendant entered and crossed the owner's property by misrepresentation). Even if entries such as those at issue in *Desnick* or *Food Lion* (or *Beaver State*) neither damage the premises nor "disrupt" the owner's activities thereon, wrongful entry is nonetheless a "legally cognizable harm" *per se*. *Taysom*, 349 P.2d at 560 ("Nominal damage . . . naturally flows from a wrongful entry.").

Furthermore, there is no suggestion in either *Desnick* or *Food Lion* that the First Amendment prohibits a state court or state legislature from establishing a different rule eliminating consent to enter land when the consent is procured by fraud. *Cf. Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 624 (2003) ("Consistent with our precedent and the First Amendment, States may maintain fraud actions when fundraisers make false or misleading representations designed to deceive donors about how their donations will be used."); *State v. Jesser*, 501 P.2d 727, 737 n.29 (Idaho 1972) ("It has long been settled that fraud vitiates the consent of the victim to the taking of his property by agreement, and that,

consequently, the taking is a constructive trespass upon possession . . . ."); Idaho Code § 18-2403 (prohibiting theft by deception, trick, or false pretenses). If the problem with subsection (a) is that it enacts something different from the substantive law of trespass advocated by a Seventh Circuit or Fourth Circuit panel, any suggestion that those panels have hit upon a "better rule" should be directed to the Idaho legislature. It is Idaho law that governs what constitutes valid consent for a license sufficient to avoid a trespass on Idaho land.

Subsection (a) is also limited to lies which are likely to cause a "specific harm," as Justice Breyer's *Alvarez* concurrence would require. Justice Breyer distinguished the Stolen Valor Act, which prohibited "falsity and nothing more," from various other statutes which prohibit certain false or deceptive communications which cause or are likely to cause a "specific harm." *Alvarez*, 567 U.S. at 734–36 (Breyer, J., concurring). For example, (1) fraud statutes require "actual injury," (2) defamation statutes require a reputational harm, (3) intentional infliction of emotional distress liability requires an "emotional, dignitary, or privacy-related" harm, (4) statutes dealing with perjury or lying to government officials are "typically limited to circumstances where a lie is likely to . . . interfer[e] with the functioning of a government department," (5) impersonation statutes focus "may require" a showing that someone was deceived into following a course of action he would not have pursued but for the deceitful conduct, and (6) trademark infringement statutes are focused on infringement which causes confusion among consumers about the source of a product, and thereby dilutes the value of a trademark. *Alvarez*, 567 U.S. at 734–36 (Breyer, J., concurring). The "specific harm" requirement thus mandates that a prohibition on lies be limited to or "focused on" lies which

are "more likely" to cause a discrete and identifiable type of harm. That is, a generalized prohibition on telling lies about consumer products is overbroad, while a prohibition on lies which are likely to trick consumers into buying a product they would not otherwise buy is not. Unlike the Stolen Valor Act, subsection (a) is limited to lies which are likely to cause a specific harm: invasion of and onto land, or the harm to property owners' right to exclude others. In fact, in this analysis, subsection (a) is even better than Justice Breyer's trademark infringement and impersonation examples because the specific harm *must* occur for liability to attach, rather than just be "more likely" to occur.

Conversely, when one obtains permission to enter onto the land of another, he obtains a material gain: a license to enter. The resulting license is a legally cognizable interest or privilege. *See* Restatement (First) of Property § 512 (1944) ("[T]he word 'license' indicates the legal interest arising from a consent."). It confers the ability to do lawfully that which the law otherwise forbids and punishes as trespass. *Shultz v. Atkins*, 554 P.2d 948, 953 (Idaho 1976) ("[A]n essential element of a license . . . [is] the right to use land in the possession of another."). Take the example, suggested by the Majority's opinion, of the teenager who lies to get a reservation at an exclusive restaurant. The majority admits that the teenager gains *something* (entry to the restaurant) but concludes, without explanation,[13] that "[t]his entry alone does not constitute a material gain." No material

---

[13] Because the majority does not explain how it reaches this conclusion, I assume it is my colleagues' own appraisal of the restaurant's menu.

gain to the teenager?  However one defines "material"[14] and "gain,"[15] it seems a stretch to say the teenager stands to obtain neither at the restaurant.  The majority must imagine the lad served thin gruel indeed for him to have received nothing of "substance," leaving him with a sense of not "getting something" as a result of hoodwinking the *maître d'hôtel*.

Furthermore, if the teenager takes a seat in the restaurant with permission procured by fraud, he commits trespass and is liable for at least nominal damages.  But if he obtains consent, he is able to gain lawful (albeit limited) use of another's land—a discrete, legally cognizable advantage[16] that he did not have before consent was given.  If nothing else, he gains a suspension of the owner's right to expel him from the restaurant by force.  *See* Restatement (Second) of Torts § 77 (1965).

The majority's restaurant analogy merely evades the crucial inquiries under *Alvarez*.  First, "entry alone" is a

---

[14] Material: "1. of matter; of substance . . . physical: a *material* object . . . 2. a. of the body or bodily needs, satisfactions . . . corporeal . . . ." MATERIAL, Webster's New World College Dictionary (5th ed. 2014).

[15] Gain: "1. An increase; addition . . . 2. the act of getting something . . . ."  GAIN, Webster's New World College Dictionary (5th ed. 2014).

[16] Furthermore, as an empirical matter, it is not self-evidently true that interfering only with the right to exclude does not appropriate anything of material value.  *See* Jonathan Klick & Gideon Parchomovsky, *The Value of the Right to Exclude: An Empirical Assessment*, 165 U. Pa. L. Rev. 917 (2017) (finding, based on an empirical analysis of the effect of legislation that recognized a "right to roam" in England and Wales on property values, that "even so-called slight intrusions on owners' exclusion right in favor of more public access . . . come at a real cost to owners").

legally cognizable harm under Idaho law; that is why under Idaho law aggrieved landowners, subjected to a trespass, need not prove unjust enrichment or any other form of damages. *Taysom*, 349 P.2d at 560. Legally *cognizable* harm—not some unknown quantum of physical damage or economic harm to be determined by courts *ex post,* on a case-by-case basis—is what *Alvarez* requires. *Alvarez*, 567 U.S. at 719 (plurality opinion). Second, although "entry alone" may seem insignificant to the majority, it was apparently significant to the *Beaver State* contractor who took the shortcut across Ms. Green's land. *See supra* at 47–48. And in the majority's hypothetical, it is apparently significant to restauranteurs who offer their in-demand tables to "well-known journalists" but not to journalists' teenage sons. Indeed, the teenager *does* cause economic harm in the majority's hypothetical: When he secures one of a limited number of reservations, he takes a valuable table off of the market and puts it to a perhaps economically sub-optimal use (his own). That is, unless his journalist mother has been splendid as to an allowance. Third, the majority's hypothetical does not present a case of entry "by misrepresentation." The *maître d'hôtel* must recognize that the teenager is not his famous journalist mother when the teenager arrives at the restaurant; if he seats the teenager anyway, then the restaurant *consents* to the entry and the teenager does not violate the Idaho statute. Finally, the majority concludes that the teenager's lie is "pure speech." "Nothing but speech," yes; but a lie is seldom "pure." Nonetheless, the Idaho statute criminalizes entries, not lies. *See supra*, at 43.

The majority seems to be concerned—understandably—that the Idaho law's punishments for such trespasses are Draconian or unwise ("the teenager would be subject to punishment of up to one year in prison, a fine not to exceed

$5,000, or both.").  But that concern has nothing to do with whether entry-by-misrepresentation inflicts a legally cognizable harm or provides a material gain—which is to say that it has nothing to do with the *Alvarez* analysis.  That the Idaho statute may take a heavy-handed approach to punishing certain trespasses is a policy argument against the Idaho statute, and that argument should be addressed to Idaho's legislators and voters.

The misconception of the ancient right at stake—the right of an owner of real property to exclude all others from his property—is where the majority goes wrong, as our holding as to subsection (b) demonstrates.  Applying *Alvarez* to subsection (b), the majority finds that "[o]btaining an agricultural production facility's records by misrepresentation inflicts a 'legally cognizable harm' by impairing an agricultural production facility owner's ability to control who can assert dominion over, and take possession of, his property."  Quite right.  The farmer's records are his property.  So is his land his property.  Subsection (a) is constitutional for precisely the same reason: Entering an agricultural production facility by misrepresentation inflicts a "legally cognizable harm" by "impairing an agricultural production facility owner's ability to control who can assert dominion over . . . his [real] property."  There is no meaningful legal distinction between the two subsections under *Alvarez*, and neither is unconstitutional.

I respectfully dissent.